# EXHIBIT B

# STATE OF MICHIGAN
## IN THE 48ᵀᴴ JUDICIAL CIRCUIT COURT FOR ALLEGAN COUNTY

BORREGO ENERGY, LLC, a Delaware limited
liability company, f/k/a BORREGO SOLAR
SYSTEMS, INC., a California corporation,

        Plaintiff

v.

PULLMAN SOLAR, LLC, a Delaware limited
liability company; sPOWER, LLC,  a Delaware
limited liability company; and UNITED STATES
FIRE INSURANCE COMPANY, a Delaware
corporation

        Defendants.

Case No.  # - 24 - 68809 - CK

Honorable  Matthew Antkoviak P-59449

**COMPLAINT**

---

John M. Sier (P39336)
KITCH ATTORNEYS & COUNSELORS, PC
Attorneys for Plaintiff
1 Woodward Ave Ste 2400
Detroit, MI 48226-5485
Phone: 313-965-2915

Richard E. Elder (CA SBN 205389)
Abram P. Petersen (CA SBN 254832)
LUBIN OLSON & NIEWIADOMSKI LLP
Attorneys for Plaintiff
600 Montgomery Street, 14th Floor
San Francisco, CA 94111
Phone: 415-981-0550
Appearing *Pro Hac Vice* (application pending)

**Demand for Jury Trial**

---

# COMPLAINT

Plaintiff, by its attorneys, states the following:

## Parties, Jurisdiction, and Venue

1.     Plaintiff Borrego Energy, LLC ("Plaintiff" or "Borrego") is a Delaware limited liability company, and was formerly known as Borrego Solar Systems, Inc., a California corporation, and has its principal place of business in San Diego, California.

2.     Defendant Pullman Solar, LLC ("Pullman") is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.

3.     Defendant sPower, LLC ("sPower") is Delaware limited liability company with its principal place of business in Salt Lake City, Utah.  Together, Pullman and sPower are referred to as "Owner Defendants."

4.     Defendant United States Fire Insurance Company ("Surety") is a Delaware corporation with its principal place of business in Morristown, New Jersey.  (together, Pullman, sPower, and Surety are referred to as "Defendants."

5.     This Complaint requests relief of more than $25,000, exclusive of interest, costs, and attorneys' fees, and it asserts equitable claims.  As a result, this Court has subject matter jurisdiction.

6.     Venue is proper in the Circuit Court of Allegan County because this dispute arises from the design, engineering, construction, and payment for a utility-scale solar photovoltaic electrical generation facility, including a PV Field, Gen-Tie, and Project Substation (the "Facility") located in the city of Pullman, County of Allegan, State of Michigan, and, according to the EPC Agreement (defined below), any action under the EPC Agreement shall be brought in the "State and federal courts located in the state and county in which the Facility is located…"  Original EPC Agreement, ¶16.7.  **Exhibit 1**.

**Background**

7.      Borrego is an engineering, procurement, and construction contractor.

8.      On December 29, 2020, Pullman and Borrego entered into the Solar Power Facility Engineering, Procuring and Construction Agreement (the "Original EPC Agreement"), **Exhibit 1**, whereby Borrego agreed to act as the general contractor in the design, engineering, and construction of the Facility in exchange for payment from Pullman.

9.      By a separate Guaranty dated contemporaneously with the Original EPC Agreement (the "Guaranty"), **Exhibit 2**, sPower unconditionally, absolutely, and irrevocably guaranteed, on behalf of Pullman, the payment of amounts due under the EPC Agreement to Borrego.  Specifically, the Guaranty provides:

> **1. Payment Guarantee.**  Guarantor hereby unconditionally, absolutely and irrevocably guarantees to Beneficiary on behalf of Obligor, the payment when due of (i) all payment obligations of Obligor and Obligor's successors and assigns due under the EPC, and (ii) payment or reimbursement for all costs, charges and expenses (including reasonable attorneys' fees and expenses) incurred in enforcing Beneficiary's rights under this Guaranty ((i) and (ii) collectively are, the "Guaranteed Obligations"); provided that the obligations of Guarantor shall in no event exceed those of Obligor under the EPC. Any amounts paid by Guarantor shall be made in freely transferable United States currency.

> Guaranty, ¶1.

10.     The Original EPC Agreement was amended by the First Amendment to Solar Power Facility, Engineering, Procurement and Construction Agreement dated December 28, 2022 (the "First Amendment" **(Exhibit 3)**; together, the Original EPC Agreement and the First Amendment are referred to as the "EPC Agreement").  Capitalized terms not otherwise defined herein shall have the same meanings as provided in the EPC Agreement.

11.     The Facility is located at 107th Avenue & 56th Street in Pullman, Michigan.

12.     The nameplate capacity of the Facility is 20 MWAC/26 MWDC measured at the point of interconnection.

13.     The original contract price for the design, engineering, and construction of the Facility was $15,479,969.79.

14.     The EPC Agreement's Change Order provisions (found in Section 7) are typical of solar energy EPC projects, granting Borrego a right to change order relief for force majeure (¶6.4), suspension of work (¶6.5), stop work directives (¶6.6), differing site conditions (¶7.4), owner caused delays (¶7.5), changes in law (¶7.6) and amendments to the relevant power purchase, connection, and/or site control agreements, and other circumstances defined in the EPC Agreement (¶7.2).

15.     Past due amounts accrue interest at Wall Street Journal prime rate +200bps.  EPC Agreement, ¶5.3.

16.     In negotiating the EPC Agreement, Pullman rejected Borrego's offer to procure major equipment including modules, inverters, and racking, choosing to procure that equipment itself.  The EPC Agreement provides that all delays and costs resulting from late delivery of, and other issues with, Owner Furnished Equipment would be Owners' responsibility.  EPC Agreement, ¶3.7; definition of "Owner Caused Delay" at p.10.

17.     In the early stages of the project, Pullman executed Change Orders acknowledging its responsibility for costs and time associated with late deliveries of Owner-Furnished Equipment, and other circumstances where Change Orders were justified or required.

18.     On December 28, 2022, Borrego and Pullman signed a Substantial Completion Certificate whereby Pullman acknowledged that Substantial Completion was achieved with respect to the Facility.  Pursuant to Section 4.5(b) of the EPC Agreement, care, custody, and

control of the Facility passed to Pullman.  The Facility has been operational since before this time and generating revenue for Pullman and its affiliates.

19.     Pullman stopped approving Change Orders and payment applications for things like owner caused delays, differing site conditions from what is reflected in the contract documents, weather delays, and other circumstances justified by the EPC Agreement despite the Change Orders or payment applications being appropriate under the EPC Agreement.  Further, around the time Pullman signed the Substantial Completion Certificate, Pullman stopped making payments to Borrego, even for base scope work and retention, despite further work needing to be done before Final Acceptance.  sPower did not provide any payments due from Pullman under the EPC Agreement as it was required to guarantee under the Guaranty.

20.     Borrego is informed and believes that Pullman withheld payments due under the EPC Agreement in order to financially harm Borrego and force it to accept amounts far less than those required to be paid by Pullman under the EPC Agreement.  After Pullman signed the Substantial Completion Certificate it required further work from Borrego, much of which was not required under the EPC Agreement, and refused to provide final signoff or provide a complete list of legitimate punch list items before it would provide Final Acceptance.  By August 2023, Pullman owed approximately $2 million under the terms of the EPC Agreement.

**COUNT 1 – BREACH OF CONTRACT (EPC Agreement)**

21.     Plaintiff realleges and incorporates paragraphs 1 through 20 as though fully set forth here.

22.     Pullman undertook numerous contractual obligations to Borrego under the EPC Agreement, including but not limited to the obligation to approve Change Orders based on force majeure, suspension of work, stop work directives, different site conditions, owner caused delays,

weather delays, changes in law, and amendments to the relevant power purchase, connection, and/or site control agreements, and other circumstances defined in the EPC Agreements, and to pay Borrego for work Borrego was reasonably required to perform to provide a functional, code-compliant Facility.

23.     By operation of the law, the EPC Agreement also contained implied covenants, imposing on Pullman a duty of good faith and fair dealing in connection with payment for the Facility and Borrego's performance under the EPC Agreement such that Borrego could fulfill its contractual obligations and enjoy the benefits of its bargains.

24.     Borrego has fully performed all obligations it owed to Pullman under the EPC Agreement excepting only those that have been waived or excused by Pullman or by its failure of performance.  At all times, Borrego remained ready, willing, and able to continue performing its contractual obligations to Pullman.

25.     Pullman accepted and took possession of the Facility, and has been receiving revenue from its operation.

26.     Borrego has demanded payment from Pullman for all additional costs and expenses that Pullman is responsible for under the EPC Agreement.

27.     Pullman breached the EPC Agreement and its implied covenants of good faith and fair dealing by, among other things:

   a)   Failing and refusing to approve payment applications and Change Orders provided Borrego;

   b)   Failing and refusing to pay Borrego the outstanding balance owed to Borrego for the full value of the project, including Change Orders and additional costs and expenses incurred by Borrego in the course of completing the services it performed under the EPC Agreement;

c)   Failing and refusing to pay Borrego for additional work that Borrego was reasonably required to perform and costs that Borrego was reasonably required to incur to provide a functional, code-compliant project to overcome conditions caused by Pullman;

d)   Failing to dispute any invoice package or payment application within the time periods and for the reasons specified in the EPC Agreement;

e)   Failing to make progress payments and retention payments due under the EPC Agreement;

f)   Failing to make interest payments due under the EPC Agreement for late payments;

g)   Failing to cure Owner Events of Default, including those for non-payment, pursuant to the terms of the EPC Agreement; and

h)   Withholding money owed to Borrego under the EPC Agreement based on meritless contentions by Pullman for offsets, delay damages, performance liquidated damages, and other improper pretexts.

28.     As a result of Pullman's breaches under the EPC Agreement, Borrego has suffered and incurred monetary damages in excess of $25,000.

WHEREFORE, plaintiff respectfully demands that judgment be entered in its favor and against defendants in an amount in excess of $1,900,000, plus costs, interest, attorney's fees, other damages and any other relief the Court deems just.

## COUNT 2 – BREACH OF CONTRACT (Guaranty)

29.     Plaintiff realleges and incorporates paragraphs 1 through 28 as though fully set forth here.

30. Borrego has fully performed all of its obligations under the EPC Agreement and the Guaranty, but sPower has failed and refused to make payment as required by the Guaranty for the cost of the Facility.

31. By operation of the law, the Guaranty and EPC Agreement also contained implied covenants, imposing on sPower a duty of good faith and fair dealing in connection with payment for the Facility under the Guaranty and EPC Agreement, and Borrego's performance under the EPC Agreement such that Borrego could fulfill its contractual obligations and enjoy the benefits of its bargains. sPower breached these implied covenants to Borrego's detriment in the ways described above.

32. Borrego has also incurred, and continues to incur, reasonable attorneys' fees and expenses to enforce its rights under the Guaranty, for which sPower is liable under the Guaranty.

33. As a result of sPower's breach of its payment obligations under the Guaranty, Borrego has suffered and incurred monetary damages in excess of $25,000 in addition to reasonable attorneys' fees and expenses.

WHEREFORE, plaintiff respectfully demands that judgment be entered in its favor and against defendants in an amount in excess of $1,900,000, plus costs, interest, attorney's fees, other damages and any other relief the Court deems just.

## COUNT 3 – UNJUST ENRICHMENT

34. Plaintiff realleges and incorporates paragraphs 1 through 33 as though fully set forth here.

35. The EPC Agreement and Guaranty dictate that Owner Defendants are responsible for payment of all work and materials that were not included in the work and materials specified in the EPC Agreement.

36.     Owner Defendants also bear contractual responsibility to pay for changes or alterations in the project resulting in extra costs.

37.     At the Owner Defendants' requests, Borrego supplied the Owner Defendants with services, work and materials which were not included in the original scope specified in the EPC Agreement.

38.     The Owner Defendants accepted and directly benefited from these additional services, work, and materials provided by Borrego in good faith, but have now failed and refused to pay Borrego for the value of such services, work, and materials.

39.     As a result, the Owner Defendants have been unjustly enriched in an amount in excess of $25,000 at the expense of the Borrego in violation of the principles of justice, equity, and good conscience and the Owner Defendants' obligations under the relevant contracts and laws of Michigan.

WHEREFORE, plaintiff respectfully demands that judgment be entered in its favor and against defendants in an amount in excess of $1,900,000, plus costs, interest, attorney's fees, other damages and any other relief the Court deems just.

## COUNT 4 – ACTION ON THE LIEN DISCHARGE BOND

40.     Plaintiff realleges and incorporates paragraphs 1 through 39 as though fully set forth here.

41.     Borrego recorded a claim of lien, which was later amended, against certain real property underlying the Facility with Allegan County.

42.     Borrego performed all of the requirements of the Michigan Construction Lien Act necessary to perfect and foreclose its claim of lien or bring suit on the construction lien discharge bond.

43.     Pullman, as principal, and Surety, as surety, provided a lien discharge bond as Bond No. 612416615 (the "Bond") **(Exhibit 4)** in the amount of $3,756,355.46 against Borrego's claim of lien.

44.     Pursuant to the terms of the EPC Agreement, Borrego provided labor and materials for the construction of the Facility.

45.     Borrego has not been paid in full for the labor and materials it provided to the Facility pursuant to the EPC Agreement and relevant change orders.

46.     Because Pullman and sPower failed to pay Borrego the outstanding amount due for labor and materials supplied by Borrego and utilized in the Facility pursuant to the terms of the EPC Agreement, the related change orders, and the Guaranty, Surety is liable as surety for the payment of these sums.

47.     Despite repeated demands by Borrego, Defendants have wrongfully and continually failed and refused to make payment of the amounts due Borrego for the labor and materials supplied to the Facility pursuant to the EPC Agreement and relevant change orders.

48.     Borrego has performed all conditions required for recovery against the Bond and Defendants – contractual, statutory, and otherwise.

49.     There is presently due and owing to Borrego, over and above all legal counter-claims and setoffs, for the labor and materials furnished by Borrego pursuant to the EPC Agreement and related change orders an amount exceeding the Bond.

50.     Pursuant to the terms of the Bond, Surety is the responsible surety for the indebtedness of Pullman to Borrego for the labor and material provided for the Facility pursuant to the EPC Agreement and related change orders.

51.     Upon recording of the Bond, Borrego's remedy under the relevant statute is to

bring suit to satisfy its construction lien claims against the Pullman and Surety on the Bond.

WHEREFORE, plaintiff respectfully demands that judgment be entered in its favor and

against defendants in an amount in excess of $1,900,000, plus costs, interest, attorney's fees,

other damages and any other relief the Court deems just.

WHEREFORE Borrego respectfully prays for relief as follows:

1)     As to Count 1 – Breach of Contract (EPC Agreement), an amount in excess of
       $25,000 for all damages incurred, plus statutory interest thereon until paid in full;

2)     As to Count 2 – Breach of Contract (Guaranty), an amount in excess of $25,000
       for all damages incurred, plus reasonable attorneys' fees and expenses, and
       interest thereon until paid in full;

3)     As to Count 3 – Unjust Enrichment, an amount in excess of $25,000 for all
       damages incurred, plus statutory interest thereon until paid in full;

4)     As to Count 4 – Action on the Lien Discharge Bond, an amount equal to the
       amount of the Bond, plus statutory interest thereon until paid in full;

5)     As to all Counts, such other or further relief as the Court shall deem just, fair,
       equitable, and consistent with the dictates of good conscience.


                              Respectfully submitted,

DATED: April 2, 2024          KITCH ATTORNEYS & COUNSELORS, PC


                      By:     _____
                              John M. Sier (P39336)
                              Attorneys for Plaintiff
                              BORREGO ENERGY, LLC, f/k/a BORREGO
                              SOLAR SYSTEMS, INC.
                              One Woodward Avenue, Suite 2400
                              Detroit, MI 48226
                              (313) 965-2915
                              john.sier@kitch.com

**STATE OF MICHIGAN**
**IN THE 48TH JUDICIAL CIRCUIT COURT FOR ALLEGAN COUNTY**

BORREGO ENERGY, LLC, a Delaware limited
liability company, f/k/a BORREGO SOLAR
SYSTEMS, INC., a California corporation,                     Case No.

    Plaintiff                                         Honorable

v.

PULLMAN SOLAR, LLC, a Delaware limited          **DEMAND FOR JURY TRIAL**
liability company; sPOWER, LLC,  a Delaware
limited liability company; and UNITED STATES
FIRE INSURANCE COMPANY, a Delaware
corporation

    Defendants.

_____

John M. Sier (P39336)
KITCH ATTORNEYS & COUNSELORS, PC
Attorneys for Plaintiff
1 Woodward Ave Ste 2400
Detroit, MI 48226-5485
Phone: 313-965-2915

Richard E. Elder (CA SBN 205389)
Abram P. Petersen (CA SBN 254832)
LUBIN OLSON & NIEWIADOMSKI LLP
Attorneys for Plaintiff
600 Montgomery Street, 14th Floor
San Francisco, CA 94111
Phone: 415-981-0550
Appearing *Pro Hac Vice* (application pending)

_____

## **JURY DEMAND**

NOW COMES Plaintiff, by and through its attorneys, and hereby demands trial

by jury for each count of its complaint.

Respectfully submitted,

DATED: April 2, 2024

KITCH ATTORNEYS & COUNSELORS, PC

By: _____

John M. Sier (P39336)
Attorneys for Plaintiff
BORREGO ENERGY, LLC, f/k/a BORREGO
SOLAR SYSTEMS, INC.
One Woodward Avenue, Suite 2400
Detroit, MI 48226
(313) 965-2915
john.sier@kitch.com

# EXHIBIT 1

*Execution Version*

**SOLAR POWER FACILITY ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT**

by and between

**Pullman Solar, LLC**

and

**Borrego Solar Systems, Inc.**

Dated as of December 29, 2020

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS; INTERPRETATION; EXHIBITS ..........................1

1.1      Defined Terms ..............................................................................1

1.2      Interpretation ..............................................................................15

ARTICLE II       CONTRACTOR RESPONSIBILITIES ...............................15

2.1      General Services of Contractor ...................................................15

2.2      Compliance with Laws ...............................................................15

2.3      Environmental Laws ...................................................................16

2.4      Specific Services of Contractor ..................................................16

2.5      Subcontractors ............................................................................21

2.6      Independent Contractor ...............................................................22

2.7      Security and Safety Procedures ..................................................22

2.8      Quality Assurance Plan ...............................................................23

2.9      Spare Parts ..................................................................................23

2.10     Equipment Labeling .....................................................................23

ARTICLE III      OWNER RESPONSIBILITIES ..........................................23

3.1      Access to Site ..............................................................................23

3.2      Owner's Representative ...............................................................23

3.3      Review of Deliverables ...............................................................23

3.4      Payment of Contract Price ..........................................................24

3.5      Compliance with Laws ...............................................................24

3.6      Permits ........................................................................................24

3.7      Owner-Furnished Equipment ......................................................24

3.8      Coordination with Interconnection Provider ...............................24

3.9      Owner Payment Security .............................................................25

ARTICLE IV      SCHEDULE, COMPLETION, INSPECTION AND PERFORMANCE .........25

4.1      Project Schedule ..........................................................................25

4.2      Contractor Schedule and Reports ...............................................26

4.3      Mechanical Completion ..............................................................27

4.4      Installed Nameplate Capacity Inspection ...................................28

4.5      Substantial Completion ...............................................................28

4.6      Final Acceptance .........................................................................31

i

| | | |
|---|---|---|
| 4.7 | Delay Damages | 33 |
| 4.8 | Performance Tests | 33 |
| 4.9 | Guaranteed Facility Capacity Ratio, Performance Tests and Performance Liquidated Damages | 34 |
| 4.10 | Delay Damages and Performance Liquidated Damages Not a Penalty | 35 |
| 4.11 | Inspection | 36 |
| 4.12 | Work Notwithstanding Disputes | 36 |
| ARTICLE V | COMPENSATION AND PAYMENT | 36 |
| 5.1 | Contract Price | 36 |
| 5.2 | Taxes, Royalties and License Fees | 37 |
| 5.3 | Schedule of Values | 37 |
| 5.4 | Payments Not Acceptance of Equipment or Services | 39 |
| 5.5 | INTENTIONALLY OMITTED | 39 |
| 5.6 | Withholding | 39 |
| 5.7 | Payment and Performance Bonds | 39 |
| 5.8 | Releases and Waivers | 40 |
| 5.9 | Removal of Liens | 41 |
| 5.10 | Set-Off | 41 |
| ARTICLE VI | TITLE; LOSS OR DAMAGE; FORCE MAJEURE | 41 |
| 6.1 | Title | 41 |
| 6.2 | Rights in Drawings, Etc | 41 |
| 6.3 | Risk of Loss | 42 |
| 6.4 | Force Majeure | 42 |
| 6.5 | Suspension of Work | 43 |
| 6.6 | Stop Work Directive | 43 |
| ARTICLE VII | CHANGES | 44 |
| 7.1 | Change Orders | 44 |
| 7.2 | Contractor Proposed Change Orders | 44 |
| 7.3 | Compensation for Change Orders | 45 |
| 7.4 | Differing Site Conditions | 45 |
| 7.5 | Owner Caused Delay | 45 |
| 7.6 | Change in Law | 45 |
| ARTICLE VIII | WARRANTIES | 46 |

106910544.22 0081519-00002

| | | |
|---|---|---|
| 8.1 | Warranties | 46 |
| 8.2 | Warranty Period | 46 |
| 8.3 | Remedies | 46 |
| 8.4 | Warranty Exclusions | 47 |
| 8.5 | Subcontractors' and Vendors' Warranties | 48 |
| 8.6 | NO IMPLIED WARRANTIES | 48 |
| ARTICLE IX | LIMITATIONS ON LIABILITY | 49 |
| 9.1 | Aggregate Limit of Liability | 49 |
| 9.2 | Direct Damages Only | 49 |
| 9.3 | Intent | 49 |
| ARTICLE X | INDEMNIFICATION | 50 |
| 10.1 | Contractor Indemnity | 50 |
| 10.2 | Intellectual Property Indemnity | 50 |
| 10.3 | Environmental Indemnity | 51 |
| 10.4 | Owner's Indemnity | 51 |
| 10.5 | Defense of Claims | 51 |
| ARTICLE XI | INSURANCE | 52 |
| 11.1 | Contractor Insurance | 52 |
| 11.2 | Subcontractor Insurance | 54 |
| 11.3 | Additional Requirements | 54 |
| 11.4 | Builders All-Risk Insurance | 55 |
| ARTICLE XII | DEFAULT AND REMEDIES; TERMINATION | 56 |
| 12.1 | Owner Events of Default | 56 |
| 12.2 | Contractor Events of Default | 57 |
| 12.3 | Contractor Remedies Upon Owner Event of Default | 58 |
| 12.4 | Owner Remedies Upon Contractor Event of Default | 58 |
| 12.5 | Termination for Convenience | 59 |
| 12.6 | Mitigation Upon Breach | 60 |
| 12.7 | Termination Prior to NTP | 60 |
| ARTICLE XIII | ASSIGNMENT | 60 |
| 13.1 | General | 60 |
| 13.2 | Permitted Assignments | 60 |
| ARTICLE XIV | REPRESENTATIONS | 61 |

iii

DocuSign Envelope ID: C73955B1-FAB9-4EB7-BE41-DF5DD8329AA5

14.1    General Representations and Warranties ................................................. 61

14.2    Additional Representations and Warranties of Contractor .................. 61

14.3    Title Company Representations ................................................................ 62

14.4    Financing Assistance ................................................................................... 62

ARTICLE XV   NOTICES; INFORMATION ................................................................. 63

15.1    Notices .......................................................................................................... 63

15.2    Technical Communications ....................................................................... 64

15.3    Public Announcements ............................................................................... 64

ARTICLE XVI MISCELLANEOUS ................................................................................. 64

16.1    Entire Agreement ....................................................................................... 64

16.2    Waiver .......................................................................................................... 64

16.3    Dispute Resolution ..................................................................................... 64

16.4    Confidentiality ............................................................................................ 65

16.5    Signage ......................................................................................................... 66

16.6    Governing Law ............................................................................................ 66

16.7    Consent to Jurisdiction ............................................................................. 66

16.8    Waiver of Jury Trial ................................................................................... 66

16.9    Time of Performance .................................................................................. 67

16.10   Construction ................................................................................................ 67

16.11   Headings ...................................................................................................... 67

16.12   Status of the Parties ................................................................................... 67

16.13   Parties in Interest ....................................................................................... 67

16.14   Further Assurances ..................................................................................... 67

16.15   Amendments ............................................................................................... 68

16.16   Severability .................................................................................................. 68

16.17   Conflicting Provisions ............................................................................... 68

16.18   Survival ........................................................................................................ 68

16.19   Counterparts ............................................................................................... 68

106910544.22 0081519-00002

DocuSign Envelope ID: C73955B1-EAB9-4EB7-BE41-DF5DD8329*A5

## **EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | The Facility |
| Exhibit B-1 | - | Contractor's Scope of Work (PV Field) |
| Exhibit B-2 | - | Scope of Work (Project Substation) |
| Exhibit B-3 | - | SLUP Conditions Responsibility Matrix |
| Exhibit C-1 | - | Contractor Permits |
| Exhibit C-2 | - | Owner Permits |
| Exhibit D | - | Contractor's Security and Safety Procedures |
| Exhibit E-1 | - | Schedule of Values |
| Exhibit E-2 | - | Cost Segregation Categories |
| Exhibit F-1 | - | Form of Partial Conditional Lien Waiver |
| Exhibit F-2 | - | Form of Partial Unconditional Lien Waiver |
| Exhibit F-3 | - | Form of Full Conditional Waiver |
| Exhibit F-4 | - | Form of Full Unconditional Waiver |
| Exhibit G | - | Project Schedule |
| Exhibit H | - | Form of Change Order |
| Exhibit I | - | Site Description and Constraints Map |
| Exhibit J | - | Mechanical Completion Certificate |
| Exhibit K | - | Substantial Completion Certificate |
| Exhibit L | - | Final Acceptance Certificate |
| Exhibit M-1 | - | Form of Lien Waiver Tracker |
| Exhibit M-2 | - | Reserved |
| Exhibit M-3 | - | Form of Invoice |
| Exhibit M-4 | - | Form of Performance Bond |
| Exhibit M-5 | - | Form of Payment Bond |
| Exhibit M-6 | - | Form of Title Company Indemnity Agreement |
| Exhibit M-7 | - | Reserved |
| Exhibit M-8 | - | Sworn Construction Statement |
| Exhibit N | - | Contractor's Quality Assurance Plan |
| Exhibit O | - | List of Owner Preapproved Suppliers and Subcontractors |
| Exhibit P | - | Spare Parts |
| Exhibit Q | - | Post-Energization Harmonics Measurement Test |
| Exhibit R-1 | - | Performance Testing (PV Field) |
| Exhibit R-2 | - | MV Collection System Cables Test |
| Exhibit R-3 | - | Project Substation Commissioning Plan |
| Exhibit R-4 | - | Gen-Tie Commissioning Test |
| Exhibit S-1 | - | List of Required Deliverables (PV Field) |
| Exhibit S-2 | - | List of Required Deliverables (Project Substation) |
| Exhibit T | - | Manufacturer Warranties |
| Exhibit U | - | Form of Warranty Assignment Agreement |
| Exhibit V | - | Form of Assignment Clause |
| Exhibit W | - | Contractor's Key Personnel |
| Exhibit X | - | Form of Progress Report |
| Exhibit Y | - | Schedule of Owner-Furnished Equipment and Owner Documents |
| Exhibit Z | - | Site Control Documents |

106910544.22 0081519-00002

DocuSign Envelope ID: C73055B1-FAB9-4EB7-BE41-DE5DD3329AA5

| | | |
|---|---|---|
| Exhibit AA | - | Final Environmental Documents |
| Exhibit BB | - | Power Purchase Agreement |
| Exhibit CC | - | Interconnection Agreement |
| Exhibit DD | - | Owner-Furnished Equipment Agreement Installation Instructions and Technical Specifications |
| Exhibit EE | - | Redacted Inverter Skid Purchase Agreement |
| Exhibit FF | - | Redacted Tracker Purchase Agreement |
| Exhibit GG | - | Owner-Furnished Equipment Responsibility Matrix |
| Exhibit HH | - | Solar Device Naming Convention |
| Exhibit II | - | Form of LNTP 1 |
| Exhibit JJ | - | Form of Owner Payment Security |

DocuSign Envelope ID: C73055B1-FAB9-4EB7-BE41-DF5DD8329A45

## SOLAR POWER FACILITY ENGINEERING,
## PROCUREMENT AND CONSTRUCTION AGREEMENT

This SOLAR POWER FACILITY ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT (this "Agreement"), dated as of December 29, 2020 (the "Effective Date"), is entered into by and between Borrego Solar Systems, Inc., a California C Corp corporation ("Contractor"), and Pullman Solar, LLC, a Delaware limited liability company ("Owner"), with reference to the following matters:

### RECITALS

WHEREAS, Owner owns, leases, or otherwise controls certain real property, as more fully described in Exhibit I hereto, for the purpose of constructing and operating an on-site solar photovoltaic facility.

WHEREAS, Contractor designs, constructs and installs photovoltaic facilities and as such is able to design, engineer and construct the Facility (defined below) and all the necessary ancillary systems to produce electric energy.

WHEREAS, Owner desires to retain Contractor to provide, and Contractor desires to provide, complete fixed-price turnkey design, engineering, permitting, procurement, construction and installation of the Facility, as set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Contractor, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### DEFINITIONS; INTERPRETATION; EXHIBITS

1.1     Defined Terms.  Capitalized terms used in this Agreement without other definition shall have the meanings specified in this Section 1.1, unless the context requires otherwise.

"Additional Insureds" has the meaning set forth in Section 11.1(i)(1).

"Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with such first Person.  For purposes of this definition and the Agreement, the term "control" (and correlative terms) means the right and power, directly or indirectly through one or more intermediaries, to direct or cause the direction of substantially all of the management and policies of a Person through ownership of voting securities or by contract, including, but not limited to, the right to fifty percent (50%) or more of the capital or profits of a partnership or, alternatively, ownership of fifty percent (50%) or more of the voting stock of a corporation.

"Agreement" has the meaning set forth in the preamble to this Agreement and shall include all Exhibits hereto.

"ALTA-1" means ALTA/NSPS Land Title Survey PLMN - ALTA Survey with Gentie (Mark-up) v200630 for Pullman Solar Energy Generation Project dated June 30, 2020, a copy of which Contractor acknowledges has been provided by Owner to Contractor.

"Articles" means Articles I through XVI of this Agreement.

"As-Built Drawings" has the meaning set forth in Exhibit B-1 and Exhibit B-2.

"Availability Guarantee" has the meaning set forth in Exhibit R-1.

"Availability Test" has the meaning set forth in Exhibit R-1.

"Bulk-Power System Order" means the Executive Order on Securing the United States Bulk-Power System, issued on May 1, 2020 by the President of the United States of America, and any rules, regulations, guidance, publications or pronouncements issued pursuant thereto from time to time.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banking institutions in New York are not open for the transaction of normal banking business.

"Capacity Test" has the meaning set forth in Exhibit R-1.

"Change in Law" means the enactment, adoption, promulgation, modification (including a change in interpretation by a Governmental Authority) or repeal of any applicable Law or Permit after the Effective Date, excluding any Laws relating to (i) income Taxes, duties, or import fees for which Contractor is required to pay under this Agreement, (ii) any change in a Permit directly or indirectly caused by the negligent acts or omissions of or the failure to comply with any Legal Requirement or Permit by a Contractor Indemnified Party, any Subcontractor or any of their Affiliates, and (iii) the organization, existence, good standing, qualification, or licensing of Owner and Contractor or their Affiliates or Subcontractors in any jurisdiction.

"Change Order" means a written order signed by Owner and Contractor authorizing a change in the Work and, to the extent authorized under the terms of this Agreement, an adjustment in the completion dates for performance or delivery of the Work (which, for the avoidance of doubt, shall include the Project Schedule, the Guaranteed Mechanical Completion Date and Guaranteed Substantial Completion Date, as applicable).and the Contract Price.

"Claims" has the meaning set forth in Section 10.1.

"Commercial Operation Date" means that the Facility has achieved commercial operation in accordance with the terms of the Power Purchase Agreement.

"Commercial Tolerance" means 0.001% of the Expected Capacity in AC.

"Completion Cost" means the total (and reasonably documented) expenses actually incurred by Owner in completing the Work, including (i) all reasonably incurred amounts charged by any replacement contractor to finish the Work based on the obligations such replacement contractor assumes under this Agreement and under any of Contractor's subcontract(s) or other

2

contractual agreement(s) that Owner elects to have assigned to such replacement contractor, plus, to the extent accrued as of the date of termination of this Agreement due to a Contractor Event of Default, any Delay Damages that are not being disputed in good faith by Contractor, payable to the Owner pursuant to this Agreement, (ii) additional reasonable and necessary overhead incurred by Owner to effect such takeover and to complete the Work, and (iii) any termination and cancellation charges Owner is assessed by third parties resulting from Owner's termination of Contractor.

"Constraints Map" means the Constraints Exhibit by Metro Consulting Associates depicting the Facility overlay as of the Effective Date, attached as Exhibit I.

"Contract Documents" means this Agreement together with all Exhibits referenced or attached, Design Documents and any Change Orders.

"Contract Price" has the meaning set forth in Section 5.1.

"Contractor" has the meaning set forth in the preamble to this Agreement.

"Contractor Event of Default" has the meaning set forth in Section 12.2.

"Contractor Indemnified Parties" means (i) Contractor, (ii) any Affiliate of a Person described in clause (i), and (iii) any director, officer, shareholder, partner, member, manager, agent or employee of a Person described in clause (i) or (ii).

"Contractor Permits" has the meaning set forth in Section 2.4(g).

"Contractor Personnel" means Contractor's employees, consultants, independent contractors, agents and representatives.

"COVID-19" has the meaning set forth in Section 14.2(d).

"Critical Path Item" shall mean any activity included in the Project Schedule set forth in Exhibit G, the delay of which would result in a delay in the Contractor's achieving the Guaranteed Dates; provided that to the extent that Project Schedule is later modified by Change Order or Amendment to this Agreement, the analysis of the Critical Path Items will be based on the Project Schedule, as amended.

"Delay Damages" has the meaning set forth in Section 4.7.

"Design Documents" means documents and Legal Requirements relating to the design and construction of the Facility including the design basis documents referred to in Exhibit B-1 and Exhibit B-2, Geotechnical Report(s), the Owner provided Engineering Basemap, the Constraints Map, pre-construction and post-construction hydrology reports, Final Environmental Documents, Owner Permits, Owner Documents, Contractor Permits, Environmental Laws, IFP Plans, IFC Plans, the Facility Model referred to in Exhibit R-1, structural calculations, electrical calculations, technical studies (including those listed in Exhibit S-1, Exhibit S-2 ), Equipment design manuals, Equipment installation manuals, Equipment warranties, Equipment specifications, Interconnection Provider requirements identified in the Interconnection Agreement and applicable tariffs,

3

requirements identified in the Power Purchase Agreement, Prudent Industry Standards, Legal Requirements, and the Contract Documents.

"Direct Costs" means actual and verifiable (and reasonably documented) direct cost of labor (including home office labor directly performing the Work), support labor, material, equipment, services, tools, supplies, subcontracts, jobsite facilities, utilities, Taxes (other than income Taxes), permits, insurance, bonds, jobsite general conditions costs, jobsite overhead, and jobsite staffing necessary to perform the Work, plus ten percent (10%) of the foregoing amounts for overhead and profit; *provided* that, for the avoidance of doubt, "Direct Costs" shall not include profit or overhead (other than jobsite overhead), except for the ten percent (10%) for overhead and profit specifically set forth above.

"Disclosing Party" has the meaning set forth in Section 16.4.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Environmental Law" means any and all present and future Laws and any amendments thereto (whether common law, public law, rule, order, regulation, or otherwise), directives, judgments, and other requirements promulgated or entered into by any Governmental Authority relating to the environment, human health, public safety, protected animal or plant species, cultural resources, preservation or reclamation of natural resources, or to the management, handling, use, generation, treatment, storage, transportation, disposal, manufacture, distribution, formulation, packaging, labeling, Release or threatened Release of or exposure to Hazardous Materials, whether now existing or subsequently amended or enacted and in effect, including but not limited to: CERCLA, 42 U.S.C. § 9601, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Emergency Planning and Community Right to Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., and any similar or implementing state or local Law, all amendments or regulations promulgated thereunder; and any applicable standard of conduct under any common law doctrine, including but not limited to, negligence, nuisance, or trespass, personal injury, or property damage related to or arising out of the presence, Release, or exposure to Hazardous Materials.

"Equipment" means all of the equipment, materials, apparatus, structures, supplies and other goods required to complete the Work and to be incorporated into the Facility as described in Exhibit B-1, Exhibit B-2 as well as any other equipment, materials, apparatus, structures, supplies and other goods required to complete the Facility in accordance with the requirements of this Agreement, including Owner-Furnished Equipment. Equipment shall not include any materials, apparatus or tools owned by Contractor or any Subcontractor that are used to complete the Work but are not contemplated under this Agreement to become part of the Work.

"Equipment Bill of Sale" has the meaning set forth in Section 5.2.

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DF5DD8329AA5

"Equipment Documentation" means copies or originals of (i) all operating specifications, warranties and other similar information obtained by Contractor from equipment vendors or prepared by Contractor as part of the design, construction and/or installation services provided by Contractor hereunder, (ii) a complete inventory list of all Equipment comprising the Facility, and (iii) all documentation and identification information with respect to all Equipment comprising part of the Facility, including the equipment listed in Exhibit B-1, but excluding with respect to Owner-Furnished Equipment.

"Exhibits" means the Exhibits comprising part of this Agreement.

"Expected Capacity" means the expected capacity of the Facility as set forth in Exhibit A.

"Facility" means the PV Field, Gen-Tie and Project Substation set forth on Exhibit A, including its integrated assemblies of Equipment to be located at the Site and to be interconnected with the Interconnection Provider, as more specifically described in Exhibit A.

"Facility Lender" means any lenders or other third parties (including cash equity and Tax equity providers) providing Financing, and any trustee or agent acting on their behalf.

"Final Acceptance" has the meaning set forth in Section 4.6.

"Final Acceptance Certificate" means a notice in the form attached as Exhibit L delivered by Contractor to Owner pursuant to Section 4.6(b) indicating that, in Contractor's opinion, the Facility has satisfied the requirements for Final Acceptance.

"Final Acceptance Date" means the date on which the Facility achieves Final Acceptance pursuant to Section 4.6(b), as set forth in a Final Acceptance Certificate.

"Final Environmental Documents" means the documents listed in Exhibit AA.

"Financing" means any construction financing, term financing or equity financing or other credit support provided by any Facility Lender in connection with the Facility.

"Force Majeure Event" means the occurrence of any act or event that delays or prevents a Party from timely performing its obligations under this Agreement or from complying with conditions required under this Agreement if such act or event, despite the exercise of reasonable efforts, cannot be avoided by, and is beyond the reasonable control of and without the fault or negligence of, the Party relying thereon as justification for such delay, nonperformance, or noncompliance, which includes, to the extent that the foregoing conditions are satisfied, an act of God or the elements, Unsuitable Weather Conditions, weather conditions for the relevant area that are sufficient to cause work stoppage for safety reasons or other stoppage to avoid catastrophic results, explosion, fire, epidemic (including COVID-19), landslide, mudslide, sabotage, terrorism, lightning, earthquake, flood, volcanic eruption or similar cataclysmic event, an act of public enemy, war, blockade, civil insurrection, riot, civil disturbance, strike or other labor difficulty and labor disputes that are national or regional in scope, or actions or failures to act of any Governmental Authority that are national or regional in scope.  However, financial cost or difficulties alone or as the principal factor shall not constitute grounds for a claim of a Force

5

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DE5DD8329AA5

Majeure Event. Notwithstanding anything in the foregoing to the contrary, Force Majeure Events shall not include any of the following:

(a)     mechanical or equipment failures (except to the extent such events or conditions themselves are caused by a Force Majeure Event);

(b)     any condition at the Site for which the affected Party is responsible under this Agreement including but not limited to lost Equipment or damage to the Site;

(c)     increases in the cost of performance of a Party's obligations under this Agreement, and changes in market conditions, other than increased costs incurred in responding to a Force Majeure Event;

(d)     delays in customs clearance;

(e)     any labor disturbance, strike or dispute specific to Contractor's or any Subcontractor's workers or personnel or specific to the Site;

(f)     any delay in obtaining, inability or failure to obtain, suspension, non-renewal or cancellation of, any Permit to the extent caused or provoked by the Contractor's failure to timely submit a final, complete Permit application, renew such Permit, or provide any requested responses thereto in accordance with Prudent Industry Standards (except to the extent such delays themselves are caused by a Force Majeure Event);

(g)     any concealed or latent natural subsurface condition at the Site whether or not it is identified in a Geotechnical Report;

(h)     any surface or subsurface structures, materials, properties or conditions having historical, cultural, archaeological, religious or similar significance that are identified in the Permits or the Exhibits attached to this Agreement;

(i)     any habitat of an endangered or protected species as provided in applicable Law that were identified in the Permits or the Exhibits attached to this Agreement; and

(j)     any Change in Law including but not limited to the imposition of, or increase of, any Taxes, fees or duties imposed on Equipment.

"Gen-Tie" means the overhead 46kV transmission line commencing at the Project Substation and terminating at Interconnection Provider's Scott Lake substation.

"Gen-Tie Commissioning Test" means the tests to verify the performance of the Gen Tie described in Exhibit R-4.

"Geotechnical Report" means the Final Geotechnical Report_ by Mott MacDonald dated July 13, 2020 a copy of which Contractor acknowledges has been provided by Owner to Contractor.

"Good Utility Practice" means, with respect to the performance by Contractor of its

obligations under this Agreement, the practices, methods and acts engaged in or approved by a significant portion of the solar power industry in the same region as the Facility that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that should reasonably have been known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent with applicable Law, regulation, codes, standards, equipment Manufacturer's recommendations, reliability, safety, environmental protection, economy and expedition. With respect to Contractor's obligations under this Agreement, Good Utility Practice includes, but is not limited to, taking reasonable steps to ensure that:

(a)     Equipment (other than Owner-Furnished Equipment), materials, resources and supplies are available to meet the Contractor's obligations under this Agreement;

(b)     the Equipment (other than Owner-Furnished Equipment) will function properly under both normal and emergency conditions at the Facility;

(c)     appropriate monitoring and testing as set forth in the Scope of Work are performed to ensure the Facility (including all Equipment) is functioning as designed;

(d)     to the extent Contractor is obligated to operate the Facility under this Agreement, the equipment is not operated in a negligent manner, or in a manner unsafe to workers, the general public, or contrary to applicable Law or regulations or without regard to defined limitations such as flood conditions, safety inspection requirements, operating voltage, current, frequency, polarity, synchronization, and/or control system limits;

(e)     Equipment will operate at its expected performance level; and

(f)     Contractor's performance of its obligations under this Agreement complies, in all material respects, with the requirements of each of the Interconnection Agreement, the Power Purchase Agreement, the Site Control Documents and all Permits.

"Governmental Authority" means any national, regional or local government, any political subdivision thereof, or any governmental, quasi-governmental, regulatory, judicial or administrative agency, utility, authority, commission, board or similar entity having jurisdiction over the performance of the Work, the Facility or their operations, or the Site or otherwise over any Party, including the Interconnection Provider, the Federal Energy Regulatory Commission, the North American Electric Reliability Corporation, and any local, state or federal authority having jurisdiction.

"Guaranteed Facility Capacity Ratio" has the meaning set forth in Exhibit R-1.

"Guaranteed Dates" means the Guaranteed Mechanical Completion Date and the Guaranteed Substantial Completion Date.

"Guaranteed Mechanical Completion Date" means, with respect to the Facility, April 5, 2022, as such date may be adjusted pursuant to this Agreement.

"Guaranteed Substantial Completion Date" means, with respect to the Facility, May 31, 2022, as such date may be adjusted pursuant to this Agreement.

7

"Hazardous Material" means (i) any asbestos and any asbestos containing material; (ii) any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Law or any other applicable Law as a "hazardous substance," "hazardous material," "hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity or Toxicity Characteristic Leaching Procedure (TCLP) toxicity; (iii) any petroleum and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources; and (iv) any petroleum product, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive material (including any source, special nuclear, or by-product material), medical waste, chlorofluorocarbon, lead or lead-based product, and any other substance whose presence could be detrimental to the Site or hazardous to health or the environment.

"Hydrology Report" means the Pullman Solar Hydrology & Drainage Study_ by Mott McDonald dated July 10, 2020, a copy of which Contractor acknowledges has been provided by Owner to Contractor

"Independent Engineer" means an engineering firm with experience in the design and construction of solar energy projects selected and retained by Owner or any Facility Lenders.

"Installed Nameplate Capacity" has the meaning set forth in Section 4.4.

"Interconnected" and "Interconnection" means the Facility is connected to the Interconnection Provider's transmission system.

"Interconnection Agreement(s)" means, collectively, the Facilities Agreement by and between the Owner and the Interconnection Provider dated as of February 6, 2020 and the Generator Interconnection & Operating Agreement for Category 3-5 Projects with Aggregate Generator Output of Greater than 150kW by and between the Owner and Interconnection Provider dated as of February 6, 2020,  as it may be amended or assigned on one or more occasions, a copy of which is attached hereto as Exhibit CC.

"Interconnection Provider" means Consumers Energy Company.

"Interest Rate" means an annual rate equal to the lesser of (a) the "prime rate" (as published in the Wall Street Journal) from time to time plus two percent (2%), and (b) the highest rate permitted by applicable Law.

"Inverter Spec Document" has the meaning set forth in Section 3.7.

"Invoice Package" has the meaning set forth in Section 5.3(b).

"ITC" means the investment tax credit under Section 48 of the Internal Revenue Code.

"Law" means any constitution, charter, act, statute, law, including any Environmental Law, ordinance, code, rule, regulation, order, or other legislative or administrative action of any Governmental Authority or a final decree, judgment or order of a court or tribunal, including the

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DE5DD8329EA5

requirements set forth in engineering, construction, electrical, safety and similar codes and standards.

"Legal Requirement" means the requirements of any Law, including any Environmental Law, Tax, the Power Purchase Agreement, the Interconnection Agreement, the Site Control Documents, or any Permit.

"Limited Notice to Proceed" or "LNTP" has the meaning set forth in Section 4.1(a).

"Liquidated Damages Cap" has the meaning set forth in Section 9.1.

"LNTP Scope of Work" means any procurement, pre-construction, design and engineering services or other portions of the Work described in any LNTP that may be issued by Owner.

"Major Equipment" has the meaning set forth in Section 8.1.

"Major Subcontract" has the meaning set forth in Section 2.5(c).

"Major Subcontractor" means any Subcontractor who is a party to a Major Subcontract.

"Manufacturer" means the manufacturer of each piece of Equipment.

"Measured Capacity" has the meaning set forth in Exhibit R-1.

"Mechanical Completion" has the meaning given in Section 4.3(b).

"Mechanical Completion Certificate" means the notice in the form attached as Exhibit J delivered by Contractor to Owner pursuant to Section 4.3(c) indicating that, in Contractor's opinion, the Facility has satisfied the requirements for Mechanical Completion.

"Mechanical Completion Date" means the date on which the Facility achieves Mechanical Completion, as set forth in a Mechanical Completion Certificate.

"Metered Facility Capacity Ratio" has the meaning set forth in Exhibit R-1.

"Minimum Facility Capacity Ratio" has the meaning set forth in Exhibit R-1.

"MV Collection System" means the means the portion of the Facility comprising the 12.47 kV medium voltage AC circuits and associated communication circuits extending from the inverters to the 12.47 kV connection at the Project Substation.

"MV Collection System Cables Test" means the test of the MV Collection System set forth in Exhibit R-2.

"MWAC" means AC (nameplate) megawatt.

"MWDC" means DC (peak) megawatt.

"Notice to Proceed" or "NTP" has the meaning set forth in Section 4.1(b).

"Offtaker" means Consumers Energy Company.

"Operating Manual" has the meaning set forth in Section 2.4(m).

"Owner" has the meaning set forth in the preamble to this Agreement.

"Owner Caused Delay" means a failure (other than (i) any failure excused by a Force Majeure Event, (ii) any failure that does not materially delay Contractor's performance of any item of Work, and (iii) any failure related to a breach by Contractor of its obligations under this Agreement) by Owner to perform any of its obligations under this Agreement, including without limitation (a) any failure by Owner to achieve any of the critical path items that are the responsibility of Owner under this Agreement, including the timely delivery of the Owner-Furnished Equipment in accordance with Exhibit GG and the Phasing and Logistics Plan and timely acquisition of Owner Permits, (b) any failure to ensure sufficient on site Owner representatives when requested by Contractor for testing observation; (c) any delays (whether by Owner, or Interconnection Provider or any other Person other than Contractor or any Subcontractor) with respect to construction or completion of any Upgrades necessary for interconnecting the Facility or any telemetry required for the Facility, and (d) any event or circumstance that is identified in this Agreement as an Owner Caused Delay.

"Owner Documents" means the documents identified on Exhibit Y.

"Owner Event of Default" has the meaning set forth in Section 12.1.

"Owner-Furnished Equipment" means the Equipment identified in Exhibit Y.

"Owner-Furnished Equipment Agreement" means any agreement for the purchase and sale of Owner-Furnished Equipment between Owner or its Affiliate and the Manufacturer of any Owner-Furnished Equipment.

"Owner Guarantor" means the Person providing a guaranty or other security as Owner Payment Security.

"Owner Indemnified Parties" means (i) Owner and the Facility Lenders, (ii) any Affiliate of a Person described in clause (i), and (iii) any director, officer, shareholder, partner, member, manager, agent or employee of a Person described in clause (i) or (ii).

"Owner Payment Security" means a guaranty in the form of Exhibit JJ to be provided by Owner Guarantor on the Effective Date.

"Owner Permits" has the meaning set forth in Section 3.6.

"Owner's Representative" means the employee of Owner (or Owner's Affiliate) designated by Owner in accordance with Section 3.2 to act as Contractor's primary point of contact.

"Parties" means Owner and Contractor.

"Party" means Owner or Contractor.

"Payment Bond" has the meaning set forth in Section 5.7(a).

"Performance Bond" has the meaning set forth in Section 5.7(a).

"Performance Liquidated Damages" shall have the meaning set forth in Section 4.9(b).

"Performance Tests" means the Availability Test, the Capacity Test, the MV Collection System Cables Test, the Gen-Tie Commissioning Test, and the Post Energization Harmonics Measurement Test as described in Exhibit R-1, Exhibit R-2, Exhibit R-4, and Exhibit Q, respectively.

"Permits" means all permits, licenses, authorizations, consents, orders, waivers, franchises, registrations, variances, extensions, filings, notifications, certificates, exemptions and approvals and other authorizations obtained from or made with any Governmental Authority, including all applicable conditions as set forth in Exhibit B-3.

"Person" means any individual, limited liability partnership, limited liability company, partnership, corporation, association, joint stock company, business, trust, estate, joint venture, unincorporated organization, government or political subdivision thereof, governmental agency or other entity.

"Phase 1 ESA" means the Phase I Environmental Site Assessment for the Pullman Solar Project by Environmental Consulting & Technology, Inc. dated September 2, 2020 a copy of which Contractor acknowledges has been provided by Owner to Contractor.

"Phasing and Logistics Plan" means the detailed plan and schedule for delivery of Owner-Furnished Equipment and performance by Contractor of related obligations, to be developed and agreed by the Parties after the Effective Date.

"POCO" means the point where ownership of the Facility changes from the Owner to the Interconnection Provider as defined in the Interconnection Agreement.

"Post-Energization Harmonics Measurement Test" means the procedures, testing and analysis of the Facility set forth in Exhibit Q.

"Power Purchase Agreement(s)" means the Power Purchase Agreement dated October 24, 2019 by and between Owner and Offtaker, as it may be amended or assigned on one or more occasions, a copy of which is attached hereto as Exhibit BB.

"Professional Engineer" means a professional engineer licensed by the Michigan Department of Licensing and Regulatory Affairs (LARA) - Bureau of Professional Licensing.

"Project Manager" means the Project Manager designated by Contractor pursuant to Section 2.4(f).

"Project Schedule" means the schedule for the Work attached hereto as Exhibit G.

"Project Substation" means the electrical substation described on Exhibit A, Exhibit B-2,

DocuSign Envelope ID: C73955B1-EAB9-4EB7-BE41-DF5DD83294A5

and <u>Exhibit S-2</u> including, but not limited to its integrated assemblies of switchgear, breakers, disconnect switches, fuses, current transformers, potential transformers, capacitor banks, reactors, Protection and Control System, SCADA system, TELECOM backboard, DC batteries and charger, emergency generator with automatic transfer switch, structural steel, dead end structure, control wiring, 600V wiring, conduits and trenches, equipment concrete foundations, revenue meters, check meters, bus-bar extension, terminations, grounding system, lightning masts, fencing, primary and redundant fiber/copper extension from existing control room, access roads, lightning arrestors/protection, service station power, lighting, security, and signage to be located at the Site.

"<u>Proprietary Interest</u>" has the meaning set forth in <u>Section 10.2(a)</u>.

"<u>Prudent Industry Standards</u>" means, with respect to Contractor's performance of its obligations under this Agreement, at a particular time, in the exercise of reasonable judgment in light of the facts known, or that should have been known, at the time a decision was made, those practices, standards, designs, methods, means, techniques, equipment and acts that would require a Person to: (a) perform its duties in good faith and as a reasonably prudent contractor and in compliance with applicable Law and applicable Permits, (b) perform its duties in compliance with the requirements of the Interconnection Agreement, the Power Purchase Agreement and the Site Control Documents in all material respects, (c) perform its duties in compliance with Good Utility Practices, (d) exercise such care, skill and diligence as a reasonably prudent business company of established reputation engaged in the solar energy business would exercise in the conduct of its business and for the advancement or protection of its own interest (e) perform the duties in accordance with applicable solar energy industry standards, taking into account the requirements to qualify for the ITC, (f) use sufficient and properly trained and skilled personnel, and (g) use parts and supplies that meet the specifications set forth in the Interconnection Agreement, the Power Purchase Agreement and the Site Control Documents, in all cases with respect to (a) through (g) herein, taking into account all of the costs, expenses and benefits of construction and ownership of the Facility.

"<u>Punchlist</u>" means the list of Work uncompleted upon the achievement of Substantial Completion for the Facility, the lack of which or the failure of which to complete (considered individually and in the aggregate) does or will not adversely affect the safe, reliable, normal and continuous operation of the Facility in compliance with the requirements of this Agreement, Legal Requirements and Prudent Industry Standards.

"<u>PV Field</u>" means solar photovoltaic energy generation system and its integrated assemblies of Equipment to be located at the Site including, but not limited to the photovoltaic modules, racking, inverters, wiring, the MV Collection System, and disconnect switches up to the list the point of demarcation for the PV Field Work (e.g., the Gen-Tie).

"<u>Racking Spec Document</u>" has the meaning set forth in <u>Section 3.7</u>.

"<u>Receiving Party</u>" has the meaning set forth in <u>Section 16.4</u>.

"<u>Release</u>" or "<u>Released</u>" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, or dumping of a

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DF5DD8329AA5

Hazardous Material into soil, surface water, ground water, land surface, subsurface strata, ambient air, wildlife, plants or other natural resources.

"Relevant Matter" has the meaning set forth in Section 11.3(k).

"Remedial Action Plan" has the meaning set forth in Section 4.2(b).

"Retainage" has the meaning set forth in Section 5.3(d).

"Schedule of Values" means the schedule of values set forth in Exhibit E-1, according to which the Contractor earns progress payments against the Contract Price during the Work in accordance with the provisions of Section 5.3.

"Scope of Work" means the Scope of Work attached hereto as Exhibit B-1 and Exhibit B-2.

"Site" means the real property on which the Facility will be located as further described in Exhibit I.

"Site Conditions" has the meaning set forth in Section 7.4.

"Site Control Documents" means (i) the site control documents and related forms and requirements set forth in Exhibit Z, copies of which Contractor acknowledges have been provided by Owner to Contractor, and (ii) leases, easements, access agreements and other real property documents relating to the Site entered into by Owner or its Affiliates after the Effective Date and which are provided to Contractor by Owner.

"Spare Parts" has the meaning set forth in Section 2.9.

"Subcontractor" means any Person with whom Contractor enters into an arrangement for the performance of the Work or for the supply of services or Equipment to Contractor, including Persons at any tier with whom any Subcontractor has further subcontracted any part of the Work or supply of services or Equipment, and the legal or personal representatives, successors, and assigns of such Person.

"Substantial Completion" has the meaning set forth in Section 4.5(a).

"Substantial Completion Certificate" means a notice in the form attached as Exhibit K delivered by Contractor to Owner pursuant to Section 4.5(b) indicating that, in Contractor's opinion, the Facility has satisfied the requirements for Substantial Completion.

"Substantial Completion Date" means the date on which the Facility achieves Substantial Completion, as set forth in a Substantial Completion Certificate.

"SWPPP" means the approved Stormwater Pollution Prevention Plan and all applicable rules and requirements of the National Pollutant Discharge Elimination System permit.

"System Warranty Period" has the meaning set forth in Section 8.2.

13

DocuSign Envelope ID: C73955B1-FAB9-4EB7-BE41-DF5DD8329AA5

"Target Capacity" has the meaning set forth in Exhibit R-1.

"Tax" means any federal, state, local, or foreign tax, charge, duty, fee, levy or other assessment, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, import duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, imposed by any taxing or Governmental Authority, and including any interest, penalty, or addition thereto, whether disputed or not or in respect to failure to comply with any requirement concerning Tax Returns.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, required to be filed with any Governmental Authority, including any schedule or attachment thereto and including any amendment thereof.

"Unsuitable Weather Conditions" means the following conditions at the Site that delay or prevent Contractor from timely performing Critical Path Items: (a) Heat Index above 110 degrees Fahrenheit; (b) Wind Chill Factor below 0 degrees Fahrenheit; (c) Instances where performance of Work is reasonably deemed unsafe and impracticable by Contractor's safety officer due to weather related conditions that are not within Contractor's control and are not caused by the acts or omissions of Contractor; or (d) a National Weather Service warning is in effect for any of the following conditions: (i)Winter Storm Warning – Heavy snow of 6" or more in a 12 hr. period, or 8" of snow in 24 hrs., or sleet of 1/2 " or more; (ii) Ice Storm Warning – Ice accumulations of ¼" or more; (iii) Blizzard Warning – Blizzard conditions for at least three hours; (iv) Tornado Warning – A Tornado Warning is issued when a tornado is imminent; (v) Standing accumulation of snow 10" or more or rainfall of ½" or more; or (vi) Lighting Storms.

"Upgrades" means the interconnection upgrades as defined in the Interconnection Agreement including, but not limited to, the interconnection facilities, distribution upgrades and network upgrades.

"Warranty Period" means the System Warranty Period or the Workmanship Warranty Period, as applicable.

"Work" means all work to be performed by Contractor under this Agreement, including, except as explicitly excluded, engineering and design, procurement, construction and erection, installation, training, start-up (including calibration, inspection and start-up operation), and testing with respect to the Facility on a turnkey basis as more fully set forth in Exhibit B-1 and Exhibit B-2. Work includes, except as explicitly excluded (i) all labor, materials, equipment, services and any other items to be used by Contractor or its Subcontractors in the prosecution of this Agreement, wherever the same are being engineered, designed, procured, manufactured, delivered, constructed, installed, trained, erected, tested, started-up or operated during start-up and testing and whether the same are on or are not at the Site; (ii) all supervision and administration; and (iii) all related items which would be required of an engineering, procurement and construction contractor of projects of comparable size and design acting in accordance with Prudent Industry Standards which are necessary for the Facility to operate in accordance with the terms of this

14

Agreement, the Power Purchase Agreement, the Interconnection Agreement, the Site Control Documents and all applicable Legal Requirements.  Contractor shall be responsible for providing any and all additional items and services which are not expressly included by the terms of this Agreement and which are required for construction and commercial operation of the Facility.  The Work shall not include (x) any Upgrades beyond the POCO which will be constructed by the Interconnection Provider pursuant to the Interconnection Agreement and (y) the procurement and delivery of the Owner-Furnished Equipment.

"Work Product" has the meaning set forth in Section 6.2.

"Workmanship Warranty Period" has the meaning set forth in Section 8.2.

1.2    Interpretation.  As used in this Agreement, the terms "herein," "herewith" and "hereof" are references to this Agreement, taken as a whole, the terms "includes" or "including" shall mean "including, without limitation," and references to a "Section," "Article" or "Exhibit" shall mean a Section, Article or Exhibit of this Agreement, as the case may be, unless in any such case the context requires otherwise.  All references to a given Exhibit, agreement, instrument or other document shall be a reference to that Exhibit, agreement, instrument or other document as modified, amended, supplemented and restated through the date as of which such reference is made.  A reference to a Person includes its permitted successors and permitted assigns.  The singular shall include the plural, and the masculine shall include the feminine and neuter, and vice versa.  Unless expressly specified otherwise, "day" means a calendar day.  The expression "and/or" shall connote "any or all of."

## ARTICLE II

## CONTRACTOR RESPONSIBILITIES

2.1    General Services of Contractor.  Contractor shall, on a fixed-price turnkey basis, and except as explicitly excluded, design, engineer, permit, procure all Equipment (other than Owner-Furnished Equipment), construct, erect, install, start-up, commission and test the Facility, perform all obligations set forth in the Scope of Work and perform related activities for the successful completion of the Work and the delivery of the Facility and associated documentation in compliance with the Contract Documents.  The Parties understand that Contractor is obligated to perform all tasks required by the Scope of Work or reasonably implied by the Scope of Work to be necessary to deliver to Owner the completed and fully operational Facility meeting the requirements of the Contract Documents.  All Work performed by Contractor and all Subcontractors shall be performed in accordance with good engineering design practices, sound construction procedures, Legal Requirements and Prudent Industry Standards.

2.2    Compliance with Laws.  Throughout the performance of all aspects of the Work, Contractor shall, at Contractor's sole cost, comply with, and shall ensure that each Subcontractor complies with, all Legal Requirements. If Contractor fails to perform the Work in compliance with all Legal Requirements, including performance of or lack of performance of any activities described in the Permits, Contractor shall include as part of the Work, all activities and additional Work necessary to bring the Facility back into compliance with the Legal Requirements to the satisfaction of the Governmental Authorities, including any additional Work and increased

15

permitting requirements that may be required by a Governmental Authority after the Effective Date related to Contractor's failure to comply with the Legal Requirements, all at Contractor's expense. The Parties acknowledge and agree that all activities under this Agreement which are required to be performed by a Michigan licensed engineer shall be performed by either a Professional Engineer employed directly by Contractor, or by a Professional Engineer retained by Contractor through a subcontract.

      2.3   <u>Environmental Laws</u>.  Throughout performance of the Work, Contractor shall comply, and shall ensure that each Subcontractor complies with, all Permits and Environmental Laws applicable to the Work. Without limiting the generality of the foregoing, Contractor shall not: (i) Release or permit the Release of Hazardous Materials brought on to the Site or generated at the Site by Contractor or a Subcontractor in connection with the Work, or (ii) negligently Release or exacerbate the Release of pre-existing Hazardous Materials or Hazardous Materials brought to the Site by Owner, and shall, if any such Hazardous Materials are so Released, remediate and prevent the spread of such Hazardous Materials.  In the event Contractor encounters material reasonably believed to be a Hazardous Material on the Site, Contractor shall immediately (i) stop work in the affected area and notify Owner of the condition and (ii) submit a plan for Owner's approval for remediating such Hazardous Material.  Upon approval of such plan by Owner, Contractor shall remediate such Hazardous Material in accordance with the approved plan and shall thereafter resume work in the affected area. Contractor is entitled to a Change Order including an adjustment to the Contract Price and/or Guaranteed Dates to reflect the effect of such remediation on the completion of the Work except (x) if the Hazardous Materials were brought on to the Site or generated at the Site by Contractor or a Subcontractor; (y) to the extent that the cost of or time for remediating Hazardous Materials are increased due to delays in commencing remediation or other mishandling or exacerbation of the remediation by Contractor or a Subcontractor; and/or (z) to the extent that any preexisting Hazardous Materials or Hazardous Materials brought to the Site by Owner are negligently Released by Contractor or a Subcontractor.

      2.4   <u>Specific Services of Contractor</u>.  Without limiting the generality of <u>Section 2.1</u>, Contractor shall perform all of the following specific tasks in accordance with the Scope of Work in order to achieve Mechanical Completion, Substantial Completion and Final Acceptance for the Facility in accordance with this Agreement:

      (a)   <u>Supply and Procurement of Equipment</u>.  Contractor shall procure or supply and pay for all of the Equipment (except for Owner-Furnished Equipment), shall arrange and pay for the delivery of all Equipment (except for Owner-Furnished Equipment) to the Site, and shall arrange and pay for the unloading and storage of all of the Equipment (including Owner-Furnished Equipment) at the Site. With respect to each Equipment supply agreement that (i) relates to inverters, wire, disconnects, foundation piles, transformers, SCADA, combiner boxes, racking equipment or mounting equipment or (ii) provides for payments in excess of $250,000, the Contractor shall provide Owner with an opportunity to comment on drafts of such Equipment supply agreement (with pricing information redacted) and Contractor shall use commercially reasonable efforts to incorporate any of Owner's comments received by Contractor (but only to the extent such Owner comments are received within seven (7) days of such Equipment supply agreement being delivered to Owner).  No later than forty-five (45) days after the Effective Date, the Parties shall develop and agree upon the Phasing and Logistics Plan.

DocuSign Envelope ID: C73955B1-EAB9-4EB7-BE41-DF5DD8329AA5

(b)    <u>Engineering and Design</u>.  Contractor acknowledges and agrees that the Scope of Work sets forth Owner's minimum design requirements for the Facility and the separate components, systems, items of Equipment, processes, and other portions of the Work.  Except as explicitly excluded, Contractor shall at its own expense design and provide engineering services with respect to the Facility in a manner that shall be:

(1)    consistent with the actual conditions existing at the Site;

(2)    consistent with the requirements set forth in the Scope of Work;

(3)    consistent with the requirements of the Power Purchase Agreement, Interconnection Agreement and Site Control Documents;

(4)    sufficient, complete and adequate in all respects necessary to enable the Facility (A) to satisfy the requirements of Mechanical Completion and Substantial Completion by the Guaranteed Mechanical Completion Date and the Guaranteed Substantial Completion Date, respectively, (B) to satisfy the requirements of all applicable Permits, and (C) to successfully interconnect with the Interconnection Provider; and

(5)    in conformance with applicable Legal Requirements and Prudent Industry Standards.

Contractor shall provide all design and engineering drawings to Owner for its review. Owner shall have the right, but not the obligation, to review all design and engineering drawings, ask related questions and provide comments and shall do so in accordance with the timelines set forth in <u>Exhibit G</u>, or if no timeline is set forth on <u>Exhibit G</u>, within seven (7) Business Days of receipt.  Contractor shall consider, but shall have no obligation to accept, Owner's comments; *provided however*, that (i) Owner may direct Contractor to make such changes to the design and engineering of the Facility as Owner reasonably believes are necessary by issuing a Change Order and (ii) Contractor shall address any comments which demonstrate that such drawings are not in compliance with the requirements of this Agreement.  Unless required to comply with applicable Legal Requirements or Prudent Industry Standards, Contractor shall be entitled to an adjustment in the Contract Price and/or the Guaranteed Dates in the event that the original design conformed to the Scope of Work and the change directed by Owner increases the cost of the Work or Contractor's time of performance or both.  No such review or requested changes (including review or acceptance of the Inverter Spec Document) shall impose any liability on Owner (other than to make payment in accordance with any applicable Change Order) or relieve Contractor of any of its ultimate responsibility for the design, engineering and performance of the Facility as provided in this Agreement.

(c)    <u>Construction and Installation</u>.  Contractor shall provide, install, complete and pay for all labor, Equipment (excluding Owner-Furnished Equipment), tools, supplies, construction equipment and machinery, utilities and consumables, transportation and other facilities and services (including any temporary materials, equipment, supplies and facilities) necessary for the proper execution and completion of the Work, except that Owner shall pay for

106910544.22 0081519-00002

and cause delivery of the Owner-Furnished Equipment that will be visually inspected, off loaded, distributed, stored, secured and installed by Contractor.  All construction and installation performed by Contractor under this Agreement shall be in accordance with the given Manufacturer's written instructions and the specific instructions of the Manufacturer's representative, unless otherwise agreed by Owner in advance in writing, sound construction procedures, Prudent Industry Standards and all Legal Requirements.

(d)    Utilities.  Contractor shall provide and pay for all utilities used or required at the Site in connection with the construction, installation, start-up, commissioning, Substantial Completion and Final Acceptance of the Facility.

(e)    Equipment Training.  As a condition to achieving Final Acceptance, Contractor shall provide Owner with all Equipment Documentation for the Facility.  As a condition to achieving Substantial Completion, Contractor shall provide Owner's (or its operator's) personnel with up to five (5) days of on-site training in the use and operation of the Equipment (other than Owner-Furnished Equipment) incorporated into the Facility, including the location and operation of all disconnects and grounding necessary for safe operation of the Equipment and the Facility.

(f)    Project Management.  Exhibit W contains a list of Contractor's key personnel and their respective positions.  Contractor shall not replace any of the key personnel in the positions listed in Exhibit W without the prior written consent of Owner, which consent shall not be unreasonably withheld.  Contractor's Project Manager shall act as Contractor's liaison with Owner and shall have the authority to administer this Agreement on behalf of Contractor and bind Contractor.  Contractor's Project Manager shall have overall day-to-day responsibility for managing and directing the performance of the Work and shall issue and receive communications on Contractor's behalf under this Agreement.  In addition to the key personnel required hereunder, Contractor's construction management staff shall include site engineering staff, contract administration staff, project controls, construction specialists, safety, environmental and quality control personnel, and such other personnel as Contractor may require to manage the performance of the Work.

(g)    Permits.  Contractor shall obtain, before required under any Law, including Environmental Law, and maintain in full force and effect and pay for (including but not limited to all inspection costs, bond costs, application fees and processing fees) the following Permits (the "Contractor Permits"):  (i) all the Permits listed in Exhibit C-1, (ii) all other Permits necessary for Contractor and any Subcontractor to do business in the jurisdiction where the Facility is located and the Work is to be performed, and (iii) all other Permits required to be obtained to perform the Work, including all Permits required to be obtained in the name of Owner with respect to the Work or the construction, commissioning, start-up, testing, or energization of the Facility, excluding the Owner Permits.  Notwithstanding the foregoing, Contractor shall not be required to obtain the Owner Permits.  Contractor shall promptly provide Owner with copies of all Contractor Permits upon Contractor's obtaining such Contractor Permits.  In order to assist Contractor in obtaining the Contractor Permits, Owner shall provide Contractor with such reasonable assistance as Contractor may request.  Contractor shall conduct the Work in compliance with the Permits and shall be responsible for the satisfaction of all conditions set forth in the Permits except to the extent otherwise indicated on Exhibit C-1 or Exhibit C-2.

18

DocuSign Envelope ID: C73955B1-EAB9-4EB7-BE41-DF5DD83294A5

(h)    Security; Safety.  Contractor shall be responsible for the security of the Work and all materials and Equipment prior to Substantial Completion and shall coordinate with Owner for the ingress and egress of Contractor's personnel to and from the Site.  Contractor shall comply with, and require all Subcontractors to comply with, the security and safety procedures set forth in Exhibit D.

(i)    Local and General Conditions.  Contractor acknowledges and agrees that it has satisfied itself as to the general and local conditions and circumstances affecting the Work, including technical information and requirements, conditions affecting transportation, disposal, handling and storage of materials at the Site, availability and conditions of roads, availability of housing, climatic conditions and seasons, physical conditions at the Site, topography and ground surface materials to be encountered, Permits delivered by Owner to Contractor prior to the Effective Date, geotechnical conditions as described in the Geotechnical Report, the Owner Documents, the Site Conditions, the Constraints Map, and equipment and facilities needed for performance of the Work, construction, installation or operation of the Facility.  Contractor shall only use the entrances to the Site specified by the Owner for ingress and egress of all personnel, Equipment, and vehicles.  Contractor shall perform the Work consistent and in accordance with Owner's rights under the Site Control Documents and Owner's real property rights in and to the Site to the extent Owner has brought any restrictions or specific requirements to Contractor's attention. Subject to the provisions of Section 7.4, Contractor's failure to acquaint itself with the general or local condition or circumstances affecting the Work existing as of the Effective Date shall neither relieve it from the responsibility for successfully performing this Agreement, nor entitle Contractor to an adjustment to the Contract Price and/or Project Schedule.

(j)    Other Activities.  Contractor shall not (i) create or place, or suffer to exist, any liens, security interests or other encumbrances on the Facility, the Equipment or the Site arising out of the performance of the Work other than mechanic's liens or similar liens or security interests arising by operation of Law for the sole purpose of securing Owner's obligation to pay Contractor for Work performed hereunder, provided that Contractor complies with its obligations under Section 5.9 with respect thereto, or (ii) except as expressly provided in this Agreement without the express prior written consent of Owner, take any action that is permitted for Owner or exercise any right or remedy of Owner under the Power Purchase Agreement, Interconnection Agreement or the Site Control Documents.

(k)    Ownership of Green Attributes.

(i)    Contractor acknowledges that Owner shall own, and may assign or sell in its sole and absolute discretion, all right, title and interest in all green attributes, renewable energy credits, production, ITCs, investment and/or energy Tax credits (or grants in lieu of) and/or any other environmental financial incentives or similar financial rebates or incentives associated with or resulting from the development, installation and ownership of the Facility or the production, sale, purchase or use of the energy output of the Facility.  If any such incentives are initially credited to or treated as owned by Contractor, Contractor shall cause, to the extent permissible under applicable Law, such incentives to be assigned or transferred to Owner without delay or otherwise pay to Owner the financial benefit of any such incentives obtained by Contractor.

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DF5DD8329AA5

(ii)     Contractor shall provide reasonable assistance to Owner in the preparation and submittal of all documents necessary to participate in or obtain any governmental, Offtaker, or other third-party payments or incentives available to Owner and/or Offtaker in respect of the Facility or the sale of electric power generated therefrom.   Contractor shall provide reasonable assistance to Owner in Owner's efforts to meet the requirements for any certification, registration, or reporting program relating to environmental attributes or incentives, including providing cost breakdowns for all portions of the Work necessary for Owner's cost segregation report including the cost categories in <u>Exhibit E-2</u>.

(l)     <u>Condition of the Site</u>.   Contractor shall at all times comply with all requirements of Owner and Legal Requirements with respect to the use, occupancy and condition of the Site, including use of parking areas by Contractor and any Subcontractors, location and maintenance of storage and laydown areas used by the Contractor, and shall maintain the Site and all other areas used by the Contractor free from accumulation of waste material or rubbish, and shall, prior to Final Acceptance, remove any rubbish from the Site and all tools, scaffolding, equipment and unused materials.   Contractor shall leave the Work and the Site in a clean, neat and workmanlike condition.

(m)     <u>Operating Manual</u>.   On or before the Substantial Completion Date for the Facility, Contractor shall deliver to Owner an operation and maintenance manual for the Facility (the "<u>Operating Manual</u>") which shall contain all instruction manuals and special directions provided by equipment manufacturers or vendors and all information necessary and appropriate for the start-up, operation, maintenance and repair of the Facility, including complete equipment and system instructions and procedures for the start-up, operation, maintenance and repair of the Facility.   The Operating Manual shall be consistent with Prudent Industry Standards and Legal Requirements.

(n)     <u>Deliverables</u>.   Contractor shall timely provide to Owner all deliverables and written materials required to be delivered hereunder and as set forth in <u>Exhibit S-1</u> and <u>Exhibit S-2</u>.

(o)     <u>Owner-Furnished Equipment</u>.   In accordance with the timeframes and protocols set out in <u>Exhibit DD</u> through <u>Exhibit GG</u>, Contractor shall (i) perform a visual inspection of and inventory the Owner-Furnished Equipment following delivery of such Owner-Furnished Equipment to the Site, and provide Owner with notice of any defects thereof, in a manner to allow Owner to reject any defective Owner-Furnished Equipment or notify the supplier of any equipment shown on a shipping manifest but not delivered pursuant to the terms of any Owner-Furnished Equipment Agreement, which Contractor acknowledges have been provided to Contractor, and (ii) perform any other obligations of Owner or its Affiliates under the Owner-Furnished Equipment Agreements as set forth in <u>Exhibit DD</u> through <u>Exhibit GG</u> and to the extent directly relating to the inspection, acceptance, rejection or installation of the Owner-Furnished Equipment, including, without limitation, any such obligations necessary to preserve the warranty rights of Owner or its Affiliates thereunder.

(p)     <u>Commissioning Plan</u>.   As required by Section 6 of <u>Exhibit B-1</u>, simultaneous with submittal of its IFP plan (as set forth in <u>Exhibit B-1</u>), Contractor shall prepare and submit for Owner's approval, Contractor's commissioning plan for testing the Facility,

including the PV Field, Project Substation and MV Collection System, and all Equipment and subsystems, for proper operation.  Within ten (10) Business Days after Owner's receipt of the Contractor's commissioning plan, Owner shall either (i) notify Contractor that it approves such commissioning plan or (ii) submit requested changes to such commissioning plan to Contractor, except that if Owner requires additional time for review, then Owner shall provide Contractor written notice of the need for such additional time during the ten (10) Business Day period recited above, and Contractor shall grant Owner the additional time required by Owner for such review.  In the event Owner submits requested changes to such commissioning plan, Contractor shall endeavor to incorporate such reasonably requested changes in a revised commissioning plan until Owner approves Contractor's commissioning plan, such approval not to be unreasonably withheld or delayed.  No such review, requested changes or approval by Owner shall impose any liability on Owner or relieve Contractor of any of its ultimate responsibility for the design, engineering and performance of the Facility as provided in this Agreement.

2.5     Subcontractors.  Contractor may employ Subcontractors for the performance of portions of the Work, provided that Contractor obtains Owner's prior written approval of such Subcontractors providing mechanical, electrical or civil Work as well as Equipment vendors, which approval shall not be unreasonably withheld or delayed; *provided* that it shall be reasonable for Owner to withhold from Contractor approval for any Subcontractor that would violate the Bulk-Power System Order.  A list of Subcontractors preapproved by Owner is set forth in Exhibit O.  Contractor shall be fully responsible and liable for all Work performed by, and all acts or omissions, of each Subcontractor.  Contractor shall ensure that all Subcontractors performing Work at the Site shall be licensed as required by Laws applicable at the Site.  Contractor shall promptly pay when due under the applicable subcontracts all undisputed amounts payable to its Subcontractors so long as Contractor receives payment from Owner in accordance with the terms of this Agreement. Provided Contractor receives payment from Owner in accordance with this Agreement, Contractor shall cause its Subcontractors not to create or place any liens, security interests or other encumbrances on the Facility, the Equipment or the Site other than mechanic's liens or similar liens or security interests arising by operation of Law for the sole purpose of securing Contractor's obligation to pay a Subcontractor for Work performed hereunder provided that Contractor complies with its obligations under Section 5.9 with respect thereto.

(a)     No Privity with Subcontractors.  Owner shall not be deemed by virtue of this Agreement to have any contractual obligation to, or relationship with, any Subcontractor, and, except as otherwise expressly stated herein, all Work shall be performed solely by Contractor and its Subcontractors.

(b)     Review not Relief of Contractor's Liability.  Any Owner inspection permitted or required under this Agreement of any portion of the Work, either completed or in progress, shall not relieve Contractor of any duties, liabilities or obligations under this Agreement.

(c)     Major Subcontract Review.  Contractor shall promptly notify Owner if any subcontract with a Subcontractor has a contract price or anticipated value in an amount that is equal to or greater than one hundred seventy-five thousand dollars ($175,000) (each such subcontract, a "Major Subcontract").  Contractor shall provide Owner with a list of all Major Subcontracts within thirty (30) days after the Effective Date and shall update such list on a monthly basis thereafter. Contractor shall deliver to Owner an unpriced copy of each Major Subcontract,

21

which may also exclude other commercially confidential information. The review by Owner regarding any Subcontractor or subcontract shall not relieve Contractor of any of its duties, liabilities or obligations under this Agreement, and Contractor shall be liable hereunder for the performance, acts and omissions of such Subcontractors.

(d)  Required Provisions in Major Subcontracts. No subcontract shall bind or purport to bind Owner. Contractor shall use commercially reasonable efforts to cause each Major Subcontract and each supply agreement with a Subcontractor for Major Equipment to contain provisions (i) in the form set forth in Exhibit V, which Contractor shall not waive, release, modify or impair and (ii) that Subcontractor shall continue to perform its responsibilities under such subcontract for the benefit of Owner and shall recognize Owner as being vested with all the rights and responsibilities of Contractor under such subcontract upon termination of this Agreement pursuant to Section 12.4 by Owner (whether or not such termination is disputed by Contractor) and notification to the Subcontractor from Owner that (A) this Agreement has been terminated pursuant to Section 12.4, (B) Contractor's right to proceed with the Work has been terminated and (C) Owner will thereafter be assuming Contractor's obligations under such subcontract. If Owner assumes any Major Subcontract pursuant to this Section 2.(5)(d), any supply agreement with a Subcontractor for Equipment or any warranty or guaranty thereunder as contemplated under this Agreement, then Contractor shall execute all assignments or other reasonable documents and take all other reasonable steps requested by Owner which may be required to vest in Owner all rights, set-offs, benefits and titles necessary to effect such assumption by Owner. Notwithstanding the foregoing, it is specifically understood and agreed (and each subcontract shall so state) that no Subcontractor shall have any right to look to Owner for the performance of Contractor's obligations under any subcontract unless and until such Subcontractor has received notice from Owner of the assignment of such subcontract from Contractor to Owner.

2.6  Independent Contractor. Contractor shall be an independent contractor with respect to the Facility and the Work, and neither Contractor nor its Subcontractors nor the employees of either shall be deemed to be agents, representatives, employees or servants of Owner in connection with this Agreement. Owner shall not have the right to control, nor any actual, potential or other control over the methods and means by which Contractor or any of its agents, representatives, Subcontractors or employees conducts its independent business operations. The Parties covenant and agree that in the performance of the Work, Contractor shall not perform any act or make any representation to any Person to the effect that Contractor or any of its agents, representatives or Subcontractors, is the agent of Owner. Contractor, Subcontractors, and the employees of either shall have no right and shall make no claim under any employee plan or benefit plan or program of Owner or any of its Affiliates.

2.7  Security and Safety Procedures. Contractor shall hold the Contractor Personnel (when working at the Site) to the standards set forth in Exhibit D, including but not limited to the policies regarding drugs and alcoholic beverages set forth therein. Contractor shall promptly remove, and deny access to the Site to, any Contractor Personnel who violate such standards hereunder upon Owner's reasonable request, and in any event within one (1) day of receipt of such reasonable request from Owner. In addition to the foregoing, in the event Owner believes that any Contractor Personnel is violating the standards of care and performance contained in this Agreement, upon notice from Owner, Contractor and Owner shall meet to discuss and mutually agree upon a resolution of such issues which may include the removal of such Contractor

Personnel.  Contractor shall promptly provide Owner with: (a) verbal notification of recordable accident(s) within 24 hours, (b) written accident reports for O.S.H.A. lost time and recordable accidents that occur at or in connection with construction of the Facility within seven (7) days of the accident, prepared in accordance with the safety and security assurance program approved by Owner pursuant to this Section, and (c) copies of all written communications with any Governmental Authority and insurance company (including any notices, written warnings, notice of violation, or cease and desist orders) with respect to accidents or inspections that occur at or in connection with construction of the Facility within seven (7) days of receipt by Contractor, and thereafter provide such written reports relating thereto as Owner may reasonably request.

2.8    <u>Quality Assurance Plan</u>.  Contractor shall comply with and implement Contractor's quality assurance plan, a copy of which is attached as <u>Exhibit N</u>.

2.9    <u>Spare Parts</u>.  Contractor shall procure and deliver the Equipment set forth on <u>Exhibit P</u> (the "<u>Spare Parts</u>") with respect to the Facility as a condition to Substantial Completion with respect to such Facility.  If any Equipment fails before Substantial Completion, then Contractor may withdraw Spare Parts from Owner's stock of Spare Parts procured under this <u>Section 2.9</u>, to the extent that such Spare Parts are available in Owner's stock, so that the Equipment that failed may be returned to operating condition.  Contractor shall replace any such Spare Parts at its cost prior to Final Acceptance.

2.10    <u>Equipment Labeling</u>.  Contractor shall apply a label to each piece of Equipment.  Each label shall identify the Equipment, be clearly visible, and adhere to the naming conventions set forth in <u>Exhibit HH</u>.

**ARTICLE III**

**<u>OWNER RESPONSIBILITIES</u>**

3.1    <u>Access to Site</u>.  Owner shall provide at all times access to the Site sufficient to enable Contractor's performance of the Work, provided, however, that Owner may withhold any such right or access until Contractor delivers to Owner the Payment Bond and the Performance Bond in accordance with <u>Section 5.7</u>.  Contractor shall allow Owner at all times complete and unobstructed access to the Site and the Work performed by Contractor hereunder provided that Owner shall (i) not unreasonably impede or unreasonably disrupt Contractor's performance of the Work; and (ii) comply with the security and safety procedures set forth in <u>Exhibit D</u>.

3.2    <u>Owner's Representative</u>.    Owner shall designate in writing an Owner's Representative to represent the Owner and to receive communications from the Contractor.  The Owner's Representative shall have such authority to act for the Owner under this Agreement as is specified by Owner in the notice to Contractor appointing such Owner's Representative; *provided* that Owner's Representative shall under no circumstances have the authority to terminate or assign, or consent to the termination or assignment of this Agreement.  Owner hereby designates Will Nielsen as the initial Owner's Representative.

3.3    <u>Review of Deliverables</u>.  Owner shall review all of the deliverables set forth on <u>Exhibit S-1</u> and <u>Exhibit S-2</u> and provided by Contractor under this Agreement and shall do so in

23

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DF5DD8329AA5

accordance with the timelines set forth in <u>Exhibit S-1 and Exhibit S-2</u>, or if no timeline is set forth on <u>Exhibit S-1 and Exhibit S-2</u>, within seven (7) Business Days of receipt. Owner may, but shall not be obligated to, provide comments to Contractor regarding such deliverables. Contractor shall (i) make such changes to the deliverables as Owner reasonably believes are necessary, provided the same do not violate any of the other terms of this Agreement, and (ii) address any comments which demonstrate that such deliverables are not in compliance with the requirements of this Agreement. No such review or requested changes shall impose any liability on Owner or relieve Contractor of any of its responsibility under this Agreement.

3.4    <u>Payment of Contract Price</u>.  Owner shall pay Contractor for the Work in accordance with this Agreement.

3.5    <u>Compliance with Laws</u>.  Owner shall comply with all applicable Laws in performing its obligations under this Agreement.

3.6    <u>Permits</u>.  Owner shall obtain the Permits described in <u>Exhibit C-2</u> (the "<u>Owner Permits</u>").  In order to assist Owner in obtaining the Owner Permits, Contractor shall provide Owner with such reasonable assistance as Owner may request.

3.7    <u>Owner-Furnished Equipment</u>.  Owner shall, at its sole cost and expense, deliver the Owner-Furnished Equipment to the Site for unloading by Contractor in accordance with the critical path dates identified in the Project Schedule. Owner shall provide the Contractor with copies of each Owner-Furnished Equipment Agreement (which may have pricing and commercially sensitive information redacted), inclusive of commissioning obligations for which the Contractor shall coordinate scheduling in accordance with <u>Exhibit DD</u> through <u>Exhibit GG</u>. Prior to issuing the inverter purchase order, Owner shall deliver to Contractor a document signed and acknowledged by the manufacturer of the inverters which are part of the Owner-Furnished Equipment confirming the selected inverters meet the configurations, settings, and requirements of the Interconnection Agreement, the Power Purchase Agreement and any Governmental Authority (the "<u>Inverter Spec Document</u>").  Prior to issuing the racking purchase order, Owner shall deliver to Contractor a document signed and acknowledged by the manufacturer of the racking which is part of the Owner-Furnished Equipment confirming the selected racking meets the requirements of the Interconnection Agreement, the Power Purchase Agreement and any Governmental Authority (the "<u>Racking Spec Document</u>").  Prior to the issuance by Owner of the Notice to Proceed, Owner shall deliver to Contractor the manufacturer's specifications and electronic (.xls) flash data reports for the modules which are part of the Owner-Furnished Equipment. Owner shall provide Contractor with an opportunity to comment on the Inverter Spec Document and the Racking Spec Document and Owner shall use commercially reasonable efforts to address any of Contractor's comments received by Owner with the manufacturer of such Owner-Furnished Equipment (but only to the extent such Contractor comments are received within ten (10) days of the Inverter Spec Document or the Racking Spec Document, as the case may be, being delivered to Contractor).

3.8    <u>Coordination with Interconnection Provider</u>.  Owner shall cause the Interconnection Provider to (a) provide specifications for metering and telemetering equipment to be installed by Contractor, (b) subject to Contractor's obligation to pay for power consumption as provided in this Agreement, make back-feed power available to the Facility, and (c) permit

24

DocuSign Envelope ID: C73955B1-FAB9-4EB7-BE41-DF5DD8329AA5

Interconnection of the Facility at the point of interconnection specified in the Interconnection Agreement and accept electricity generated by the Facility, as needed, for commissioning and performance of the Performance Tests, in each case in accordance with the Project Schedule; provided that, Contractor shall properly design, engineer, commission and test the Facility such that the Interconnection Provider agrees to allow Interconnection. For the avoidance of doubt, Contractor is responsible for determining the applicable requirements of the Interconnection Provider to ensure the successful design, procurement, permitting, construction, commissioning, testing, Interconnection and continuous operation of the Facility.

3.9     Owner Payment Security. On the Effective Date, Owner shall deliver the Owner Payment Security.

## ARTICLE IV

## SCHEDULE, COMPLETION, INSPECTION AND PERFORMANCE

4.1     Project Schedule.  Contractor shall design, install, engineer, construct, start-up, test and commission the Facility and perform all Work hereunder in material conformance with the Project Schedule set forth in Exhibit G.  The Project Schedule includes anticipated dates for achievement of significant project milestones, including the issuance of the Limited Notice to Proceed, Notice to Proceed, the start and completion dates for design, the anticipated award and delivery dates of long lead-time procured items, the start and completion dates for construction and testing, and the scheduled Mechanical Completion Date, Substantial Completion Date and Final Acceptance Date.  This Section 4.1 shall not limit Contractor's obligations to achieve Mechanical Completion, Substantial Completion and Final Acceptance for the Facility by the dates provided in this Agreement.

(a)     Limited Notice to Proceed. On or after the Effective Date, Owner may, at Owner's sole discretion, but subject to Contractor's written agreement to the terms thereof, issue to Contractor a limited notice to proceed directing Contractor to commence and complete the LNTP Scope of Work under and in accordance with the terms of this Agreement (such notice a "Limited Notice to Proceed").  All Work performed by Contractor prior to the date of issuance of the Limited Notice to Proceed shall be deemed part of the Work.  Owner shall have no obligation to Contractor under this Agreement until the Owner issues the Notice to Proceed, except that, upon issuance of a Limited Notice to Proceed, Owner shall be obligated to make the payments for Work complete as specified therein provided such Work is performed by Contractor in the manner required by such Limited Notice to Proceed and otherwise in accordance with the requirements of this Agreement.  As of the Effective Date, Owner hereby issues, and Contractor hereby accepts, LNTP 1 as set forth in Exhibit II.  Subject to Section 5.8, Owner shall pay Contractor for each amount due under this Limited Notice to Proceed in accordance with, and subject to compliance with, Section 5.3 and 5.8, provided, with respect to each of the Equipment deposits, Owner shall pay Contractor at least ten (10) Days prior to the due date for such deposit as shown on the relevant vendor's invoices and conditional lien waivers provided by Contractor in connection therewith. For any Equipment deposits paid by Owner through Contractor pursuant to Contractor's request, Contractor shall provide unconditional lien waivers from such Equipment supplier within fifteen (15) days of Owner's payment to Contractor demonstrating that the Contractor's payment to such Equipment supplier was made.

25

DocuSign Envelope ID: C73955B1-FAB9-4EB7-BE41-DF5DD8339AA5

(b)　　　Notice to Proceed.　On or after the Effective Date, Owner may, at Owner's sole discretion, issue Contractor a notice to proceed directing Contractor to commence and complete all Work under and in accordance with the terms of this Agreement (such notice the "Notice to Proceed").　All Work performed by Contractor prior to the date of issuance of the Notice to Proceed shall be deemed part of the Work.　In the event Owner has (i) approved the IFC PV Overlay per Exhibit B-1, (ii) approved the IFC HV Overlay per Exhibit B-2, and (iii) Contractor has received all applicable Contractor Permits required to commence performance of the Work in accordance with the Project Schedule, and Owner fails to issue the Notice to Proceed on or before May 1, 2021, Contractor shall be entitled to a Change Order to be issued in accordance with ARTICLE VII for an equitable adjustment to the Project Schedule (including the Guaranteed Dates) but shall not be entitled to an adjustment to the Contract Price.

(c)　　　Completion Date.　Contractor shall achieve (i) Mechanical Completion on or before the Guaranteed Mechanical Completion Date and (ii) achieve Substantial Completion on or before the Guaranteed Substantial Completion Date.　Contractor shall be responsible for Delay Damages as provided in Section 4.7 if it fails to achieve Mechanical Completion or Substantial Completion on or before the Guaranteed Mechanical Completion Date or the Guaranteed Substantial Completion Date (as such dates may be adjusted pursuant to this Agreement), respectively.　Contractor shall not be excused from any failure to achieve Mechanical Completion or Substantial Completion by the Guaranteed Mechanical Completion Date or Guaranteed Substantial Completion Date (as applicable) for any reason, *provided*, for the avoidance of doubt, that such Guaranteed Dates may be adjusted pursuant to a Change Order issued in accordance with ARTICLE VII.

4.2　　Contractor Schedule and Reports.　Contractor shall prepare and submit to Owner updated progress schedules and progress reports on a regular basis (as requested, but no less often than monthly) and progress reports on a weekly basis (by close of business Friday) in the form provided in Exhibit X and in such detail as Owner may reasonably request (*provided*, that any such report submitted on a monthly basis shall be submitted either no earlier than five (5) days prior to or in conjunction with the Invoice Package described in Section 5.3(b)), as well as such other reports relating to the Work as Owner shall reasonably request from time to time.　From and after the issuance of the Limited Notice to Proceed until Substantial Completion, Contractor's Project Manager shall hold weekly progress meetings with the Owner's Representative (and shall hold more frequent progress meetings at Owner's reasonable request), to assess and verify actual progress, to predict future progress and to review and, if possible, resolve any construction-related issues that Owner or Contractor may wish to discuss.　During those meetings, Contractor shall disclose to Owner the failure or unavailability of any critical components or labor force necessary for the Work.

(a)　　　Schedule Requirements.　All schedules provided by Contractor must (i) be suitable for monitoring the progress of the Work, (ii) provide necessary data about the timing for Owner decisions (including earliest delivery dates and "need by" dates for Owner-Furnished Equipment), and all Owner milestones and commitments, and (iii) be in sufficient detail to demonstrate adequate planning for and completion of the Work.

(b)　　　Remedial Action Plan.　If at any such weekly progress meeting it is determined that Contractor is more than two (2) weeks behind schedule in respect of any of the

anticipated dates for achievement of significant project milestones (identified as such in the Project Schedule), then Owner may deliver a written notice to Contractor and require that within five (5) Business Days of Contractor's receipt of such notice that Contractor submit to Owner a plan demonstrating the measures that Contractor has taken or will take in order to ensure that Mechanical Completion and Substantial Completion will occur no later than the Guaranteed Mechanical Completion Date and the Guaranteed Substantial Completion Date (as applicable) notwithstanding such missed significant project milestone(s) (such plan, a "<u>Remedial Action Plan</u>").  If Contractor fails to provide the Remedial Action Plan, or such plan is deemed unsuitable by Owner exercising reasonable judgment, or, if at any weekly progress meeting following delivery of a Remedial Action Plan, Owner determines, in its reasonable discretion that Contractor has failed to perform the Work in accordance with such Remedial Action Plan, then Owner shall have the right to self-perform, or engage separate subcontractors to perform, any portion of the Work and recover from Contractor the Direct Costs incurred by Owner in connection with the performance of such Work.

4.3     <u>Mechanical Completion</u>.

(a)      <u>Notice of Mechanical Completion</u>.  No less than fourteen (14) days prior to the date it expects to have achieved Mechanical Completion, Contractor shall give Owner notice of the expected date of Mechanical Completion.

(b)      <u>Mechanical Completion of the Facility</u>.  "<u>Mechanical Completion</u>" of the Facility shall mean the achievement of the following conditions:

(1)   the Facility has been installed in accordance with the Contract Documents (except that Interconnection has not occurred and it has not been synchronized into the grid), is mechanically and electrically sound, and is ready for synchronization, initial start-up, adjustment, testing and commissioning;

(2)   the Facility is ready to be started-up and thereafter, following synchronization into the grid and satisfactory adjustment, testing and commissioning, will be ready to be continuously operated without damage to the Facility or any other property and without injury to any Person and without voiding any third-party warranties; and

(3)  Owner has received those documents set forth on <u>Part I</u> of <u>Exhibit S-1</u> and <u>Part I</u> of <u>Exhibit S-2</u> to the Agreement at least five (5) Business Days before the date on which Contractor delivers to Owner a Mechanical Completion Certificate.

(c)      <u>Application of Mechanical Completion</u>.  When Contractor believes Mechanical Completion for the Facility has been achieved, Contractor shall notify Owner by delivering to Owner a Mechanical Completion Certificate.  Within seven (7) Business Days after receipt of the Mechanical Completion Certificate, Owner shall either (i) notify Contractor that Mechanical Completion has been achieved and execute the certificate noting that the Mechanical Completion Date is the date on which Owner received the Mechanical Completion Certificate or (ii) notify Contractor that Mechanical Completion has not been achieved and provide a detailed explanation of the reasons therefor, except that if Owner requires additional time for review, then Owner shall provide Contractor written notice of the need for such additional time during the seven

27

(7) Business Day period recited above, and the Contractor shall grant the Owner the additional time required by Owner for such review.  If Owner fails to accept or reject a properly tendered Mechanical Completion Certificate within the initial seven (7) Business Day period after submission or resubmission of the certificate by Contractor, Contractor will be entitled to a Change Order extending the Guaranteed Dates by the number of days that Owner's response was delayed beyond the seven (7) Business Day period and an equitable adjustment to the Contract Price for actual Direct Costs incurred by Contractor as a result of such delay.  In the event Owner rejects a Mechanical Completion Certificate delivered by Contractor, Contractor shall correct such defects or deficiencies and/or perform such Work and the foregoing notice procedure shall be repeated until the requirements for Mechanical Completion have been met.

4.4    Installed Nameplate Capacity Inspection.  Contractor shall keep a log of all module serial numbers installed at the Site and share this log with Owner on an ongoing basis for verification during construction.  The total actual installed DC nameplate capacity for the Facility (the "Installed Nameplate Capacity") shall be determined by summing the module nameplate capacities as specified by the factory flash test reports for the modules, and verifying with module serial numbers for each module confirmed as installed in the Facility from the module serial number log.  Within three (3) Business Days of receipt of notice from Contractor that the Facility is ready for inspection and as a condition to Final Acceptance, Owner shall review the data and inspect the Facility to determine whether the Facility has achieved the Expected Capacity in accordance with this Section 4.4, except that if Owner requires additional time for review, then Owner shall provide Contractor written notice of the need for such additional time during the three (3) Business Day period recited above, and the Contractor shall grant the Owner the additional time required by Owner for such review.

4.5    Substantial Completion.

(a)    Substantial Completion of the Facility.  "Substantial Completion" of the Facility shall mean the achievement of the following conditions:

(1) the Facility has achieved Mechanical Completion;

(2) Contractor has (i) completed the Performance Tests on the Facility (other than the Post-Energization Harmonics Measurement Test), (ii) delivered to Owner results demonstrating that the Facility has passed the Availability Test and any other tests required to be performed under Exhibit B-1 and Exhibit B-2 on or before Substantial Completion, and (iii) either (A) delivered to Owner results demonstrating that the Metered Facility Capacity Ratio is equal to or greater than the Guaranteed Facility Capacity Ratio or (B) delivered to Owner results demonstrating that the Metered Facility Capacity Ratio is equal to or greater than the Minimum Facility Capacity Ratio, and either (x) Contractor has paid in full to Owner all Performance Liquidated Damages or (y) Owner has elected by written notice to Contractor (whether or not Contractor has elected to cure under Section 4.8) to retain an amount of the Contract Price remaining to be paid sufficient to off-set all Performance Liquidated Damages (in which case, subject to Contractor's rights under Section 4.8 to cure, Contractor shall be deemed to have agreed that such damages may be off-set against the Contract Price remaining to be paid);

28

(3) all requirements of Interconnection Provider to perform testing and Interconnection of the Facility have been satisfied, and Contractor has delivered to Owner evidence thereof reasonably satisfactory to Owner, and the Facility has been physically Interconnected at its full capacity and is capable of delivering electric energy to the grid;

(4) the Equipment has been commissioned so as to allow the commercial operation of the Facility and the Commercial Operation Date has occurred;

(5) Owner and Contractor have agreed on a Punchlist of all uncompleted items in accordance with Section 4.5(c);

(6) all Spare Parts and special tools required to be delivered at Substantial Completion in connection with the Facility under the Agreement have been delivered to Owner;

(7) all applicable Contractor Permits have been received, are in full force and effect, if necessary and permitted by Law, have been transferred to, or issued in the name of, the Owner and copies thereof have been delivered to Owner;

(8) the Facility complies with all applicable Legal Requirements and has passed all inspections by any applicable Governmental Authority;

(9) all Delay Damages and Performance Liquidated Damages payable by Contractor have been paid to Owner or the amount of the Contract Price remaining to be paid at Substantial Completion is sufficient to off-set the Delay Damages and Performance Liquidated Damages due and Contractor agrees in writing (or has been deemed to have agreed as provided in Section 4.5(a)(2)) that such Delay Liquidated Damages and Performance Liquidated Damages may be off-set against the Contract Price remaining to be paid;

(10) the design, construction and operation of the Facility is in compliance with the requirements of the Contract Documents, the Power Purchase Agreement, the Interconnection Provider, the Interconnection tariff and Interconnection Agreement;

(11) Contractor has completed the required operations and maintenance training program for Owner's personnel;

(12) Owner has received those documents set forth on Part II of Exhibit S-1 and Part II of Exhibit S-2 (including, but not limited to, the Operating Manual and passing test results) at least five (5) Business Days before the date on which Contractor delivers to Owner a Substantial Completion Certificate;

(13) to the extent not previously delivered, all lien waivers then required under ARTICLE V have been delivered to and received by Owner; and

(14) Contractor has assigned to Owner all warranties and guarantees from all Subcontractors and vendors with respect to the Facility either pursuant to the form of warranty assignment agreement attached hereto as <u>Exhibit U</u> or such other warranty assignment agreement in form and substance satisfactory to Owner.

Notwithstanding anything the contrary contained herein, the conditions set forth in subsections (13) and (14) of this <u>Section 4.5(a)</u> shall be conditions only to payment of the amount of the Contract Price due upon Substantial Completion, and shall not be required for purposes of determining whether Substantial Completion has occurred for purposes of the assessment of Delay Damages.

(b)        <u>Application for Substantial Completion</u>.  When Contractor considers that the criteria for Substantial Completion have been met, Contractor shall so notify Owner in writing by delivering to Owner a Substantial Completion Certificate.  Within ten (10) Business Days after Owner's receipt of the Substantial Completion Certificate, Owner shall either (i) notify Contractor that Substantial Completion has been achieved and execute the Substantial Completion Certificate noting that the Substantial Completion Date is the date on which Owner received the Substantial Completion Certificate or (ii) notify Contractor that Substantial Completion has not been achieved and provide a detailed explanation of the reasons therefor, except that if Owner requires additional time for review, then Owner shall provide Contractor written notice of the need for such additional time during the ten (10) Business Day period recited above, and the Contractor shall grant the Owner the additional time required by Owner for such review.  If Owner fails to accept or reject a properly tendered Substantial Completion Certificate within the initial 10-Business Day period after submission or resubmission of the Substantial Completion Certificate by Contractor, Contractor will be entitled to a Change Order extending the Guaranteed Substantial Completion Date by the number of days that Owner's response was delayed beyond the 10-Business Day period and an equitable adjustment to the Contract Price for actual Direct Costs incurred by Contractor as a result of such delay.   In the event Owner rejects a Substantial Completion Certificate delivered by Contractor, Contractor shall correct such defects or deficiencies and/or perform such Work, and the foregoing notice procedure shall be repeated until the requirements for Substantial Completion have been met.  Upon execution and delivery by Owner of the Substantial Completion Certificate, care, custody and control of the Facility shall pass to Owner; *provided*, *however*, Contractor shall not be relieved of its ongoing liabilities and obligations under this Agreement.

(c)        <u>Punchlist</u>.  Prior to Substantial Completion, Owner and Contractor shall develop a comprehensive list of all known defects or deficiencies in the Work or discrepancies between installed Equipment or workmanship and that required by this Agreement that are then known to Owner or Contractor and that meet the requirements of this Agreement for inclusion on the Punchlist.  A comprehensive Punchlist developed by Contractor of remaining Work for such Facility shall be agreed upon by Contractor and Owner and include a schedule pursuant to which each task will be performed by Contractor, except that (i) Contractor shall not thereby be excused from responsibility for any and all defects or deficiencies in the Work or discrepancies between installed Equipment or workmanship and that required by this Agreement that are not then known to Owner, and (ii) if any remaining Work, defects or deficiencies in the Work or discrepancies between installed Equipment or workmanship and that required by this Agreement does not meet the requirements of this Agreement for inclusion on the Punchlist, then Contractor shall complete

30

such Work and correct such defects, deficiencies or discrepancies in accordance with this Agreement prior to achieving Substantial Completion.

(d)     <u>Independent Engineer's Certificate</u>.  Without limiting the requirements of <u>Section 4.5(a)</u>, Owner may seek, at its own cost and expense, and Contractor shall provide reasonable assistance in obtaining, a certificate from the Independent Engineer with respect to Mechanical Completion, Substantial Completion or Final Acceptance for the Facility, which may include certifications that the criteria required for Mechanical Completion, Substantial Completion or Final Acceptance have been met. Except to the extent that the Independent Engineer requests resolution to deficiencies in Contractor's performance under this Agreement, such certification from the Independent Engineer shall in no event be considered a condition precedent to Mechanical Completion, Substantial Completion or Final Acceptance.

4.6     <u>Final Acceptance</u>.

(a)     "<u>Final Acceptance</u>" of the Facility shall mean the achievement of the following conditions:

(1)  Substantial Completion for the Facility has occurred;

(2)  Contractor has (i) completed the Post-Energization Harmonics Measurement Test and (ii) delivered to Owner results demonstrating that the Facility has passed the Post-Energization Harmonics Measurement Test;

(3)  Owner has received all documentation set forth on <u>Part III</u> of <u>Exhibit S-1</u> and <u>Part III</u> of <u>Exhibit S-2</u> at least five (5) Business Days before the date on which Contractor delivers to Owner a Final Acceptance Certificate

(4)  Owner has received from Contractor all As-Built Drawings for the Work in both PDF and CAD format;

(5)  Owner has received from Contractor a post-construction survey verified site layout drawing in dwg format depicting the as-built location of all Equipment;

(6)  Owner has received from Contractor all Equipment Documentation with respect to the Facility, including the log of flash test data described in <u>Section 4.4</u>;

(7)  Owner has received from Contractor all testing acceptance reports, final job books and each other item described on <u>Exhibit S-1</u> and <u>Exhibit S-2</u>.

(8)  all Contractor's materials and wastes related to the Facility have been removed from the Site and properly disposed of;

(9)  to the extent not previously delivered, all lien waivers then required under <u>ARTICLE V</u> have been delivered to and received by Owner;

31

(10) all documentation obtained by, and other requirements provided by the Contractor under the scope of this Agreement, necessary for Owner to receive payments or credits pursuant to all applicable incentives, rebates, exemptions and Tax credits related to the Facility have been received by the applicable Governmental Authorities, Offtaker, Interconnection Provider or Owner, as applicable;

(11) the performance of the Work is 100% complete, including the completion by Contractor to Owner's satisfaction of all items set forth on the Punchlist; provided that the Parties may agree that any outstanding item of Work may be completed by Owner or otherwise be deleted from the Punchlist, subject to the Parties' agreement of an appropriate sum to be paid or allowed by Contractor to Owner for such outstanding item of Work; and provided further that, notwithstanding any other provision of this Agreement, if the completion of any Punchlist item requires that the Facility be shut down or that its output be curtailed, Owner shall have the option of completing such Punchlist item itself and Owner shall deduct its reasonable and documented costs required to complete such Punchlist item from the monies otherwise due from Owner to Contractor hereunder;

(12) any public streets damaged by construction traffic have been restored to pre-construction conditions;

(13) the Facility complies with all applicable Legal Requirements and has passed any additional final inspections and received final certifications from any applicable Governmental Authority;

(14) all Work performed at the Facility from and after the Substantial Completion Date is in compliance with the requirements of the Contract Documents, the Power Purchase Agreement and the Interconnection Agreement, and the Facility is capable of being operated safely;

(15) confirmation has been provided that all ongoing third-party accounts set up by Contractor have been assigned to Owner for billing (e.g. communications provider);

(16) all Spare Parts withdrawn by Contractor from Owner's stock pursuant to Section 2.9 have been replaced by Contractor; and

(17) all undisputed amounts owed from Contractor to Owner have been paid.

(b)      Final Acceptance Certificate.   When Contractor considers that the criteria for Final Acceptance for the Facility have been met, Contractor shall so notify Owner in writing by delivering to Owner a Final Acceptance Certificate.  Within ten (10) Business Days after Owner's receipt of the Final Acceptance Certificate, Owner shall either (i) notify Contractor that Final Acceptance has been achieved and execute the Final Acceptance Certificate noting that the Final Acceptance Date is the date on which Owner received the Final Acceptance Certificate, or (ii) notify Contractor that Final Acceptance has not been achieved and provide a detailed explanation of the reasons therefor, except that if Owner requires additional time for review, then Owner shall provide Contractor written notice of the need for such additional time during the ten

32

(10) Business Day period recited above, and the Contractor shall grant the Owner the additional time required by Owner for such review. In the event Owner rejects a Final Acceptance Certificate delivered by Contractor, Contractor shall correct such defects or deficiencies and/or perform such Work, and the foregoing notice procedure shall be repeated until the requirements for Final Acceptance have been met.

4.7    Delay Damages. Subject to Section 12.4, in the event (a) Mechanical Completion has not occurred on or before the Guaranteed Mechanical Completion Date or (b) Substantial Completion has not occurred on or before the Guaranteed Substantial Completion Date, then, as Owner's sole and exclusive remedy for Contractor's failure to achieve Mechanical Completion or Substantial Completion by the Guaranteed Mechanical Completion Date or the Guaranteed Substantial Completion Date (as applicable), Contractor shall pay to Owner, as liquidated damages and not as a penalty, an amount equal to TWENTY THOUSAND DOLLARS ($20,000) per day for each day after (x) the Guaranteed Mechanical Completion Date until the Mechanical Completion Date or (y) the Guaranteed Substantial Completion Date until the Substantial Completion Date, as the case may be (the "Delay Damages"). Notwithstanding the foregoing, in the event Contractor achieves Substantial Completion by the Guaranteed Substantial Completion Date, Contractor shall have no obligation to pay Delay Damages on account of any failure by it to achieve Mechanical Completion by the Guaranteed Mechanical Completion Date and any Delay Damages previously assessed by Owner for delay in achieving Mechanical Completion shall be credited to the account of Contractor. The Delay Damages set forth herein are not cumulative or additive, and only the greater of the Delay Damages for Mechanical Completion or Substantial Completion shall apply at any one time.

4.8    Performance Tests.

(a)    As part of the Work, Contractor shall, at its sole expense, (i) perform the Performance Tests in accordance with Exhibit R-1 to verify the Facility has a Metered Facility Capacity Ratio that is equal to or greater than the Guaranteed Facility Capacity Ratio (and the Minimum Facility Capacity Ratio) and to verify that the Facility can achieve the Availability Guarantee and (ii) perform the MV Collection System Cable Test, the Gen-Tie Commissioning Test, and the Post-Energization Harmonics Measurement test in accordance with Exhibit R-2, Exhibit R-4 and Exhibit Q, respectively. In preparing for the performance of Performance Tests, the Contractor shall cooperate to the extent reasonably necessary with the Interconnection Provider. Prior to commencing the Availability Test or the Capacity Test, Contractor shall complete all commissioning procedures outlined in this Agreement including but not limited to SCADA commissioning, inverter commissioning, tracker commissioning, and transformer commissioning.

(b)    The Owner shall be permitted to have its own and its designees' personnel (including personnel of the Facility Lender, the Independent Engineer and the Interconnection Provider) on the Site to observe and/or verify all Performance Test conditions, as well as verify the Performance Test results.

(c)    The Contractor shall give the Owner at least ten (10) Business Days written notice in advance of the date on which the Contractor intends to commence the initial Performance Test.

33

(d)        If the Performance Test performed for the Facility demonstrates that the Metered Facility Capacity Ratio therefor is not equal to or greater than the Guaranteed Facility Capacity Ratio, but that the Metered Facility Capacity Ratio is equal to or greater than the Minimum Facility Capacity Ratio, then, without prejudice to Section 4.5, Contractor may at its option elect either (i) to undertake, pursuant to and subject to Section 4.9, all actions as may be necessary (at its own expense) to cure the shortfall, including re-performing the Performance Tests as necessary to demonstrate such cure, by no later than forty-five (45) days after the Guaranteed Substantial Completion Date or (ii) to pay the applicable Performance Liquidated Damages in lieu of attempting to cure the applicable shortfall at that time.  Contractor shall exercise such option by delivering a notice to Owner within five (5) Business Days after the completion of such Performance Test.  If Contractor fails to notify Owner of its election of the foregoing within such five (5) Business Day period, then Owner shall notify Contractor of such non-response and provide Contractor two (2) additional Business Days to respond.  If Contractor (i) fails to respond to such second notice before the end of the second (2nd) Business Day or (ii) fails to cure the shortfall by the date which is forty-five (45) days after the Guaranteed Substantial Completion Date, then Contractor shall be deemed to have elected to pay the Performance Liquidated Damages pursuant to subsection (ii) of this Section 4.8(d) (in which case such damages may be paid by off-set against the Contract Price remaining to be paid by Owner).

(e)        If the Facility has failed to pass the Post-Energization Harmonics Measurement Test, Contractor shall use all commercially reasonable efforts in consultation with Owner to cure deficiencies in the Facility to permit the Facility to pass the Post-Energization Harmonics Measurement Test in order the achieve Final Acceptance, provided that, if (i) such Test cannot be passed without the installation of harmonic filters or other mitigation measures requiring the installation of additional equipment at the Facility and (ii) the Facility is built in accordance with the IFC plans and the Design Basis Document (as such terms are defined in Section 3 of Exhibit B-1) and as contemplated by the pre-energization harmonics study prepared by Contractor in accordance with Exhibit B-1 (assuming that the inverters meet the specifications in the Inverter Spec Document), then Contractor shall be entitled to a Change Order in accordance with ARTICLE VII for an equitable adjustment of the Contract Price for such harmonic filters or other equipment.   For the avoidance of doubt and independent of the Post-Energization Harmonics Measurement Test, the Contractor must design the Facility and must demonstrate that the Facility meets the harmonic performance requirements of the Interconnection Agreement and the current/voltage harmonic limits established in the IEEE 519 standard.

4.9        Guaranteed Facility Capacity Ratio, Performance Tests and Performance Liquidated Damages.

(a)        *Guaranteed Facility Capacity Ratio*.

(i)        Contractor guarantees that, subject to Section 4.9(b), the Performance Tests performed in accordance with Exhibit R-1 will demonstrate that the Metered Facility Capacity Ratio for the Facility will be equal to or greater than the Guaranteed Facility Capacity Ratio for the Facility.

(ii)        Notwithstanding anything in this Agreement to the contrary, the Contractor further guarantees to Owner that, in any event, as will be demonstrated and measured

during a Performance Test in accordance with <u>Exhibit R-1</u>, the Metered Facility Capacity Ratio for the Facility will be equal to or greater than the Minimum Facility Capacity Ratio for the Facility.  Subject to <u>Section 4.8(d)</u>, Contractor shall do all things necessary or appropriate to cause the Metered Facility Capacity Ratio to achieve the Minimum Facility Capacity Ratio for the Facility including, without limitation, exercise each and every repair or replacement alternative, regardless of cost to Contractor or difficulties associated therewith.  In this regard, subject to the limitations recited in the Site Control Documents, Permits, the Power Purchase Agreement, the Interconnection Agreement and available real estate on the Site for the same, Contractor will have the right, at its expense, to add additional solar generating capacity in connection with such efforts.

(b) *Performance Liquidated Damages*.  Provided that the Metered Facility Capacity Ratio for the Facility has been demonstrated to be equal to or greater than the Minimum Facility Capacity Ratio, if Contractor elects or is deemed to have elected to pay Performance Liquidated Damages as described in <u>Section 4.8(d)</u>, then such damages shall be payable to the extent the Capacity Test for the Facility demonstrates that the Metered Facility Capacity Ratio is lower than the Guaranteed Facility Capacity Ratio by an amount greater than the allowed Commercial Tolerance.  For the purposes of computing the Performance Liquidated Damages only, the Commercial Tolerance shall be calculated in accordance with <u>Exhibit R-1</u>.  The "<u>Performance Liquidated Damages</u>" shall be equal to (i) TWO THOUSAND TWO HUNDRED DOLLARS ($2,200) per kWAC multiplied by (ii) the net power rating of the Facility as set forth on <u>Exhibit A</u> in kWAC multiplied by (iii) the difference between the Guaranteed Facility Capacity Ratio and the Metered Facility Capacity Ratio (expressed as a decimal) calculated over the duration of the Capacity Test in accordance with <u>Exhibit R-1</u>, minus the Commercial Tolerance. If the Metered Facility Capacity Ratio for the Facility has not been demonstrated to be equal to or greater than the Minimum Facility Capacity Ratio, then Owner shall have all rights and remedies available under this Agreement, Law and equity.  Subject to Contractor's achievement of the Minimum Facility Capacity Ratio, Contractor's obligation to pay Performance Liquidated Damages shall be Owner's sole and exclusive remedy for Contractor's failure to achieve the Guaranteed Facility Capacity Ratio.

4.10    <u>Delay Damages and Performance Liquidated Damages Not a Penalty</u>.  THE PARTIES AGREE THAT IT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE UNDER THE PRESENTLY KNOWN AND ANTICIPATED FACTS AND CIRCUMSTANCES TO ASCERTAIN AND FIX THE AMOUNT OF ACTUAL DAMAGES THAT WOULD BE SUFFERED DUE TO A DELAY IN THE ACHIEVEMENT OF MECHANICAL COMPLETION AND SUBSTANTIAL COMPLETION AND REDUCTION IN PERFORMANCE FOR THE FACILITY.   THEREFORE, THE PARTIES ACKNOWLEDGE THAT THE DELAY DAMAGES AND PERFORMANCE LIQUIDATED DAMAGES ARE A FAIR AND REASONABLE DETERMINATION OF THE AMOUNT OF DAMAGES WHICH WOULD BE SUFFERED BY OWNER FOR SUCH DELAYS AND REDUCTION IN PERFORMANCE, AND THAT THE DELAY DAMAGES AND PERFORMANCE LIQUIDATED DAMAGES DO NOT CONSTITUTE A PENALTY.   IN ADDITION, SHOULD CONTRACTOR SUCCESSFULLY CHALLENGE THE LEGAL ENFORCEABILITY OF THE DELAY DAMAGES AND/OR THE PERFORMANCE LIQUIDATED DAMAGES, CONTRACTOR SPECIFICALLY AGREES TO PAY TO OWNER ALL ACTUAL DAMAGES (INCLUDING LOST REVENUES) INCURRED BY OWNER DUE TO A DELAY IN THE ACHIEVEMENT OF MECHANICAL COMPLETION AND SUBSTANTIAL COMPLETION AND/OR

REDUCTION IN PERFORMANCE FOR THE FACILITY, SUBJECT TO <u>SECTION 9.1</u> INCLUDING THE LIQUIDATED DAMAGES CAP.

4.11 <u>Inspection</u>. All Work performed by Contractor and all Equipment shall be properly inspected by Contractor at its expense and shall be subject to inspection by Owner, Owner's representatives, the Independent Engineer and the Facility Lenders at Owner's own expense. Contractor shall provide access to all Equipment and related documents and information as reasonably required by Owner and such other Persons. If any Equipment (other than Owner-Furnished Equipment), material or Work is defective or not in conformance with this Agreement, the provisions of <u>ARTICLE VIII</u> shall apply. Such right of inspection, and any inspection actually conducted by Owner or such other Persons, shall not relieve Contractor of its responsibility for the proper performance of the Work or the proper functioning of the Equipment to the extent provided under this Agreement. Contractor shall furnish samples as reasonably required and shall provide reasonable assistance and cooperation necessary to permit tests to be performed on materials or Work determined by Owner to be defective or not in conformance with this Agreement. Contractor shall provide to Owner and such other Persons full and unsupervised access to the Facility and any other location or facility where Work is being performed upon reasonable prior notice and subject to Contractor's customary safety rules and policies. Contractor shall permit the Offtaker to observe, inspect and monitor the construction of the Facility in compliance with the requirements of the Power Purchase Agreement at Owner's expense.

4.12 <u>Work Notwithstanding Disputes</u>. Unless otherwise agreed in writing, Contractor shall diligently carry on the Work during the pendency of any dispute so long as all undisputed amounts payable to Contractor have been paid; provided, however, that Contractor shall have no obligation to carry on the Work following any termination of this Agreement by Contractor pursuant to Section 12.1. Upon resolution of such dispute, whether by agreement of the Parties or through a dispute proceeding, any amounts found to be owing by either Party shall be promptly paid by the Party owing payment to the other Party, together with interest at the Interest Rate, from the day following the date of the overpayment or underpayment, as applicable, until the date of repayment in full.

## ARTICLE V

## <u>COMPENSATION AND PAYMENT</u>

5.1 <u>Contract Price</u>. As consideration to Contractor for the installation of the Equipment and the performance by Contractor of the Work and all other services hereunder, Owner shall pay Contractor the aggregate sum of fifteen million, four hundred seventy-nine thousand, nine hundred sixty-nine dollars and seventy-nine cents ($15,479,969.79), as such amount may be adjusted in accordance with the terms of this Agreement (the "<u>Contract Price</u>"). Notwithstanding anything herein to the contrary, the Parties shall credit amounts, if any, previously paid by Owner to Contractor for the Facility and the Work pursuant to <u>Section 4.1(a)</u> (as opposed to payment in addition to the Contract Price), and the amount of the first invoice shall be reduced by an amount equal to all payments previously made by Owner to Contractor for the Facility pursuant to such agreement.

5.2     <u>Taxes, Royalties and License Fees</u>.  The Contract Price includes, and Contractor shall be responsible for the payment of, any and all sales, use, transfer or similar excise Taxes, or other impositions of any similar amount, including duties and import fees, that may be imposed or assessed by any Governmental Authority on Contractor, any Subcontractor or Owner solely on account of performance of the Work, except for those that may be imposed with respect to the Owner-Furnished Equipment.  To the extent applicable and without limiting the generality of the foregoing, Contractor shall provide Owner all Tax Returns (as may be redacted to protect any information not reasonably necessary for Owner to obtain available Tax exemptions, credits, or grants, including ITCs), certificates and other documentation reasonably requested by Owner to establish that such Taxes have been paid.  Contractor and Owner each shall, at the other's reasonable request, cooperate with any efforts to obtain any available exemptions from Taxes with respect to the Work or any part of it, including property Taxes and any available Tax credits or grants, including ITCs, and shall execute and provide the requesting Party with all reasonably requested applicable Tax Returns (as may be redacted to protect any information not reasonably necessary for Owner to obtain available Tax exemptions, credits, or grants, including ITCs), exemption or reseller certificates and other documentation within its custody, control, or possession.  Contractor shall pay all required royalties and license fees and shall procure (whether for itself or as agent for Owner), as required, the appropriate proprietary rights, licenses, agreements and permissions, for materials, methods, processes and systems that are incorporated into the Work, save and except for those related to the Owner-Furnished Equipment.  Upon transfer of title to Owner of Equipment pursuant to <u>Section 6.1</u>, Contractor shall execute bills of sale, which bills of sale shall be in form and substance reasonably acceptable to Owner, evidencing the transfer of title to all Equipment ("<u>Equipment Bill of Sale</u>").  Contractor shall be registered with the Michigan Department of Treasury, shall hold a valid permit to collect Michigan sales and use Tax (in accordance with this <u>Article V</u> and <u>Exhibit E-1</u>), and shall collect and remit any sales and use Tax, unless a proper exemption certificate is provided.

5.3     <u>Schedule of Values</u>.

(a)     <u>Progress Payments</u>.   Part 1 of <u>Exhibit E-1</u> sets forth the Schedule of Values for the Site with respect to the aggregate Contract Price.  The Schedule of Values shall be used as the basis for preparation of progress invoices as set forth below with respect to the Work, and, except as otherwise set forth herein, shall establish the amount to be paid to Contractor on a percentage complete basis each month of the Project Schedule. Part 2 of Exhibit E-1 sets forth the portion of the Contract Price that Owner is paying to Contractor for each type of Equipment and the applicable sales Tax for such Equipment after taking into account applicable Tax exemptions.

(b)     <u>Contractor Invoicing</u>.  On the 25th day of each calendar month the Contractor shall submit a draft invoice showing percentages complete projecting through the end of the current month and a separate invoice for all Equipment for which title has transferred to Owner pursuant to <u>Section 6.1</u> during the period covered by the invoice.  Contractor and Owner shall meet and agree to final percentages actually complete by the end of the month.  Within five (5) Business Days after the end of each calendar month, Contractor shall submit an invoice package to Owner, in which Contractor shall certify that the Work for which payment is sought complies with the standards of performance hereunder.  Each invoice shall be in the form attached as <u>Exhibit M-3</u> accompanied by supporting documents, including all lien waivers required pursuant to <u>Section 5.8</u>, a summary of such lien waivers in the form attached hereto as <u>Exhibit M-1</u>,

37

completed and executed versions of <u>Exhibit M</u>-6 and <u>Exhibit M-8</u> and applicable Equipment Bills of Sale (the "<u>Invoice Package</u>").  Contractor's invoice will provide accounting information in a form reasonably specified by Owner that will enable Owner to maintain segregated accounts of the Work for Owner's records.  Such segregation shall include separate accounting for (i) taxable and non-taxable expenditures with respect to buildings, land improvements and project management, Permit and license costs and Taxes and fees paid by Contractor and (ii) the cost of Equipment and Work that qualifies for ITCs and the cost of Equipment and Work that does not qualify for ITCs.

        (c)      <u>Conditions of Payment</u>.  Upon receipt of an invoice, Owner shall review the Invoice Package and reasonably verify the progress on the Project Schedule and Work completed and the amounts for which payment is sought under the invoice.  Within ten (10) Business Days after Owner receives an invoice and related documentation required under this Agreement from Contractor, Owner shall notify Contractor concerning any dispute over the accuracy of, or entitlement to, any amount of the invoice submitted by Contractor and the basis for such dispute.  If Owner has not notified Contractor within such ten (10) Business Day period of any good faith objection to an invoice, Owner shall be deemed to have approved such invoice; *provided*, *however*, that any such approval shall not constitute approval of any Work reflected on such invoice or a waiver by Owner of any rights under this Agreement (other than the right to approve or dispute such invoice).  Subject to the terms of this <u>Section 5.3</u>, Owner shall pay or cause to be paid to Contractor the full undisputed amount (as reduced by any Retainage or any set-offs) specified in each invoice within thirty (30) days after the day on which Owner originally received a properly supported and correct Invoice Package; *provided* that:

        (1)  Owner shall not be obligated to make any progress payment hereunder for Work that is not completed or for Work the completion of which is being disputed if Owner reasonably determines that the matters so certified to or by Contractor in an invoice with respect to such payment are materially erroneous; *provided*, *however*, that Owner shall pay the undisputed portion of the disputed progress payment and *provided further* that if Contractor disputes the decision of Owner and it is determined pursuant to <u>Section 16.3</u> that Owner should have confirmed the matters so certified by Contractor with respect to such payment, but failed to do so, then Contractor shall be entitled to interest on all unpaid amounts withheld from such progress payment to be accrued at the Interest Rate from the date such progress payment would otherwise have been due to Contractor until the date paid to Contractor;

        (2)  Owner shall not be obligated to make any progress payment hereunder until Contractor has supplied Owner with the certification and lien waivers required pursuant to <u>Section 5.8</u>, including utilization of electronic lien waiver software, if requested by Owner; and

        (3)  Owner shall make no payment to Contractor for any item of Equipment unless the amount requested by Contractor in such invoice in respect of such Equipment is then due or will be due under the supply agreement for such Equipment in the next thirty (30) days after the date of such invoice.

(d)     Retainage.  Owner shall withhold from each progress payment an amount equal to five percent (5%) of such payment, which shall be held by Owner as retainage ("Retainage").  Contractor shall not be entitled to any interest payment by Owner on Retainage. Retainage shall be paid to Contractor in accordance with the following:

(1)     Subject to receipt of the applicable invoice from Contractor, all Retainage shall be paid to Contractor, minus an amount equal to two hundred percent (200%) of the aggregate agreed valuation of the Punchlist, within fifteen (15) Business Days of the earlier of (A) if the criteria set forth in Section 4.5(a)(3) remains outstanding solely due to Interconnection Provider delays, the date on which all other criteria for Substantial Completion have been satisfied  and (B) the Substantial Completion Date; and

(2)     Within fifteen (15) Business Days after the date on which the Punchlist items have been completed by Contractor in accordance with this Agreement, and provided that Substantial Completion has occurred, all remaining Retainage shall be paid to Contractor.

(e)     Late Payments.  All amounts a Party owes the other Party under this Agreement which are not paid when due, shall bear interest on the unpaid balance at the Interest Rate from the due date until they are paid in full.

5.4     Payments Not Acceptance of Equipment or Services.  No payment made hereunder shall be considered or deemed to represent that Owner has inspected Contractor's Work or checked the quality or quantity thereof, or made a detailed examination, audit or arithmetic verification of any payment documentation, and shall not be deemed or construed as approval or acceptance of any Work, or as a waiver of any claim or right that Owner may then or thereafter have, including any rights with respect to warranty claims.

5.5     *INTENTIONALLY OMITTED*

5.6     Withholding.  Owner may withhold payment on any payments to be made hereunder (i) in an amount equal to payments previously made to Contractor which were not yet properly due and payable pursuant to this ARTICLE V; or (ii) for any other sums which Owner is entitled to recover from Contractor under the terms of this Agreement, including Delay Damages and Performance Liquidated Damages.

5.7     Payment and Performance Bonds.

(a)     No later than five (5) Business Days following the date on which Owner issues the Notice to Proceed, the Contractor shall obtain and deliver to Owner (i) a properly completed performance bond in the form attached hereto as Exhibit M-4 (a "Performance Bond") and (ii) a properly completed payment bond in the form attached hereto as Exhibit M-5 (a "Payment Bond"), in each case issued by issuer reasonably acceptable to Owner and having a long-term, senior unsecured credit rating of at least A- (Standard & Poor's) or A3 (Moody's).  The amount of (a) the Performance Bond shall be equal to the Contract Price and (b) the Payment Bond shall be equal to the Contract Price.  Upon any increase in the Contract Price, Owner may request, and Contractor shall within ten (10) Business Days thereafter provide, an increase in the amount of the Performance Bond and the Payment Bond such that each remains at a value not less than

39

DocuSign Envelope ID: C73055B1-FAB9-4EB7-BF41-DF5DD8329A5

the Contract Price.  All costs associated with providing and maintaining the Performance Bond and the Payment Bond shall be borne by Contractor.

(b)     On the Final Acceptance Date, Owner shall return the Performance Bond and the Payment Bond.  Upon return of the Performance Bond and the Payment Bond, the Performance Bond and Payment Bond shall be deemed fully exonerated.

5.8     <u>Releases and Waivers</u>.  On or before Owner's remittance of each payment to be made pursuant to this Agreement, Contractor shall, in accordance with the provisions of this <u>Section 5.8</u>, provide to Owner releases and waivers to the extent of payment of (i) all of Contractor's liens and other claims of lien and encumbrances, legal and equitable, against Owner, the Facility, the Site, and all other property and Equipment (to the extent created or brought about due to performance of the Work), and (ii) all Subcontractors' liens, claims of lien, and encumbrances, legal and equitable, arising out of or in connection with the Work performed.  The forms of required lien waivers are set forth in <u>Exhibits F-1</u> through <u>F-4</u>.

(a)     <u>Interim Waivers</u>.  On or before any payment to Contractor hereunder:

(1)     Contractor shall duly execute and deliver to Owner a conditional lien waiver and release upon payment for Contractor, dated as of the date of the applicable invoice, in the form attached hereto in <u>Exhibit F-1</u> and in the total amount of the payment being requested;

(2)     with respect to each Major Subcontractor, Contractor shall deliver to Owner a conditional lien waiver and release executed by such Major Subcontractor in the form included in <u>Exhibit F-1</u>.  The amount of each such conditional lien waiver and release that is to be delivered by a Major Subcontractor in direct privity with Contractor shall not exceed the portion of the total amount of the payment being requested that is allocable to such Major Subcontractor;

(3)     Contractor shall duly execute and deliver to Owner an unconditional lien waiver and release upon payment for Contractor, in the form attached hereto in <u>Exhibit F-2</u>, with respect to all Work previously billed and paid through the date of the applicable invoice; and

(4)     with respect to each Major Subcontractor, Contractor shall deliver to Owner an unconditional lien waiver and release in the form included in <u>Exhibit F-2</u>, executed by such Major Subcontractor, with respect to all Work previously billed and paid through the date of the applicable invoice.

(b)     <u>Final Release from Contractor or Subcontractors; Removal of Liens</u>.  In addition to the interim waivers required under <u>Section 5.8(a)</u>, within thirty (30) days after the date on which final payment to a Major Subcontractor is made, with respect to each such Major Subcontractor, Contractor shall deliver to Owner a final unconditional lien waiver and release in the form included in <u>Exhibit F-4</u>, executed by such Major Subcontractor.  On or before the date on which final payment to Contractor is made under this Agreement, Contractor shall duly execute and deliver to Owner a conditional lien waiver and release upon payment, dated as of the date of the applicable invoice, in substantially the form attached hereto in <u>Exhibit F-3</u>, in the total amount of the payment being requested.  Within fifteen (15) days after the date on which final payment to

Contractor is made under this Agreement, Contractor shall duly execute and deliver to Owner a final unconditional lien waiver and release in the form included in Exhibit F-4.

5.9     Removal of Liens.  If any lien, claim of lien or stop notice is filed related to the Work with respect to any portion of the Facility, Equipment (except for any lien, claim of lien or stop notice filed by the Manufacturer or vendor of the Owner-Furnished Equipment), or the Site, Contractor shall promptly (and in any case not later than thirty (30) days after such lien or claim of lien or stop notice is received by Contractor) cause such lien, claim of lien or stop notice to be removed by obtaining and recording a bond in accordance with applicable Law.  In the event Contractor fails to cause such lien, claim of lien or stop notice to be removed, Owner may withhold from any payment payable to Contractor an amount sufficient to discharge any or all such liens or claims of lien and Owner may discharge such lien or claim with the moneys withheld, whereupon for purposes of this Agreement such moneys shall be deemed to have been paid to Contractor hereunder.  Contractor shall indemnify, save harmless and defend the Owner Indemnified Parties and Owner's title insurance company from all Claims arising from liens related to the Work so long as Owner has paid Contractor all amounts required pursuant to this Agreement, or such amounts have been set-off pursuant to Section 5.10.  In the event and to the extent that any such lien results from Owner's failure to pay Contractor or set-off undisputed amounts as and when due under this Agreement, Contractor shall have no obligation under this Section 5.9 to cause the removal of any such lien to the extent of such failure (until such amounts are paid or set-off).

5.10     Set-Off.  Owner may deduct and set-off against any part of the balance due or to become due to Contractor from Owner under this Agreement monies due to Owner from Contractor (including any Delay Damages and Performance Liquidated Damages due or accrued but not yet paid).

**ARTICLE VI**

**TITLE; LOSS OR DAMAGE; FORCE MAJEURE**

6.1     Title.  Contractor warrants that, as of the date of payment for Work, legal title to and ownership of the Work shall be free and clear of any and all liens, claims, security interests or other encumbrances when title thereto passes to Owner.  Except as set forth in Section 6.2, title to all Work shall pass to Owner upon the earliest to occur of (i) incorporation into the Facility, (ii) delivery to the Site and (iii) when payment (other than Retainage) is made by Owner therefore in accordance with this Agreement; *provided* that at Owner's request, title and ownership of the Work shall pass to Owner at such other time as notified by Owner to accommodate financing or other considerations.  Contractor shall deliver to Owner such assignments, bills of sale or other documents as reasonably requested by Owner to evidence such transfer of title.

6.2     Rights in Drawings, Etc.  All drawings, documents, and engineering and other data furnished or to be furnished by Contractor in connection with the Work (the "Work Product") shall be the property of Contractor or its Subcontractors, but an irrevocable and royalty-free license to use such Work Product for use incident to ownership and operation of the Facility shall pass to Owner (assignable to Owner's successors in interest) on Substantial Completion.  Owner assumes all liability and it shall defend, indemnify, and hold harmless Contractor from and against any and all claims, causes of action, damages, costs and expenses, including reasonable attorneys' fees, in

41

DocuSign Envelope ID: C73055B1-FAB9-4EB7-BE41-DE5DD8329AA5

the event that Owner or its successors or assigns (i) modifies or causes any other Person to modify the Work Product for any purpose, or (ii) use the Work Product for any purpose other than the ownership, operation or maintenance of the Facility.

6.3     Risk of Loss.  Notwithstanding anything herein to the contrary, Contractor shall have the full responsibility for care, custody and control of material and Equipment incorporated into the Work (including all equipment and materials used in connection therewith) and shall bear the risk of loss thereof until the earlier of (i) the date on which the Owner executes and delivers the Substantial Completion Certificate, or (ii) the termination of this Agreement; *provided* that at Owner's request, risk of loss shall pass to Owner at such other time as notified by Owner; *provided, further*, that Contractor shall continue to be responsible for claims for physical loss or damage to the Facility or the Equipment to the extent resulting from any Work by Contractor undertaken to achieve Final Acceptance, any warranty Work as set forth in Section 8.2, other actions taken by Contractor pursuant to the warranties set forth in Section 8.1 or any other actions required to be undertaken by Contractor in accordance with this Agreement after the time of transfer of such risk of loss to Owner in accordance with this Section 6.3.  Thereafter, Contractor shall not be liable for any damage or loss to the Facility or the Equipment except to the extent such loss or damage is caused by Contractor's fault or negligence.  Notwithstanding the foregoing, risk of loss with respect to Owner-Furnished Equipment shall remain with Owner, and shall not pass to Contractor, until it has been delivered by Owner for unloading by Contractor at the Site.

6.4     Force Majeure.  Each Party shall be excused from performance and shall not be considered to be in default with respect to any obligation hereunder, except the obligation to pay money in a timely manner for services actually performed or other liabilities actually incurred, if and to the extent that its failure of, or delay in, performance is due to a Force Majeure Event; *provided*, that:

(a)     such Party gives the other Party written notice describing the particulars of the Force Majeure Event, and, if applicable, requesting a Change Order in respect thereof, as soon as is reasonably practicable and in any event within five (5) Business Days after the discovery of the Force Majeure Event;

(b)     the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

(c)     no obligations of the Party that arose before the occurrence causing the suspension of performance shall be excused as a result of the occurrence;

(d)     the Party (i) uses its commercially reasonable efforts to overcome or mitigate the effects of such occurrence (including by resequencing Work and, with respect to Unsuitable Weather Conditions, removing standing snow), (ii) works diligently to cure, remove or otherwise correct such occurrence, (iii) minimizes and contains all costs and expenses attendant to or arising from such occurrence, or (iv) in the case of Contractor, uses its commercially reasonable efforts to demobilize and/or otherwise reduce its costs promptly after receiving written notice from Owner directing such action;

42

DocuSign Envelope ID: C73055B1-FAB9-4EB7-BE41-DE5DD8329AA5

(e)     when the Party is able to resume performance of its obligations under this Agreement, such Party shall give the other Party written notice to that effect and shall promptly resume performance hereunder;

(f)     if all of the requirements of this <u>Section 6.4</u> are met, such Party shall be entitled to a Change Order adjusting the Project Schedule (including the Guaranteed Dates) but shall not be entitled to an adjustment to the Contract Price; and

(g)     if a Force Majeure Event prohibits Contractor from performing the Work for more than seven (7) consecutive days or twenty (20) days in the aggregate (provided, however, that delays attributable to Unsuitable Weather Conditions shall only count against such seven (7) and twenty (20) day periods if Contractor is prevented from performing more than two (2) hours of Work before 12:00 p.m. eastern time on a given day or four (4) hours of Work after 12:00 p.m. eastern time on a given day), Contractor shall be entitled to recover from Owner the actual and reasonable increase in the cost of performing the Work pursuant to a Change Order attributable to the period after such seven (7) or twenty (20) day period, as the case may be, as a direct result of the Force Majeure Event, on condition that Contractor shall use commercially reasonable efforts to demobilize and reduce such costs.  If either Party is substantially prevented from fulfilling its obligations as a result of a Force Majeure Event for more than three hundred and sixty-five (365) days in the aggregate, then, notwithstanding that the Parties may by reason thereof have been granted an extension of any required dates, either Party may terminate this Agreement by written notice to the other.  Any such termination by either Party shall be considered a termination for convenience by Owner pursuant to <u>Section 12.5</u>.

6.5     <u>Suspension of Work</u>.  Owner shall have the right to suspend all or any portion of the Work for any period of time (not to exceed one hundred twenty (120) days); *provided* that following such suspension, Contractor shall be entitled to a Change Order for an equitable adjustment to the Project Schedule (including the Guaranteed Dates) and the Contract Price as a result of such suspension; *provided, further* that Contractor shall not be entitled to an adjustment in the Project Schedule or Contract Price if Owner's suspension arose out of a breach of, or other failure of performance under, this Agreement by Contractor.

6.6     <u>Stop Work Directive</u>.     Notwithstanding <u>Section 6.5</u>, Owner or Owner's Representative may issue a stop work directive where:

(a)     continued work could cause damage, or render remedial action ineffective for any product or service provided by Contractor or the Subcontractors; or

(b)     a safety issue arises that is an imminent threat to Person(s) or property.

Upon receipt of a stop work directive, Contractor and all Subcontractors shall cease performance of the Work, including shipments of any specified products, to the extent stipulated by the stop work directive.  Contractor and the Subcontractors shall not resume Work on an activity described in a stop work directive until Contractor has obtained a written authorization from Owner or Owner's Representative.  The issuance of a stop work directive shall entitle Contractor to a Change Order for an equitable adjustment to the Project Schedule (including the Guaranteed Dates) and

Contract Price, only if the stop work directive did not arise out of a breach of, or other failure of performance under, this Agreement by Contractor.

## ARTICLE VII

## <u>CHANGES</u>

7.1     <u>Change Orders</u>.  Owner may request by Change Order any change in the Work within the general scope of and consistent with this Agreement, whether such changes are modifications, alterations, additions, or deletions.  All such changes shall be made in accordance with this <u>ARTICLE VII</u>, in the form attached as <u>Exhibit H</u>, and shall be considered, for all purposes of this Agreement, as part of the Work.  If Owner provides notice to Contractor that Owner is requesting a change in the Work, then Contractor shall, as soon as practicable, prepare a draft change order, which shall include a detailed proposal for such change in the Work, together with an explanation for the basis thereof.  If Contractor and Owner reach agreement on all matters that constitute a Change Order, then the Parties shall execute a Change Order, and Contractor shall perform all changes to the Work included in such Change Order.  If the Parties do not agree on the effects of an Owner-requested Change Order on the Contract Price, the Project Schedule, the Schedule of Values, the Guaranteed Mechanical Completion Date, Guaranteed Substantial Completion Date, or on any other provision hereof, then Contractor shall, if directed by Owner pursuant to a written instruction, nevertheless proceed to perform such Change Order work for the compensation described in <u>Section 7.3</u>.

7.2     <u>Contractor Proposed Change Orders</u>.  The intent of this Agreement is to provide a fixed-price, date certain, turn-key agreement.  Consequently, subject to the restrictions set forth below in this <u>Section 7.2</u>, Contractor shall be entitled to a Change Order under the following circumstances: (i) as provided in <u>Section 6.4</u> (Force Majeure), <u>Section 6.5</u> (Suspension of Work), <u>Section 6.6</u> (Stop Work Directive), <u>Section 7.4</u> (Differing Site Conditions), <u>Section 7.5</u> (Owner Caused Delay), <u>Section 7.6</u> (Change in Law), or amendments to the Power Purchase Agreement, Interconnection Agreement or Site Control Documents after the Effective Date, or (ii) under any other event or circumstance for which Contractor is entitled to a Change Order pursuant to terms of this Agreement. Notwithstanding anything to the contrary herein, Contractor shall not be entitled to a Change Order:

(a)     if Contractor fails to deliver to Owner a Change Order request to Owner within thirty (30) days after the date Contractor became aware, or should have become aware, of the act, event or condition giving rise to the delay in or increase in cost of performance (except with respect to a Force Majeure Event, which is governed by the requirements of <u>Section 6.4</u>);

(b)     to the extent that the event in question is attributable to Contractor's or its Subcontractor's omissions or defaults (including, without limitation, to the extent arising out of a suspension of this Agreement by Owner during the continuance of a Contractor Event of Default), or such event is not otherwise allowed to result in a Change Order because of other restrictions in this Agreement; or

(c)        for an adjustment to the Project Schedule (including the Guaranteed Dates) or the Contract Price, as applicable, except to the extent explicitly set forth in this Agreement.

7.3     Compensation for Change Orders.  In the event that Contractor is entitled to a Change Order hereunder, to the extent permitted hereunder, there shall be an equitable adjustment of the payments and time of performance under this Agreement as agreed by the Parties.  If the Parties are unable to agree on an adjustment to the Contract Price to be made for an Owner-directed Change Order, Owner shall have the right to direct Contractor to perform the Work in such Change Order on a time and materials basis under the direction and supervision of Owner or Owner's Representative.  Owner shall pay Contractor an amount equal to the actual and reasonable Direct Costs incurred, less Direct Costs avoided, as the case may be, by Contractor to make such changes to the Work as full and complete compensation for the Change Order.  Contractor shall provide Owner time cards, time sheets, invoices for materials purchases and other supporting information and documentation reasonably requested by Owner to support all such Direct Costs.  Any disputes regarding Change Orders shall be subject to the dispute resolution provisions of Section 16.3.

7.4     Differing Site Conditions.  Contractor has received site reports and reviewed the conditions at the Site including, but not limited to the Phase 1 ESA, the ALTA-1, the Hydrology Report, Geotechnical Report, the Permits that were obtained prior to the Effective Date, and the pile load testing to confirm the veracity of the Geotechnical Reports and determined the proper piling size and design (the foregoing, collectively, the "Site Conditions").  As of the Effective Date, Contractor specifically acknowledges and accepts the Site Conditions and agrees that the Project Schedule, including the Guaranteed Mechanical Completion Date and the Guaranteed Substantial Completion Date, shall not be extended and the Contract Price shall not be modified as a result of any conditions present at the Site, except as described in this Section 7.4.  To the extent that there are   conditions discovered at the Site that are materially different than the Site Conditions, including without limitation, any concealed or latent subsurface condition at the Site or any surface or subsurface structures, materials, properties or conditions having historical, cultural, archaeological, religious or similar significance, then Contractor shall be entitled to a Change Order for an equitable adjustment to the Project Schedule (including the Guaranteed Dates) and the Contract Price in accordance with this ARTICLE VII.  Contractor shall also be entitled to a Change Order in accordance with this ARTICLE VII for an equitable adjustment of the Contract Price or Project Schedule (including the Guaranteed Dates) to the extent that the habitat of an endangered or protected species as provided in applicable Law at the Site is materially different from the descriptions contained in the Site Conditions.

7.5     Owner Caused Delay.  In the event an Owner Caused Delay directly causes a delay in Contractor's performance of the Work, Contractor shall be entitled to a Change Order for an equitable adjustment to the Project Schedule (including the Guaranteed Dates) and an equitable adjustment to the Contract Price.

7.6     Change in Law.  In the event a Change in Law directly causes a delay in Contractor's performance of the Work, Contractor shall be entitled to a Change Order for an equitable adjustment to the Project Schedule (including the Guaranteed Dates).  In the event a Change in Law results in additional Direct Costs to Contractor that are in excess of Fifty Thousand Dollars ($50,000) and that are beyond the reasonable control of and not due to the fault or

negligence of Contractor, Contractor shall be entitled to a Change Order for an equitable adjustment to the Contract Price for such additional costs in excess of Fifty Thousand Dollars ($50,000). For the avoidance of doubt, the Fifty Thousand Dollar ($50,000) deductible set forth in this Section 7.6 shall be an aggregate amount that applies to any and all Changes of Law which may occur during the term of this Agreement, and shall not be a "per occurrence" amount.  All COVID-19 related issues shall be addressed pursuant to Section 6.4.

### ARTICLE VIII

### WARRANTIES

8.1     Warranties.  Contractor warrants that the Work, including each item of Equipment incorporated therein (other than Owner-Furnished Equipment), will be new and undamaged at the time of installation, will be of suitable grade of its respective kind and for its intended use, will be free from defects in design, engineering, materials, construction, and workmanship, and shall conform in all respects to all applicable Legal Requirements, Permits, the requirements of the Interconnection Provider, the Power Purchase Agreement, the Interconnection Agreement, the Site Control Documents and all other requirements of the Contract Documents.  Additionally, the modules, inverters, transformers, switches and racking systems, and all equipment incorporated into the substation (the "Major Equipment") shall, to the extent required to be procured by Contractor under this Agreement, be covered by Manufacturer warranties with terms equal to or better than those attached as Exhibit T and as approved by Owner and Contractor will take all necessary steps to ensure that the Manufacturer warranties for the Owner-Furnished Equipment are preserved through Substantial Completion.

8.2     Warranty Period.  Contractor shall remedy any breach of the warranties set forth in Section 8.1 that manifests in the Facility and for which Owner provides written notice to Contractor within two (2) years after the Substantial Completion Date (the "System Warranty Period").  When Contractor performs warranty Work after Substantial Completion, the System Warranty Period for each item of cure Work performed after Substantial Completion shall be extended until the later of (x) the expiration of the original System Warranty Period, and (y) the date that is six (6) months following the completion of such item of cure Work.  In addition, Contractor shall remedy any breach of the warranties set forth in Section 8.1 other than those involving any defect or deficiency in the Major Equipment that manifests in the Facility and for which the Owner provides written notice to Contractor within five (5) years after the Substantial Completion Date (the "Workmanship Warranty Period").  When Contractor performs warranty Work after Substantial Completion, the Workmanship Warranty Period for each item of cure Work performed after Substantial Completion shall be extended until the later of (x) the expiration of the original Workmanship Warranty Period, and (y) the date that is six (6) months following the completion of such item of cure Work.  Owner shall make all Major Equipment Manufacturer warranties that are held in Owner's name available to Contractor during the System Warranty Period and shall provide reasonable assistance to Contractor in making warranty claims to Major Equipment Manufacturers.

8.3     Remedies.

(a)       If a warranty set forth in <u>Section 8.1</u> hereof is breached or a defect or deficiency is discovered and Owner delivers a notice thereof to Contractor before the expiration of the Warranty Period, Contractor shall, upon notice from Owner of a warranty claim, at Contractor's sole option, and as Owner's sole and exclusive remedy, repair, replace, and/or correct the applicable Work (including, where required, re-engineering any deficient systems) while minimizing any impact of the failure on the availability and functionality of the Facility at a time reasonably agreed to by Owner.  Contractor shall have reasonable access to the Facility as necessary to perform its warranty obligations under this Agreement.  All costs of or incidental to Contractor's performance of its warranty obligations shall be borne by Contractor, including the removal, replacement and reinstallation of all equipment and materials necessary to gain access to defective Work and the repair of any and all damage to any part of the Facility or the Site.

(b)       If, after its receipt of notice of a breach of warranty Contractor fails to diligently commence corrective actions within five (5) days, or fails to diligently continue for and/or complete the required corrective actions within thirty (30) days, then Owner may, upon written notice to Contractor, correct such defect(s) itself, in which event Contractor shall be liable for all costs, charges and expenses incurred by Owner in connection therewith and shall forthwith pay to Owner an amount equal to such costs, charges and expenses within thirty (30) days after receipt of any invoice(s) and supporting documentation therefor from Owner.  The corrective action by Owner pursuant to this <u>Section 8.3(b)</u> shall not limit or void Contractor's warranty, provided that the corrective action by Owner is in accordance with the requirements of this Agreement, Manufacturer's warranties and Prudent Industry Standards.

(c)       If chronic failure of components of the Facility occurs during (i) the System Warranty Period or, (ii) in the case of components of the Facility other than the Major Equipment or components thereof, the Workmanship Warranty Period, Contractor shall diligently investigate the root cause of the failure and repair, replace or adjust to correct the root cause of the chronic failure in accordance with Prudent Industry Standards. For purposes hereof, a "chronic failure" shall mean a substantially similar failure occurring of same component two or more times, or a substantially similar failure occurring to more than ten percent (10%) of the same (like-kind) components as comprise part of the Equipment in a six (6) month period.

(d)       In the event any adjustment, repair, addition, correction or replacement made by Contractor pursuant to this <u>ARTICLE VIII</u> is ineffective in remedying the defective condition in question, Owner shall so notify Contractor in writing and Contractor shall proceed to conduct efforts consistent with its obligation under the root cause provision of <u>Section 8.3(c)</u> above.

8.4       <u>Warranty Exclusions</u>.  The warranty obligations of Contractor do not extend to (a) normal wear and tear or (b) damage or failure caused by (i) material abuse or material neglect of Owner, unless such action or inaction was taken or not taken, as the case may be, in reliance on written instructions provided by Contractor or its Subcontractors, (ii) modifications not performed by or through Contractor or an Affiliate of Contractor that are performed in a manner materially inconsistent with or contrary to the written information or written instructions provided by Contractor or its Subcontractors or contained in the vendor manuals provided by Contractor, (iii) the negligent acts or omissions of Owner or its contractors (other than Contractor or any Subcontractor), (iv) defects or deficiencies attributable to Force Majeure Events, or (v) failure by

47

DocuSign Envelope ID: C73055B1-5AB9-4EB7-BE41-DE5DD8329AA5

Owner to maintain or operate the Facility materially in accordance with the Operating Manual. Notwithstanding any other term or provision herein to the contrary, the warranty obligations of Contractor under this Article VIII shall not apply to, and Contractor shall have no obligations with respect to, any defect caused by the failure of any Major Equipment (including Owner-Furnished Equipment), if (x) the defect is not caused by Contractor's workmanship, or (y) the Major Equipment manufacturer (including the manufacturer of Owner-Furnished Equipment) is unable or unwilling to honor its product warranty to Owner.

8.5    <u>Subcontractors' and Vendors' Warranties</u>.   Without limiting Contractor's own warranties hereunder and without limiting Contractor's obligations under <u>Section 8.1</u> with respect to the warranty requirements for Major Equipment, Contractor shall also, for the benefit of Owner, obtain from all Subcontractors and Equipment vendors (other than vendors of Owner-Furnished Equipment) twenty-four (24) month repair and replacement warranties and guarantees (provided that twenty-four (24) month warranties and guarantees are available on commercially reasonable terms, but in no event shall such warranties be for a term of less than twelve (12) months), or for longer time period covered by a special warranty provided by a vendor as a normal part of the purchase, with respect to Equipment and services provided by such Subcontractors and vendors, which warranties shall cover the removal, repair and replacement of the Equipment under such warranties.  No warranty from a Subcontractor may be amended, modified or otherwise discharged (except in accordance with the expiration thereof) if such amendment, modification or discharge would be reasonably expected to affect such warranty after the Warranty Period.  Upon Substantial Completion of the Facility, Contractor shall assign to Owner all warranties and guarantees from all Subcontractors and vendors with respect to the Facility; *provided* that notwithstanding such assignment, Contractor shall be entitled to enforce each such warranty through the end of the Warranty Period.  Owner shall cooperate with Contractor and make such warranties and guarantees available to Contractor in connection with Contractor's performance of its warranty obligations hereunder.  Owner shall also have the right, but not the obligation, to proceed directly against any Subcontractor or vendor under their warranties or guarantees, and, to the extent Owner is able to obtain performance from such Subcontractor or vendors of any matters that are subject to Contractor's warranty obligations hereunder, such performance shall satisfy Contractor's warranty obligations with respect to the Work performed.  Neither Contractor, nor its Subcontractors, nor any Person under Contractor's control shall take any action which could release, void, impair or waive any warranties or guaranties on equipment, materials or Work that it procures from other Persons.

8.6    <u>NO IMPLIED WARRANTIES</u>.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, CONTRACTOR MAKES NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED, AND CONTRACTOR DISCLAIMS ANY WARRANTY OR GUARANTEE IMPLIED BY LAW, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES OF CUSTOM OR USAGE.

106910544.22 0081519-00002

## ARTICLE IX

## LIMITATIONS ON LIABILITY

9.1    Aggregate Limit of Liability.  Contractor's total liability for Delay Damages and Performance Liquidated Damages (including in the event of a successful challenge of the Delay Damages or Performance Liquidated Damages under the last sentence of Section 4.10) shall not exceed fifteen percent (15%) of the Contract Price (the "Liquidated Damages Cap").  Except as otherwise specifically set forth herein, Contractor's aggregate liability to Owner, from any and all causes (including all Delay Damages and Performance Liquidated Damages payable hereunder and all claims under the warranties described in this Agreement), whether based on contract, tort (including negligence), strict liability or any other cause of action, shall in no event exceed the Contract Price *provided*, *however*, that the foregoing limitation shall not apply to acts of gross negligence, willful misconduct or fraud by Contractor, amounts transferred to Owner pursuant to Section 2.4(k)(i) or Contractor's indemnification obligations under Section 5.9 and  ARTICLE X.  Contractor's total liability for purposes of this Section 9.1 shall be calculated without regard to claims made, or amounts received, in respect of any of the warranties and guarantees of the Subcontractors and vendors obtained in accordance with Section 8.4, any Manufacturer warranties obtained pursuant to Section 8.1 and liabilities excluded from the Contractor's aggregate liability limitation hereunder by the proviso to the immediately preceding sentence.  Owner's aggregate liability to Contractor, from any and all causes, whether based on contract, tort (including negligence), strict liability or any other cause of action, shall in no event exceed the Contract Price, *provided however*, that the foregoing limitation shall not apply to acts of gross negligence, willful misconduct or fraud by Owner or Owner's indemnification obligations under ARTICLE X.  Owner's total liability for purposes of this Section 9.1 shall be calculated without regard to claims made, or amounts received, in respect of liabilities excluded from the Owner's aggregate liability limitation hereunder by the proviso to the immediately preceding sentence.

9.2    Direct Damages Only.  EXCEPT FOR CONTRACTOR'S LIABILITY FOR DELAY DAMAGES, PERFORMANCE LIQUIDATED DAMAGES, ANY LIABILITIES TO A THIRD PARTY FOR WHICH A PARTY IS SEEKING INDEMNIFICATION HEREUNDER AND AMOUNTS OWED BY CONTRACTOR IN THE LAST SENTENCE OF SECTION 4.10, NO PARTY SHALL BE LIABLE FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES OR LOST PROFITS, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.

9.3    Intent.  Except in cases of fraud, willful misconduct or gross negligence, the Parties intend that the waivers and disclaimers of liability, releases from liability, limitations and apportionments of liability, and indemnity and hold harmless provisions expressed throughout this Agreement shall apply even in the event of the fault, negligence (in whole or in part), strict liability or breach of contract of the Party released or whose liability is waived, disclaimed, limited, apportioned or fixed by any such provision, and shall extend to such Party's Affiliates and its and their partners, shareholders, directors, officers, employees and agents.  The Parties also intend and agree that such provisions shall continue in full force and effect notwithstanding the completion, termination, suspension, cancellation or rescission of this Agreement.

# ARTICLE X

# INDEMNIFICATION

10.1    <u>Contractor Indemnity</u>.  To the fullest extent permitted by Law, Contractor shall indemnify, defend and hold harmless the Owner Indemnified Parties from and against any and all third-party claims for losses, damages, expenses and liabilities, including fines, penalties, court costs and reasonable attorneys' fees sought by the third-party (collectively, "<u>Claims</u>") made against any Owner Indemnified Party to the extent they arise in connection with or are related to (a) any breach or violation of or default under this Agreement or any applicable Legal Requirements by, or (b) the fault, willful misconduct, or negligent acts or omissions of, in each case of (a) and (b), any Contractor Indemnified Party, any Subcontractor or any employee, agent or other Person under their control, provided, however, that in no event shall Contractor be obligated under this <u>Section 10.1</u> to the extent such Claims arise due to (i) latent defects in the Owner-Furnished Equipment or (ii) the negligence or willful misconduct of the Owner Indemnified Parties.

10.2    <u>Intellectual Property Indemnity</u>.

(a)    <u>No Infringement</u>.  Contractor represents and warrants to Owner that the Equipment (other than the Owner-Furnished Equipment) and all specifications prepared or to be prepared by or on behalf of Contractor in connection with the Facility will not infringe any patent, patent pending, trademark, copyright, or any other intellectual property rights (hereinafter referred to separately and collectively as "<u>Proprietary Interest</u>") and no infringement of any Proprietary Interest has been asserted by any third party with respect to  the Equipment or any specifications prepared or to be prepared by or on behalf of Contractor in connection with the Facility.  For the avoidance of doubt, the representation and warranties contained herein do not apply to any infringement claims to the extent related to Owner-Furnished Equipment.

(b)    <u>Indemnification by Contractor</u>.  Contractor agrees to indemnify, defend, and hold harmless Owner Indemnified Parties from and against any and all Claims arising out of or relating to any infringement or the improper use of any Proprietary Interest which may occur in connection with Contractor's or any Subcontractor's or vendor's performance of the Work pursuant to this Agreement, except with respect to infringement claims related solely to the Owner-Furnished Equipment.

(c)    <u>Removal of Injunctions</u>.  If Owner is enjoined from completion of the Facility or any part thereof, or from the use, operation or enjoyment of the Facility, the Equipment, or any part thereof as a result of any Claim, legal action or litigation of the type described in <u>Section 10.2(b)</u>, Contractor shall promptly arrange, in each case at no cost to Owner, to have such injunction removed, or to substitute non-infringing equipment or processes, or to modify such infringing Equipment or processes or the Facility so they become non-infringing, *provided* that Owner may, at its option and without thereby limiting any other right it may have hereunder or at law or in equity, require Contractor to supply, temporarily or permanently, equipment not subject to such injunction and not infringing any Proprietary Interest or to remove all such Equipment and refund the cost thereof to Owner or to take such steps as may be necessary to ensure compliance

by Owner with such injunction, all to the satisfaction of Owner and all without cost or expense to Owner.

10.3 <u>Environmental Indemnity</u>.  Notwithstanding any other provision hereof, to the fullest extent permitted by Law, Contractor shall indemnify, defend and hold harmless the Owner Indemnified Parties from and against all Claims arising out of or relating to any violations of any Permits or Environmental Laws, including the Release at, on, above, below or near the Site or in connection with the Work, of any Hazardous Materials to the extent such violation or Release related to pre-existing Hazardous Materials that were negligently Released on the Site by Contractor or a Subcontractor, Hazardous Materials brought onto the Site by Contractor or a Subcontractor or if such violation or Release resulted from a violation by Contractor of its obligations under <u>Section 2.3</u>.

10.4 <u>Owner's Indemnity</u>.  To the fullest extent permitted by Law, Owner shall indemnify, defend and hold harmless the Contractor Indemnified Parties from and against any and all Claims made against any Contractor Indemnified Party in connection with or arising from any third-party claims for losses, damages, expenses and liabilities, including fines, penalties, court costs and reasonable attorneys' fees sought by the third party to the extent they arise in connection with or are related to (a) latent defects in the Owner-Furnished Equipment, (b) any breach or violation of or default under this Agreement or any applicable Legal Requirements by, or (c) the fault, willful misconduct, or negligent acts or omissions of, in each case of (b) and (c), the Owner Indemnified Parties, or their respective agents or employees or others under their control, provided, however, that in no event shall Owner be obligated under this <u>Section 10.4</u> to the extent such Claims arise due to the negligence or willful misconduct of the Contractor Indemnified Parties.

10.5 <u>Defense of Claims</u>.  The indemnifying party shall have the right to defend any indemnified party with counsel (including insurance counsel) of the indemnifying party's selection reasonably satisfactory to the indemnified party, with respect to any Claims within the indemnification obligations hereof; *provided* that the indemnified party shall have the right to be represented therein by advisory counsel of its own selection and at its own expense.  If the defendants in any such action include both the indemnifying party and the indemnified party, and (i) if the indemnified party shall have reasonably concluded that there may be legal defenses available to it which are inconsistent with those available to the indemnifying party, (ii) any settlement is reasonably likely to involve injunctive, equitable or prospective relief or to materially and adversely affect the indemnified party's business or operations other than as a result of monetary damages, or (iii) the indemnified party reasonably believes that the matter in question involves potential criminal liability, then the indemnified party shall have the right to select separate counsel to participate in the defense of such action on its own behalf and at the indemnifying party's expense.  An indemnified party shall give the indemnifying party prompt written notice of any asserted Claims or actions indemnified against hereunder and shall cooperate in the defense of any such Claims or actions.  Without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, the indemnifying party shall not settle any Claims or actions in a manner that would require any action or forbearance from action by, or result in any judgment, including but not limited to criminal liability against, any indemnified party.  If the indemnifying party fails to assume or diligently prosecute the defense of any Claim in accordance with this <u>ARTICLE X</u>, then the indemnified party shall have the absolute right to control the defense of such Claim and the right to settle, compromise, consent to the entry of any

judgment in or otherwise seek to terminate any action, Claim, suit, investigation or proceeding for which indemnity is afforded hereunder, and the fees and expenses of such defense, including reasonable attorneys' fees of the indemnified party's counsel, and any amount determined to be owed by the indemnifying party pursuant to such Claim shall be borne by the indemnifying party, provided that the indemnifying party will be entitled to participate in, but not control such defense.

## ARTICLE XI

## <u>INSURANCE</u>

11.1   <u>Contractor Insurance</u>.  Prior to commencing any Work through the Substantial Completion Date (except with respect to the Commercial General Liability Insurance and Professional Liability Insurance coverages required by <u>Sections 11.1(a)</u> and <u>11.1(e)</u> respectively, which shall continue until the second anniversary of such date), Contractor shall provide and maintain, with insurers of recognized responsibility authorized to do business in the State in which the Site is located and assigned an A.M. Best rating of no less than A IX, the following insurance which shall include the minimum coverages and limits set forth below.

(a)    Commercial General Liability Insurance (with coverage consistent with ISO Form CG 00 01 12 07 or its equivalent) with a limit of not less than $1,000,000 per occurrence and $2,000,000 per project or per location general aggregate, and a deductible or self-insured retention not to exceed $50,000 per occurrence, covering liability for bodily injury and property damage, arising from premises, operations, independent contractors, personal injury/advertising injury, contractual liability, and products/completed operations for not less than two (2) years from the Substantial Completion Date.

(b)    Commercial Automobile Liability Insurance, including coverage for liability arising out of the use of owned (if any), non-owned, leased or hired automobiles, for both bodily injury and property damage in accordance with applicable Legal Requirements, with a limit of not less than $1,000,000 combined single limit per occurrence.

(c)    Worker's Compensation Insurance, with statutory limits, covering all of Contractor's employees, on terms and conditions as required by applicable Law and imposed by worker's compensation, occupational disease or similar laws, including the Longshore and Harbor Workers' Act, the Federal Employers' Liability Act and the Jones Act, if applicable.

(d)    Employers' Liability Insurance with limits of not less than $1,000,000 each accident for bodily injury by accident, $1,000,000 each employee for bodily injury by disease, and $1,000,000 policy limit.

(e)    Professional Liability Insurance, with limits of no less than $5,000,000 per incident and in the aggregate prior to April 15, 2021, and limits of no less than $10,000,000 per incident and in the aggregate after April 15, 2021.  If any of the Work performed by Contractor or its Subcontractors includes the rendering of professional services including, but not limited to, architectural, engineering, design, or consulting services, Contractor shall maintain and/or require any Subcontractor involved in the same or similar services, to maintain Professional Liability or Errors and Omissions insurance.  If coverage is written on a claims-made basis, the retroactive

DocuSign Envelope ID: C73055B1-FAB9-4EB7-BE41-DE5DD83294A5

date shall precede the date on which Contractor begins performance of the Work and continuous coverage shall be maintained for two (2) years after Final Completion or the date of termination of this Agreement.

(f)     Umbrella or Excess Liability Insurance, with limits of no less than $10,000,000 per occurrence and per project or per location aggregate with coverage in excess of Sections 11.1(a), (b) and (d), which coverage shall be materially follow form, however, these liability limits may be met with any combination of primary and Umbrella or Excess Liability Insurance policy limits totaling $10,000,000.

(g)     Pollution Liability Insurance applicable to bodily injury; property damage, including loss of use of damaged property or of property that has not been physically injured or destroyed; cleanup costs; and defense, including costs and expenses incurred in the investigation, defense, or settlement of claims, with limits of $5,000,000 each claim and in the aggregate, and automobile pollution liability coverage at least as broad as that provided under the ISO pollution liability – broadened coverage for covered auto endorsement (CA 99 48) shall be provided, and the Motor Carrier Act Endorsement (MCS 90) shall be attached to the automobile liability policy as required in Section 11.1(b).

(h)     To the extent permitted by applicable Laws, all above-mentioned insurance policies shall provide the following:

(1)     Be primary and non-contributory to any other liability insurance carried by Owner as respects any claims, losses, damages, expenses or liabilities arising out of, relating to in any way, or incident to the Work or any activities of Subcontractors at the Site;

(2)     Contain cross-liability coverage as provided under standard ISO Forms' separation of insureds clause (with the exception of the Workers' Compensation policy);

(3)     Provide for a waiver of all rights of subrogation which Contractor's or Subcontractor's insurance carriers might exercise against Owner Indemnified Parties; and

(4)     Any Excess or Umbrella liability coverage will not require contribution before it will apply.

(i)     The insurance referenced in Section 11.1(a)-(b) and (f)-(g) above shall be endorsed to include the following:

(1)     Owner and Facility Lenders, including the directors, officers, Affiliates, agents, representatives, employees, subsidiaries, successors, and assigns of each ("Additional Insureds") shall be named Additional Insured.  The general liability policy shall be endorsed using the ISO Form CG 2010 07 04 and CG 2037 07 04 or their equivalent;

(2)     The coverage afforded Additional Insureds shall be primary as respects any claims, losses, damages, expenses or liabilities arising out of, relating to in

DocuSign Envelope ID: C73055B1-5AB9-4EB7-BE41-DE5DD8329AA5

any way, or incident to the Work or any activities of Subcontractors at the Site, regardless whether instituted against Owner alone or jointly with the Subcontractors or others, and noncontributing with any other insurance maintained by Additional Insureds; and

(3)  Owner and Facility Lenders shall be given thirty (30) days advance written notice of cancellation or non-renewal of the policy by the insurer, except then (10) days' notice for cancellation due to non-payment of premium.

11.2    <u>Subcontractor Insurance</u>.  Contractor shall require all first-tier Subcontractors to comply with the insurance requirements set forth in <u>Sections 11.1(a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(d)</u>.  Contractor shall require all Major Subcontractors to include provisions in all lower-tier subcontracts requiring such lower-tier Subcontractors to comply with such insurance requirements.  Contractor shall obtain insurance certificates from each first-tier Subcontractor and each Major Subcontractor and shall provide insurance certificates from first-tier Subcontractors and Major Subcontractors to Owner upon request.  Contractor shall require all Subcontractors that are not Major Subcontractors to obtain and maintain polices of insurance that are reasonable, customary and consistent with Prudent Industry Practices in light of the scope of Work to be performed by such Subcontractors.

11.3    <u>Additional Requirements</u>.

(a)    Prior to commencement of Work under this Agreement, Contractor shall provide Owner with certificates of insurance evidencing compliance with the foregoing requirements relating to insurance policies to be obtained and maintained by Contractor, accompanied by copies of the required endorsements.  Any failure of such certificates to conform to the contractual requirements specified in this <u>ARTICLE XI</u> shall not result in a waiver by Owner of any rights under this Agreement or Contractor's required insurance and indemnity obligations herein and such obligations shall continue in full force and effect.

(b)    All coverage required hereunder shall be kept in full force and effect during the performance of the Work, *provided, however*, products/completed operations coverage shall continue for two (2) years after the Substantial Completion Date and if any policy is written on a claims made basis, (i) the retroactive date may not be advanced after the date of this Agreement and (ii) coverage shall be maintained in full force and effect for two (2) years after termination of this Agreement, which coverage may be in the form of tail coverage or extended reporting period coverage if agreed by the Parties.

(c)    If Contractor fails to comply with its obligations as specified in this <u>ARTICLE XI</u>, Owner shall have the right, but not the obligation, to procure the required insurance coverage at Contractor's expense without in any way compromising or waiving any right or remedy at law or in equity and Contractor shall not be relieved of or excused from the obligation to obtain and maintain such insurance amounts and coverages.  All such costs incurred by Owner shall be promptly reimbursed by Contractor and/or may be withheld from any payment due Contractor.

(d)    To the extent allowed by Law, Contractor shall furnish Owner with accident report(s) covering accidents occurring in connection with or as a result of the performance of the Work within five (5) days of the occurrence of such an accident.

DocuSign Envelope ID: C73055B1-5AB9-4EB7-BE41-DF5DD8329AA5

(e)  Contractor shall be responsible for any deductibles or self-insured retentions applicable to the insurance provided in compliance with this ARTICLE XI, except as described in Section 11.4.

(f)  Insurance coverage provided by Contractor under this ARTICLE XI shall not include any endorsement limiting coverage available to Owner which is otherwise required by this ARTICLE XI.

(g)  Contractor shall notify Owner in writing when coverages required herein have been reduced as a result of claim payments, expenses or both.

(h)  None of the requirements contained in this ARTICLE XI as to types, limits, or Owner's approval of insurance coverage to be maintained by Contractor are intended to and shall not in any manner limit, qualify or quantify the liabilities and obligations assumed by Contractor hereunder, in any other agreement with Owner, or as otherwise provided by applicable Law.

(i)  The above-mentioned insurance policies (except Workers' Compensation) shall contain standard cross-liability (separation of insureds) provisions.

(j)  Contractor shall and hereby waives all rights of subrogation against the Owner Indemnified Parties.

(k)  In addition, Contractor shall cause each policy to include the following severability provisions: (i) a provision requiring the insurers to undertake to each insured that the policy will not be invalidated as regards the rights and interests of such insured and that the insurers will not seek to avoid liability under this policy because of any act, neglect, error or omission made by any other insured including any failure by any other insured to disclose any material fact, circumstance or occurrence, any misrepresentation by any other insured or any breach or non-fulfillment by any other insured of any condition, warranty, or provisions contained in the policy; and (ii) a provision requiring the insurers to agree that no insured shall be penalized or prejudiced in any way by any unintentional or inadvertent misrepresentation, non-disclosure, want of due diligence or breach of any declaration, terms, condition or warranty, of a policy (together the "Relevant Matter"), except as regards to the individual insured responsible for the Relevant Matter if that insured fails to notify the insurers or the brokers through whom the policy was placed as soon as reasonably practicable after the management or managers of that insured become aware or are made aware of the Relevant Matter.

(l)  Failure of Contractor to provide insurance as herein required or failure of Owner to require evidence of insurance or to notify Contractor of any breach by Contractor of the requirements of this ARTICLE XI shall not be deemed to be a waiver by Owner of any of the terms and conditions of this Agreement, nor shall they be deemed to be a waiver of the obligation of Contractor to indemnify, defend, and hold harmless Owner as required herein.  The obligation to procure and maintain any insurance required is a separate responsibility of Contractor and independent of the duty to furnish a copy or certificate of such insurance policies.

11.4  Builders All-Risk Insurance.  From and after the Effective Date and continuing until the Substantial Completion Date, Owner shall purchase and maintain builders' risk insurance,

on an "all-risk" replacement cost basis with extended coverage, including earthquake, flood, and other perils or causes of loss customarily covered under an all-risk policy providing coverage for the Facility and the Work and with customary endorsements (including but not limited to endorsements, minimum sub-limits and coverage extensions).  This insurance shall also cover equipment or other property stored off the Site including transit.  The limit of such insurance shall be equal to the 100% of the replacement cost value of the property under construction (except for earthquake and flood).  Such builder's all risk insurance shall (i) include as additional insureds Contractor and Subcontractors, but only to the extent of their interests, and (ii) name Owner and Facility Lender as loss payees as their respective interests may appear.  During the period between the Effective Date and the Substantial Completion Date, Contractor shall be solely responsible for payment of any deductibles up to $50,000 per occurrence for claims relating to builder's all-risk insurance, provided that with respect to physical loss or damage caused by the negligence of Owner, any required payments of the deductibles for claims relating to builders' all-risk insurance shall be the responsibility of Owner.  Contractor and Owner waive all rights of subrogation against each other and any Subcontractors.  Any waiver of subrogation related to the builders' all-risk or any other property insurance maintained by Owner for the Facility shall only be effective for losses that arise on or before the earlier of the termination of this Agreement, and the Substantial Completion Date.  At Owner's election and at Owner's expense, coverage may include "delay in start-up" coverage.

## ARTICLE XII

## DEFAULT AND REMEDIES; TERMINATION

12.1   <u>Owner Events of Default</u>.  The following shall constitute events of default on the part of Owner (each, an "<u>Owner Event of Default</u>") under this Agreement:

(a)      If Owner fails to make any undisputed payment required hereunder within thirty (30) days after written notice thereof from Contractor;

(b)      If any representation or warranty of Owner in this Agreement or of Owner Guarantor in the Owner Payment Security proves to have been false or misleading in any material respect when made, and Owner or Owner Guarantor, as the case may be, has not, within thirty (30) days after written notification thereof from Contractor, either fully remedied, or commenced and diligently pursued the remedy of, all adverse impacts on Contractor resulting therefrom, *provided* that such thirty (30) day period may be extended by sixty (60) days so long as Owner or Owner Guarantor, as the case may be, has commenced and is at all times diligently pursuing such remedy;

(c)      If Owner or Owner Guarantor makes a general assignment for the benefit of its creditors (except as permitted pursuant to <u>Section 13.2</u>), or if a receiver is appointed on account of the insolvency of Owner or Owner Guarantor, or if Owner or Owner Guarantor files a petition seeking to take advantage of any other Law relating to bankruptcy, insolvency, reorganization, winding up or composition of or readjustment of debts and, in the case of any such proceeding instituted against Owner or Owner Guarantor (but not by Owner or Owner Guarantor) such proceeding is not dismissed within sixty (60) days of such filing; or

(d)      If Owner or Owner Guarantor fails to comply with any material provision of this Agreement not otherwise set forth as an Owner Event of Default in this <u>Section 12.1</u> and fails to cure or remedy such failure within thirty (30) days after notice and a written demand is made by Contractor to Owner or Owner Guarantor, as the case may be, to cure the same or, if such failure cannot be cured within thirty (30) days, Owner or Owner Guarantor, as the case may be, fails to commence to cure such breach within thirty (30) days after such notice and written demand and thereafter diligently pursue such cure to completion, which cure shall in no event be later than sixty (60) days after such notice; or

(e)      The Owner Payment Security shall cease, for any reason, to be in full force and effect, or the Owner Guarantor shall so assert in writing.

12.2    <u>Contractor Events of Default</u>.  The following shall constitute events of default on the part of Contractor (each, a "<u>Contractor Event of Default</u>") under this Agreement:

(a)      If Contractor fails to make any undisputed payment required hereunder within thirty (30) days after written notice thereof from Owner;

(b)      Contractor abandons the Work;

(c)      Contractor incurring liability for Delay Damages and Performance Liquidated Damages in the aggregate equal to the Liquidated Damages Cap;

(d)      Failure of Mechanical Completion with respect to the Facility to occur within sixty (60) days of the Guaranteed Mechanical Completion Date;

(e)      Failure of Substantial Completion with respect to the Facility to occur within sixty (60) days of the Guaranteed Substantial Completion Date;

(f)      If any representation or warranty of Contractor in this Agreement proves to have been false or misleading in any material respect when made, and Contractor, as the case may be, has not, within thirty (30) days after written notification thereof from Owner, fully remedied all adverse impacts on Owner resulting therefrom; *provided* that such thirty-day period may be extended by sixty (60) days so long as Contractor has commenced and is at all times diligently pursuing such remedy;

(g)      If Contractor makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of the insolvency of Contractor, or if Contractor files a petition seeking to take advantage of any other Law relating to bankruptcy, insolvency, reorganization, winding up or composition of or readjustment of debts and, in the case of any such proceeding instituted against Contractor (but not by Contractor) such proceeding is not dismissed within sixty (60) days of such filing;

(h)      If Contractor fails to maintain insurance pursuant to <u>ARTICLE XI</u>, and Contractor has not, within (5) Business Days obtained replacement insurance;

(i)      If Contractor fails to comply with any material provision of this Agreement not otherwise defined as a Contractor Event of Default in this <u>Section 12.2</u> and fails to

57

cure or remedy such failure within thirty (30) days after notice and a written demand is made by Owner to Contractor, as the case may be, to cure the same or, if such failure cannot be cured within thirty (30) days, Contractor fails to commence to cure such breach within thirty (30) days after such notice and written demand and thereafter diligently pursue such cure to completion, which cure shall in no event be later than sixty (60) days after such notice;

(j)     Any Payment or Performance Bond ceases to be in full force and effect except that if Contractor discovers or is notified that, due to no fault of Contractor, the Payment or Performance Bond is terminated or otherwise invalid, Contractor is entitled to twelve (12) Business Days to obtain a replacement bond; or

(k)     If two or more engineering, procurement and construction agreements between Contractor and an Affiliate of Owner for solar projects are terminated in accordance with the terms thereof because of an event of default by Contractor.

12.3    Contractor Remedies Upon Owner Event of Default.

(a)     Upon the occurrence and continuation of an Owner Event of Default, Contractor may terminate this Agreement upon ten (10) days written notice to Owner, and Owner shall pay to Contractor an amount equal to the following:

(i)     the value, in accordance with the Schedule of Values included in Exhibit E-1, of all authorized Work performed by Contractor up to the date of such termination and for which Contractor has not previously been paid, plus payment for progress achieved on any partially completed Work, and

(ii)     all Direct Costs incurred by Contractor in connection with the termination of this Agreement, including in connection with (i) Equipment reasonably ordered for the Work which have been delivered to Contractor or for which Contractor is legally liable to pay or accept delivery (title to all of which shall pass to Owner upon payment for same); (ii) payments made or to be made by Contractor to any Subcontractors in connection with the termination of any subcontracts or supply arrangements with respect to the Facility, including any cancellation charges; (iii) other termination-related costs, including demobilization costs, and (iv) protecting the Work and leaving the Site in a clean and safe condition as directed by Owner.

(b)     Contractor's claim (which shall contain detailed supporting documentation) shall be submitted within thirty (30) days of the effective date of termination under this Section 12.3.  Contractor waives any claims for any other damages due to a termination pursuant to this Section 12.3 and the above amounts shall constitute Contractor's sole remedy for such termination.

12.4    Owner Remedies Upon Contractor Event of Default.

(a)     Generally.  Upon the occurrence and during the continuation of a Contractor Event of Default, in addition to any or all other remedies available at law or at equity, all of which shall be cumulative, Owner may terminate this Agreement upon ten (10) days written notice to Contractor.  If any termination for cause by Owner pursuant to this Section 12.4 is ultimately determined to have been wrongful, then such termination shall be deemed a termination

58

for convenience pursuant to <u>Section 12.5</u>, and Contractor's sole remedy shall be the receipt of the amounts set forth in <u>Section 12.5</u>.

(b) <u>Rights on Termination</u>.  If Owner terminates this Agreement pursuant to this <u>Section 12.4</u>, upon Owner's request, Contractor (i) shall withdraw from the Site, (ii) shall assist Owner in preparing an inventory of all Equipment located on the Site, in storage or in transit, (iii) shall assign to Owner (or to any replacement contractor) such of Contractor's subcontracts (including warranties), purchase orders and Permits as Owner may request, and (iv) subject to <u>Section 6.2</u>, shall deliver and make available to Owner all information, drawings, specifications documents, patents, licenses of Contractor (whether or not such information, drawings, specifications documents, patents, and licenses are complete) and any proprietary components related to the Work reasonably necessary to permit Owner to complete or cause the completion of the Work, and in connection therewith Contractor authorizes Owner and its agents to use such information solely in completing the Work and operating the Facility.  Contractor shall remove all materials, equipment, tools, and instruments used by and any debris or waste materials generated by Contractor in the performance of the Work as Owner may direct.  For those items of Work that are completed as of the date of termination, Contractor shall provide Owner with a warranty for such Work with the same protections and remedies as set forth in <u>ARTICLE VIII</u> for a period of one (1) year commencing on the date of termination.  Owner may employ any other qualified Person, firm, or corporation to finish the Work by whatever method Owner may deem expedient and may undertake such reasonable expenditures as will best accomplish the timely completion of the Work.  In such event Contractor shall not be entitled to receive any further payments under this Agreement.

(c) <u>Determination of Completion Costs</u>.  Within a reasonable time after a termination of this Agreement pursuant to this <u>Section 12.4</u>, Owner shall provide Contractor with a schedule of values estimating the cost to complete the Work.  As soon as practicable after Final Acceptance of the Facility after a termination of this Agreement pursuant to this <u>Section 12.4</u>, Owner shall determine the Completion Cost.  If the Completion Cost exceeds the unpaid portion of the Contract Price at the time of the termination of this Agreement, then Contractor shall pay to Owner the amount of such excess within thirty (30) days following receipt of Owner's demand for such payment, which shall be accompanied by reasonable supporting documentation.  Under such circumstances, Owner shall not be required to pay additional amounts to Contractor.

12.5 <u>Termination for Convenience</u>.

(a) Owner may terminate this Agreement for convenience in whole or in part (including by reducing the Scope of Work) on ten (10) days written notice to Contractor.  Upon receipt of any such notice, Contractor shall, unless the notice directs otherwise:

(i) immediately discontinue the Work on the date and to the extent specified in such notice;

(ii) place no further orders or subcontracts for Equipment or services except as may be necessary for completion of such portion of the Work that is not discontinued;

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DF5DD8329AA5

(iii)     promptly make every reasonable effort to procure cancellations upon terms satisfactory to Owner of all orders, subcontracts, and rental agreements to the extent they relate to the performance of the Work that is discontinued on terms that mitigate the cost thereof; and

(iv)     thereafter execute only that portion of the Work as may be necessary to preserve and protect Work already in progress and to protect Equipment at the Site or in transit thereto.

(b)     In the event of termination for convenience by Owner under this Section 12.5, Contractor shall be entitled to payment of the amounts that would be due Contractor for its termination of the Agreement pursuant to Section 12.3, above. Contractor's claim (which shall contain detailed supporting documentation reasonably approved by Owner) shall be submitted within thirty (30) days of the effective date of termination under this Section 12.5. Contractor waives any claims for any other damages due to a termination pursuant to this Section 12.5 and the above amounts shall constitute Contractor's sole remedy for such termination.

12.6    Mitigation Upon Breach.  Each Party shall use reasonable efforts to mitigate any damage, expense or liability incurred as a result of the other Party's breach of this Agreement.

12.7    Termination Prior to NTP.  Owner is entitled to terminate this Agreement for convenience prior to issuance of the Notice to Proceed to Contractor.  Owner will have no obligation to Contractor under this Agreement until the Owner issues the Notice to Proceed, except that, upon issuance of a Limited Notice to Proceed, Owner shall be obligated to make the payments for the Work specified therein and actually performed in the manner required by such Limited Notice to Proceed.

## ARTICLE XIII

## ASSIGNMENT

13.1    General.  Subject to Section 13.2, neither Party shall assign or in any other manner transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party.  Any purported assignment or transfer without such consent, whether voluntary or involuntary, by operation of Law, under legal process or proceedings, by receivership, in bankruptcy or otherwise, is void.

13.2    Permitted Assignments.  Notwithstanding Section 13.1, Owner may, without Contractor's consent, but with written notice to Contractor:  (i) assign this Agreement to (A) any subsidiary, Affiliate or special purpose company formed by Owner or any Affiliate for the purpose of developing and owning the Facility, or (B) a purchaser of all or substantially all of Owner's assets or Owner's successor in interest as part of a corporate reorganization, consolidation, take-over, merger or other business combination, or (ii) collaterally assign this Agreement as security to any Facility Lender; *provided*, *however*, that no assignment of this Agreement by Owner pursuant to the foregoing sub-clauses (i) or (ii) shall release Owner from its further obligations and liabilities under this Agreement.  A permitted assignee of Owner under this Section 13.2 shall be bound by the obligations of this Agreement (upon consummation of a foreclosure of its security

interest in the case of a Facility Lender) and shall, upon Contractor's request, deliver a written assumption of Owner's rights and obligations under this Agreement to Contractor.

## ARTICLE XIV

## REPRESENTATIONS

14.1    <u>General Representations and Warranties</u>.    Each Party hereby represents and warrants to the other Party that:

(a)    It is duly organized, validly existing and in good standing under the Laws of the state of its formation and is duly qualified to do business in the jurisdiction where the Site is located.

(b)    It has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; its execution, delivery and performance of this Agreement have been duly authorized by all necessary action on its part; and this Agreement has been duly and validly executed and delivered by it and constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or moratorium or other similar Laws relating to the enforcement of creditors' rights generally and by general equitable principles.

(c)    As of the Effective Date, (i) it is not in violation of any applicable Legal Requirement, or any judgment entered by any national, regional or local Governmental Authority, which violations, individually or in the aggregate, would adversely affect its performance of any obligations under this Agreement and (ii) there are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority, now pending or (to its best knowledge) threatened against it which, if adversely determined, could have a material adverse effect upon its financial condition, operations, prospects or business, as a whole, or its ability to perform under this Agreement.

(d)    No authorization, approval, exemption, or consent of or by any Person is required by it in connection with the execution, delivery, and performance of this Agreement.  In addition, subject to the requirements of <u>Section 2.3</u> and <u>Section 2.4(g)</u>, Contractor represents and warrants to Owner that the Contractor Permits either have been obtained by Contractor and are in full force and effect on the date hereof or will be obtained by Contractor and will be in full force and effect on or prior to the date on which they are required, under applicable Law, to be in full force and effect, so as to permit Contractor to commence and prosecute the Work to completion in accordance with the Project Schedule.

(e)    The execution and delivery of this Agreement, the consummation of the transactions herein contemplated and compliance with the terms and provisions hereof by it will not conflict with or result in a material breach of, or require any consent under, any of its constitutive documents, or any applicable Law, or any agreement or instrument to which it is a party or by which it is bound or to which it is subject, or constitute a material default under any such agreement or instrument.

14.2    <u>Additional Representations and Warranties of Contractor</u>.

(a)      Contractor has (either directly or through its Subcontractors) all the required authority, ability, skill, experience and capacity necessary to perform the Work and diligently do so in a timely and professional manner, utilizing sound engineering and design principles, project management procedures, construction procedures and supervisory procedures, all in accordance with applicable Laws, Permits and Prudent Industry Standards.

(b)      Subject to the requirements of Section 2.3 and Section 2.4(g), Contractor (and any Subcontractor) has, or will have at the time of performance of the relevant portion of the Work, all Contractor Permits for Contractor (or such Subcontractor) to perform the Work.

(c)      Contractor is a licensed contractor in the State of Michigan with license number 6113903 which license was issued on May 18, 2018 and is in full force and effect as of the date hereof and shall be in full force and effect for the duration of this Agreement.

(d)      The Parties acknowledge the existence of the disease designated as COVID-19 or 2019-nCoV acute respiratory disease or the virus designated as SARS-CoV-2, 2019 novel coronavirus or 2019-nCoV ("COVID-19") and that Governmental Authorities and businesses globally are making efforts and enacting measures to contain COVID-19 to protect public health and safety. Contractor acknowledges that, as of the Effective Date, (i) none of Contractor's existing or potential Subcontractors has provided written notice to Contractor that its ability to provide equipment, supplies, or services to Contractor has been adversely affected by COVID-19; and (ii) Contractor has basis to claim a Force Majeure Event resulting from COVID-19. Notwithstanding the foregoing, this Section 14.2(d) shall not restrict Contractor's ability to seek a Change Order under ARTICLE VII to the extent a Force Majeure Event occurs after the Effective Date.

14.3    Title Company Representations.  Because Owner's title insurance company will seek to provide mechanic's lien coverage for the benefit of any Facility Lenders, whose mortgage lien(s) may be recorded after the commencement of the Work, Contractor hereby expressly acknowledges that such title insurance company may rely on the certifications contained in any lien waiver delivered by Contractor pursuant to Section 5.8.  Contractor hereby agrees that Contractor shall from time to time execute any reasonable documents requested by Owner in furtherance of and/or confirming the foregoing consent, but the foregoing provisions shall be self-operative without the necessity of further documentation.  Additionally, Contractor shall from time to time upon the request of and in the form attached as Exhibit M-7 provide one or more agreements in favor of the title company and/or any holder of a mortgage loan secured by the Site, directly providing to such party the right to rely on the certifications contained in any lien waiver delivered by Contractor pursuant to Section 5.8 and indemnifying such party against those matters for which Contractor has provided an indemnity to Owner under Section 5.9.  Contractor shall include provisions equivalent to this Section 14.3 in each first-tier subcontract.  Contractor shall require all Subcontractors to include provisions equivalent to this Section 14.3 in all lower-tier subcontracts.

14.4    Financing Assistance.  Contractor shall cooperate with Owner in connection with Owner's efforts to obtain and maintain any Financing.  Without limiting the generality of the foregoing, Contractor:  (a) shall execute such typical documents as an engineering, procurement and construction contractor executes in a project finance transaction or as Owner reasonably

requests in connection with obtaining and maintaining any Financing, including a consent to assignment, an estoppel certificate and any other certifications and opinions required with respect to the Financing in form and substance reasonably acceptable to Contractor, Owner and the Facility Lender; (b) shall deliver to Owner and the Facility Lender information customarily provided in connection with a project financing in format and content mutually acceptable to the Parties regarding the financial capability of Contractor and facilitate inspections of the Site; (c) shall at Owner's reasonable request, attend and participate in presentations to actual and potential Facility Lenders; (d) hereby authorizes Owner to (i) provide this Agreement to potential Facility Lenders (subject to Section 16.4), and (ii) include a description of the material provisions of this Agreement in any offering circular or document required for the Financing and/or, if the Financing must be registered or otherwise disclosed in accordance with applicable Law, that Owner may, after consultation with Contractor, file this Agreement as an Exhibit to such registration statement or other disclosure; (e) at Owner's request, shall reasonably cooperate with the Independent Engineer and any rating agencies or credit enhancement entities associated with a Financing; (f) at Owner's request, shall reasonably cooperate in connection with Tax-exempt financing or any financing or other arrangements effected to reduce Taxes on the Facility or the Work, which cooperation shall not include, or be considered or deemed to be, Tax advice or planning; and (g) shall provide Owner and the Facility Lenders with legal opinions of outside counsel regarding the execution, delivery and validity of this Agreement, absence of conflicts, and the legal status of Contractor as Owner or any Facility Lender may reasonably request in connection with obtaining and maintaining the Financing, provided that Owner shall reimburse Contractor for any third-party expense reasonably incurred in providing such legal opinions.  Within one hundred (100) days after the close of each fiscal year during the Workmanship Warranty Period, Contractor shall provide audited consolidated financial statements to Owner.

## ARTICLE XV

## NOTICES; INFORMATION

15.1    Notices.  Except as set forth in Section 15.2, any notice, statement, demand, claim, offer or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice and shall be sent by hand messenger delivery or overnight courier service, (or facsimile or electronic mail if mutually acceptable procedures are developed) to the other Party at the address set forth below:

If delivered to Owner,                Pullman Solar, LLC
                                      sPower, LLC
                                      2180 South 1300 East, Suite 600
                                      Salt Lake City, Utah 84106
                                      Attn: Will Nielsen


With copy to:                         Pullman Solar, LLC
                                      sPower, LLC
                                      2180 South 1300 East, Suite 600
                                      Salt Lake City, Utah 84106
                                      Attn: General Counsel

DocuSign Envelope ID: C73055B1-EAB9-4EB7-BE41-DF5DD83294A5

If delivered to Contractor,            Borrego Solar Systems, Inc.
                                       1814 Franklin Street, Suite 700
                                       Oakland, CA 94612
                                       Attn: Devin McDonell

Each Party shall have the right to change the place to which notice shall be sent or delivered or to specify one additional address to which copies of notices may be sent, in either case by similar notice sent or delivered in like manner to the other Party. All notices shall be effective upon receipt.

15.2    Technical Communications.  Any technical or other communications pertaining to the Work shall be between Contractor's Project Manager and Owner's Representative or other representatives as agreed by both Parties. Each Party shall notify the other in writing of the names of such representatives.

15.3    Public Announcements.  Contractor shall not make any public announcements regarding this Agreement or the transactions contemplated hereby without Owner's prior written approval, which approval shall not be unreasonably withheld or delayed. Owner shall not make any public announcements regarding this Agreement or the transactions contemplated hereby without Contractor's prior written approval, which approval shall not be unreasonably withheld or delayed.

## ARTICLE XVI

## MISCELLANEOUS

16.1    Entire Agreement.  This Agreement and the documents executed in connection herewith constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede any prior understandings, negotiations, agreements or representations of the Parties of any nature, whether written or oral, to the extent they relate in any way to the subject matter hereof or thereof.

16.2    Waiver.  Any waiver of the provisions of this Agreement must be in writing and shall not be implied by any usage of trade, course of dealing or course of performance. No exercise of any right or remedy by Owner or Contractor constitutes a waiver of any other right or remedy contained or provided by Law. Any delay or failure of a Party to exercise, or any partial exercise of, its rights and remedies under this Agreement shall not operate to limit or otherwise affect such rights or remedies. Any waiver of performance hereunder shall be limited to the specific performance waived and shall not, unless otherwise expressly stated in writing, constitute a continuous waiver or a waiver of future performance.

16.3    Dispute Resolution.

(a)      Management Negotiations.  The Parties shall use all reasonable efforts to settle disputes through negotiation between authorized members of each Party's senior management. Either Party may, by written notice to the other Party, request a meeting to initiate negotiations to be held within five (5) Business Days of the other Party's receipt of such request,

64

DocuSign Envelope ID: 672955B1-FAB9-4EB7-BE4D-DE5DD83394A5

at a mutually agreed time and place.  If the dispute is not resolved within fifteen (15) Business Days of their first meeting, then the dispute shall be submitted to mediation in accordance with <u>Section 16.3(b)</u>.

(b) <u>Mediation</u>.  If any dispute is not resolved by the procedures set forth in <u>Section 16.3(a)</u>, then the Parties shall submit the dispute to mediation before a mutually acceptable mediator.  The mediation shall take place in Salt Lake City, Utah pursuant to the Construction Industry Rules of the American Arbitration Association.  If the dispute is not resolved by the procedures set forth in this <u>Section 16.3(b)</u>, then either Party may pursue any other remedies available to it at law or in equity.

16.4 <u>Confidentiality</u>.

(a) Neither Party (the "<u>Receiving Party</u>") shall use for any purpose other than performing the Work under this Agreement or owning and operating the Facility, divulge, disclose, produce, publish, or permit access to, without the prior written consent of the other Party (the "<u>Disclosing Party</u>"), any confidential information of the Disclosing Party.  Confidential information includes, without limitation, this Agreement, all information or materials prepared in connection with the Work performed under this Agreement or any related subsequent agreement, designs, drawings, specifications, techniques, models, data, documentation, source code, object code, diagrams, flow charts, research, development, processes, procedures, know-how, manufacturing, development or marketing techniques and materials, development or marketing timetables, strategies and development plans, customer, supplier or personnel names and other information related to customers, suppliers or personnel, pricing policies and financial information, and other information of a similar nature, whether or not reduced to writing or other tangible form, and any other trade secrets, in each case where such information or material is clearly marked as confidential or where the Receiving Party reasonably assumes under the circumstances that such information or material is considered confidential information of the Disclosing Party.  The Receiving Party may grant access to such documentation and information to its respective employees and authorized contractors, subcontractors and agents whose access is necessary to fulfill the terms of this Agreement, and who are bound by obligations of confidentiality similar or greater in scope than as provided in this <u>Section 16.4</u>.  Confidential information does not include (a) information known to the Receiving Party prior to obtaining the same from the Disclosing Party; (b) information in the public domain at the time of disclosure by the Receiving Party; or (c) information obtained by the Receiving Party from a third party who did not receive same, directly or indirectly, from the Disclosing Party or otherwise had an unrestricted right to disclose such information.  The Receiving Party shall use the higher of the standard of care that the Receiving Party uses to preserve its own confidential information or a reasonable standard of care to prevent unauthorized use or disclosure of such confidential information.  Notwithstanding anything herein to the contrary, the Receiving Party has the right to disclose confidential information without the prior written consent of the Disclosing Party:  (i) as required by any court or other Governmental Authority, or by any stock exchange the shares of any Party are listed on, (ii) as otherwise required by Law, (iii) as advisable or required in connection with any government or regulatory filings, including without limitation, filings with any regulating authorities covering the relevant financial markets, (iv) to its attorneys, accountants, financial advisors or other agents, in each case bound by confidentiality obligations, (v) to banks, investors, potential investors, financiers, potential financiers, independent engineers and other financing

106910544.22 0081519-00002

sources and their advisors, in each case if the party receiving the confidential information is bound by the same or similar confidentiality obligations, (vi) in connection with an actual or prospective merger or acquisition or similar transaction where the party receiving the confidential information is bound by the same or similar confidentiality obligations; or (vii) to the United States Department of the Treasury or the Internal Revenue Service in connection with Tax incentives, including ITCs. If a Receiving Party believes that it will be compelled by a court or other Governmental Authority to disclose confidential information of the Disclosing Party, it shall give the Disclosing Party prompt written notice so that the Disclosing Party may determine whether to take steps to oppose such disclosure.  Notwithstanding anything to the contrary contained in this Agreement, Contractor may disclose this Agreement, as well as all documents referenced or incorporated herein, to its Subcontractors to the extent necessary for such Subcontractors' performance of their respective portions of the Work covered by this Agreement provided that such Subcontractors are bound by confidentiality obligations.

(b)	The Parties obligations under this Section 16.4 shall terminate on the date that is two years after the earlier to occur of (i) the termination of this Agreement and (b) the expiration of Warranty Period.

16.5	Signage.	Subject to Owner's prior written approval, which shall not be unreasonably withheld, Contractor may erect signage on the Site indicating its role as designer and builder of the Facility.  Contractor may maintain such signage following Final Acceptance for a period as mutually agreed by the Parties and in accordance with applicable Law.  Any such signage shall comply with applicable Legal Requirements and shall not interfere with the operation of the Facility.

16.6	Governing Law.  This Agreement and all claims arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by the Laws of the State of Michigan, without regard to the conflicts of law principles that would result in the application of any Law other than the Law of the State of Michigan.

16.7	Consent to Jurisdiction.  Each of the Parties hereby irrevocably consents and agrees that any legal action or proceedings brought with respect to any dispute arising out of this Agreement shall be brought in, and each Party submits to the jurisdiction and venue of the State and federal courts located in the state and county in which the Facility is located, and by execution and delivery of this Agreement, each of the Parties hereby (i) accepts the non-exclusive jurisdiction of the foregoing courts, (ii) irrevocably agrees to be bound by any final judgment (subject to any appeal) of any such court with respect thereto, and (iii) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of venues of any suit, action or proceedings with respect hereto brought in any such court, and further irrevocably waives to the fullest extent permitted by Law any claim that any such suit, action or proceedings brought in any such court has been brought in an inconvenient forum.  Each of the Parties agrees that a final judgment in any such action or proceeding shall be conclusive (subject to any appeal) and may be enforced in other jurisdictions by suit on the judgment or in any other manner to the extent provided by Law.

16.8	Waiver of Jury Trial.  TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, EACH OF THE PARTIES IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY

DocuSign Envelope ID: 672955B1-EAB9-4EB7-BE4D-DE5DD83394A5

IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

16.9    <u>Time of Performance</u>.  Time is of the essence in the performance of each provision of this Agreement.

16.10    <u>Construction</u>.  This Agreement is to be construed so as to effectuate the normal and reasonable expectations of a sophisticated buyer and seller of the equipment and services covered by this Agreement and shall not be construed either for or against either Party.  No provision of this Agreement shall be construed or interpreted for or against either Party because such Party drafted or caused its legal representative to draft the provision.

16.11    <u>Headings</u>.  The table of contents and section headings contained in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement or affect in any way the meaning or interpretation of this Agreement.

16.12    <u>Status of the Parties</u>.  Contractor and its Subcontractors shall be independent contractors to Owner with respect to the Work, irrespective of whether such Subcontractors are approved by Owner, and neither Contractor nor its Subcontractors, nor the employees or agents of either, shall be deemed to be the employees, representatives or agents of the Owner in connection with any matter relating to this Agreement.  No provision of this Agreement shall be construed or represented as creating a partnership, trust, joint venture, fiduciary or any similar relationship between the Parties.  Contractor shall be responsible for and shall pay all federal, state or local income Taxes, payroll taxes and self-employment Taxes upon the compensation paid for services rendered under this Agreement, and all other similar Taxes.

16.13    <u>Parties in Interest</u>.  Except as provided in <u>ARTICLE X</u> and <u>Section 14.3</u>, nothing in this Agreement, whether express or implied, shall be construed to give any Person, other than the Parties, their respective successors and permitted assigns, the Owner Indemnified Parties and the Contractor Indemnified Parties, any legal or equitable right, remedy, claim or benefit under or in respect of this Agreement.

16.14    <u>Further Assurances</u>. Each Party agrees to execute and deliver all further instruments and documents, and take all further action, as may be reasonably necessary to complete performance by the Parties hereunder and to effectuate the purposes and intent of this Agreement. In particular, Contractor shall cooperate with and provide reasonable assistance to Owner, Facility Lenders and the insurers of the Facility and their independent engineering, environmental, financial, legal, technical and other consultants, officers, employees, representatives and agents, in relation to their due diligence, financial, technical, scientific, engineering, accounting, environmental studies, monitoring, inspections, audits, and the creation and administration of milestone and completion tests that shall test the physical, mechanical, legal, reliability, financial, regulatory and other relevant aspects of completion of the Work and the Facility.

106910544.22 0081519-00002

16.15   <u>Amendments</u>.  Except for a Change Order issued as a directive by Owner pursuant to <u>Section 7.1</u>, no change, amendment or modification of this Agreement shall be valid or binding upon the Parties unless such change, amendment or modification is in writing and duly executed by both Parties.

16.16   <u>Severability</u>.  If any provision of this Agreement is determined to be illegal or unenforceable, such determination will not affect any other provision of this Agreement and all other provisions will remain in full force and effect.

16.17   <u>Conflicting Provisions</u>.  In the event of any conflict between one or more of (i) the Articles, (ii) the Scope of Work, (iii) any other Exhibit, (iv) Contractor's design and engineering drawings and (v) any provision of any Law applicable to the performance of the Work or of any standard, specification, manual or code or of any instruction of any Subcontractor supplying any equipment for the Facility, Contractor shall promptly report such conflict, error, ambiguity or discrepancy to Owner in writing.

16.18   <u>Survival</u>.  The provisions of <u>Section 5.9</u>, <u>ARTICLE VIII</u>, <u>ARTICLE IX</u>, <u>ARTICLE X</u>, <u>ARTICLE XII</u>, <u>Section 14.3</u>, <u>ARTICLE XV</u> and <u>ARTICLE XVI</u> shall survive termination of this Agreement to the extent required for their full performance.

16.19   <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts and delivered by electronic means (including by ".pdf"), each of which when so executed shall be deemed an original, and all of said counterparts taken together shall be deemed to constitute but one and the same instrument.

*Signatures on Next Page*

DocuSign Envelope ID: 672955B1-FAB9-4EB7-BE4D-DE5DD83394A5

      IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

OWNER:                                                       CONTRACTOR:

Pullman Solar, LLC                                   Borrego Solar Systems, Inc.

By: _____              By: *Mark Swanson*

Name: _____              Name: Mark Swanson

Title: _____               Title: COO

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

OWNER:                                        CONTRACTOR:

Pullman Solar, LLC                            Borrego Solar Systems, Inc.

By: _____                  By: _____
Name:  Sean McBride                           Name:
Title:  Authorized Person                     Title:

# EXHIBIT 2

# GUARANTY

THIS GUARANTY (this "Guaranty") is dated December 29, 2020 and is made by sPower, LLC, a Delaware limited liability company ("Guarantor"), for the benefit of Borrego Solar Systems, Inc., a California corporation (the "Beneficiary").

An affiliate of Guarantor, Pullman Solar, LLC, a Delaware limited liability company ("Obligor") and Beneficiary have entered into that certain Solar Power Facility Engineering, Procurement and Construction Agreement dated as of December 29, 2020 (as amended, modified and supplemented from time to time, the "EPC"), which sets forth the terms and conditions for construction of a solar photovoltaic power generating facility. Capitalized terms used but not defined herein have the meanings set forth in the EPC.

As a condition to Beneficiary entering into the EPC, Guarantor must guaranty Obligor's payments under the EPC in accordance with the terms set forth herein.

Guarantor and its affiliates will derive substantial direct and indirect benefits from the transactions contemplated by the EPC including the construction of and the revenue generated by the Facility.

The parties therefore agrees as follows:

1.      **Payment Guarantee.**  Guarantor hereby unconditionally, absolutely and irrevocably guarantees to Beneficiary on behalf of Obligor, the payment when due of (i) all payment obligations of Obligor and Obligor's successors and assigns due under the EPC, and (ii) payment or reimbursement for all costs, charges and expenses (including reasonable attorneys' fees and expenses) incurred in enforcing Beneficiary's rights under this Guaranty ((i) and (ii) collectively are, the "Guaranteed Obligations"); provided that the obligations of Guarantor shall in no event exceed those of Obligor under the EPC.  Any amounts paid by Guarantor shall be made in freely transferable United States currency.

2.      **Guarantee of Payment.** This Guaranty is one of payment and not of collection and shall apply regardless of whether recovery under the EPC may be or become uncollectible or discharged in any bankruptcy, insolvency or other proceeding, or otherwise unenforceable.

3.      **Guarantor's Waivers.**  Guarantor hereby waives notice of acceptance of this Guaranty, notice of transactions entered into between Beneficiary, on the one hand, and Obligor, on the other hand, and any action taken with regard thereto; Guarantor further waives notice of presentment and demand for payment.  Guarantor further waives any and all defenses arising out of bankruptcy, insolvency, dissolution or liquidation of Obligor, and the lack of validity or enforceability of the EPC or any other documents executed in connection with the EPC. Guarantor is entitled to the benefit of and the right to assert any defenses against the claims of Beneficiary or limitations to such payment, performance or discharge, and any rights, remedies, counterclaims, reductions and set-offs which are available to Obligor and which would also have been available to Guarantor if Guarantor had been in the same contractual position as Obligor under the EPC other than (i) defenses arising out of bankruptcy, insolvency, dissolution or

DocuSign Envelope ID: 672955B1-FAB9-4EB7-BE4D-DE5DD83394A5

liquidation of Obligor, (ii) defenses expressly waived in this Guaranty and (iii) defenses previously asserted by Obligor against such claims to the extent such defenses have been finally resolved in Beneficiary's favor. All rights, powers and remedies of  Beneficiary hereunder are in addition to and not in lieu of all other rights, powers and remedies given to Beneficiary, whether at law, in equity or otherwise.

4.      **Beneficiary Rights; EPC Amendment.**  Beneficiary may, before or after termination of this Guaranty, and without notice to or consent of Guarantor, exercise any of its rights against Obligor contained in the EPC including, pursuing any remedies against Obligor.  Guarantor will continue to be subject to this Guaranty notwithstanding any change in the terms of the EPC, including, but not limited to, amendments, modifications, or changes to the Guaranteed Obligations in accordance with the terms and conditions of the EPC.

5.      **Duration.**  This Guaranty is a continuing guaranty and shall (i) remain in full force and effect to the extent the Guaranteed Obligations have not been satisfied in full, (ii) remain in full force and effect without regard to any assignment or transfer by Obligor pursuant to the EPC, (iii) remain in full force and effect without regard to any change in ownership or control of Guarantor or Obligor, (iv) consistent with the terms hereof, apply to all Guaranteed Obligations whenever arising, (v) be binding upon Guarantor, its successors and permitted assigns, and (vi) inure to the benefit of, and be enforceable by, Beneficiary and its successors and assigns.  It is understood and agreed, however, that notwithstanding any termination of this Guaranty, this Guaranty shall continue in full force and effect with respect to payment obligations under the EPC arising prior to the effective date of such termination if a claim has been made by Beneficiary prior to the termination of this Guaranty, but Guarantor shall not be liable for any Guaranteed Obligations which have been fully satisfied or discharged by Obligor.  Guarantor further agrees that this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any obligation under the EPC is rescinded or must otherwise be restored or returned due to bankruptcy or insolvency laws.

6.      **Priority of Guarantee.**  Upon payment of any sum or performance by Guarantor of any Guaranteed Obligation, all rights of Guarantor against Obligor arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full of all the Guaranteed Obligations in accordance with their terms.  Guarantor shall not seek to exercise any right of subrogation, reimbursement or indemnity arising from payments made by Guarantor pursuant hereto until the full and complete payment or performance and discharge of the Guaranteed Obligations in accordance with the terms of this Guaranty.  If any amount shall be paid to the Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of Beneficiary and shall forthwith be paid to Beneficiary to be credited and applied to the Guaranteed Obligations.

7.      **Assignment.**  Neither Guarantor nor Beneficiary may assign their rights nor delegate their obligations under this Guaranty, in whole or in part, without written consent of the other party, and any purported assignment, transfer or delegation absent such consent is void.

2

8.      **Waiver; Amendment.**  The failure of Beneficiary to enforce any of the provisions of this Guaranty at any time or for any period of time shall not be construed to be a waiver of any such provision or the right thereafter to enforce the same.  The terms and provisions hereof may not be waived, altered, modified, or amended except in a writing executed by a duly authorized officer or signatory of Guarantor and Beneficiary.

9.      **Entire Agreement.**  This Guaranty is the entire and only agreement between Guarantor and Beneficiary with respect to the guarantee of Guaranteed Obligations by Guarantor.  All representations, warranties, agreements, or undertakings of Guarantor heretofore or contemporaneously made, which are not set forth herein, are superseded hereby.

10.     **Notices to Guarantor.**  All notices and communications to Guarantor under this Guaranty, until Beneficiary is notified to the contrary by Guarantor in writing, shall be personally delivered, or sent by U.S. mail or overnight delivery, postage prepaid, addressed to Guarantor, as follows:

> sPower, LLC
> 2180 South 1300 East, Suite 600
> Salt Lake City, Utah 84109
> Attn: General Counsel
> Email: smcbride@spower.com and notices@spower.com

(with a copy to, which shall not constitute notice)

> Stoel Rives LLP
> 501 West Broadway, Suite 2000
> San Diego, California 92101
> Attn:  Brian Nese
> Email:  brian.nese@stoel.com

11.     **Notices to Beneficiary.**  All notices and communications to Beneficiary under this Guaranty, until Guarantor is notified to the contrary in writing by Beneficiary, shall be personally delivered, or sent by U.S. mail or overnight delivery, postage prepaid, addressed to Beneficiary, as follows:

> Borrego Solar Systems, Inc.
> 1814 Franklin Street, Suite 700
> Oakland, California 94612
> Email:  LegalNotices@borregosolar.com
> Attn: General Counsel

12.     **Authority.**  Guarantor hereby represents and warrants to Beneficiary that the execution, delivery and performance hereof by it are within its limited liability company powers and have been duly authorized by all necessary limited liability company action and that this Guaranty constitutes its legal, valid and binding obligation; and there are no consents or approvals of any Person which have not already been obtained or the satisfaction or waiver of any conditions

3

DocuSign Envelope ID: 672955B1-FAB9-4EB7-BE4D-DE5DD83394A5

precedent to the effectiveness of this Guaranty that have not been satisfied or waived. This Guaranty constitutes the legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, dissolution, reorganization, moratorium, liquidation or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). Guarantor hereby further represents and warrants to Beneficiary that there are no bankruptcy proceedings pending or being contemplated by Guarantor or, to its knowledge, threatened against it and there are no legal proceedings that would be reasonably likely to materially adversely affect Guarantor's ability to perform its obligations arising under this Guaranty.

13.     **Successors and Assigns.**  Subject to <u>Section 7</u> hereof, this Guaranty and the obligations of Guarantor hereunder shall (i) apply to support the obligations of any transferee or successor of Obligor to which the EPC is assigned or into which Obligor is consolidated, amalgamated, merged or had all or substantially all of its assets transferred, and (ii) remain in effect with regard to any transferee or successor of Beneficiary to which the EPC is assigned or into which Beneficiary is consolidated, amalgamated, merged or had all or substantially all of its assets transferred.

14.     **Guarantor Bankruptcy.**  It shall be a breach of this Guaranty by Guarantor if at any time during the term of this Guaranty (i) Guarantor makes a general assignment or any general arrangements of the benefit of creditors, (ii) Guarantor files a petition or otherwise commences or authorizes the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, (iii) Guarantor has such a petition filed against it and is not discharged within ninety (90) days, (iv) Guarantor is adjudged bankrupt or insolvent, (v) Guarantor has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (vi) Guarantor is generally unable to pay its debts as they fall due and such failure continues unremedied for sixty (60) days.

15.     **Dispute Resolution; Governing Law.**   The provision of Section 16.3 (Dispute Resolution) and Section 16.6 (Governing Law) of the EPC are hereby adopted in to this Guaranty and all obligations of Obligor under said sections shall apply to Guarantor under this Guaranty.

16.     **Taxes.**  All payments made pursuant to this Guaranty shall be made without any deduction or withholding for or on account of any tax imposed upon Beneficiary unless such deduction or withholding is required by the EPC or applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect.  If Guarantor is so required to deduct or withhold any imposed taxes, then Guarantor will (i) pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount of tax required to be deducted or withheld from any additional amount paid or to be paid by Guarantor to Beneficiary) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such an amount has been assessed against Beneficiary, and in any event before penalties attach thereto or interest accrues thereon, (ii) promptly forward to the Beneficiary an official receipt (or certified copy), or other documentation reasonably acceptable to the Beneficiary, evidencing such payment to such authorities and, (iii) in addition to the

payment which Beneficiary is otherwise entitled under this Guaranty, if such withholding is on account of any tax imposed upon Guarantor, pay to Beneficiary such additional amount as is necessary to ensure that the net amount actually received by Beneficiary (free and clear of taxes assessed against Guarantor) will equal the full amount Beneficiary would have received had no such deduction or withholding been required.

17.     **Damages.**   Except as provided in the EPC, none of the parties hereto, nor any of their respective Affiliates, nor their respective representatives shall be liable to any other party hereto in any action for special, punitive, indirect or consequential damages arising out of, resulting from or in connection with the performance or non-performance of this Guaranty, including (but not limited to) loss of profit or business interruptions, howsoever caused and whether or not foreseeable as of the effective date of this Guaranty.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Guarantor, through its duly authorized representative, sets forth its signature as of the date first set forth above.

**SPOWER, LLC**

By: _____
Name: _____
Title: _____

**BORREGO SOLAR SYSTEMS, INC.**

By: *Mark Swanson* _____
Name: Mark Swanson _____
Title: COO _____

IN WITNESS WHEREOF, Guarantor, through its duly authorized representative, sets forth its signature as of the date first set forth above.

**SPOWER, LLC**

By: _____
Name:  Sean McBride
Title:  Secretary & General Counsel

**BORREGO SOLAR SYSTEMS, INC.**

By: _____
Name:  _____
Title:  _____

*[Signature Page to Guaranty (Pullman Solar, LLC)]*

**EXHIBIT 3**

*AES Draft 12/15/22*

### FIRST AMENDMENT TO SOLAR POWER FACILITY
### ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT
(Pullman Solar, LLC)

This First Amendment to Solar Power Facility Engineering Procurement and Construction Agreement (this "Amendment") is dated as of December 28, 2022 and is between Borrego Energy, LLC f/k/a Borrego Solar Systems Inc. ("Contractor"), and Pullman Solar, LLC, a Delaware limited liability company ("Owner").  Owner and Contractor are sometimes referred to herein as a "Party" or, collectively, as the "Parties". Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Agreement (as defined below).

### RECITALS

WHEREAS, Owner and Contractor entered into Solar Power Facility Engineering, Procurement and Construction Agreement, dated as of December 29, 2020, Change Order 1 dated August 30, 2021, Change Order 2 dated March 25, 2022, Change Order 3 dated March 25, 2022, Change Order 4 dated March 25, 2022, Change Order 6 dated July 7, 2022, and Change Order 7 dated October 12, 2022   (the "Agreement"); and

WHEREAS, Owner and Contractor desire to amend the Agreement as follows.

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements hereinafter contained, the Parties hereto do mutually agree as follows:

1.      Amendments.

   i.      Section 4.5(a)(2) of the Agreement is hereby deleted in its entirety and replaced with the following:

      "(2)     Contractor has (i) completed the Performance Tests on the Facility (other than the Capacity Test and Post-Energization Harmonics Measurement Test), and (ii) delivered to Owner results demonstrating that the Facility has passed the Availability Test and any other tests required to be performed under Exhibit B-1 and Exhibit B-2 on or before Substantial Completion;"

   ii.     Section 4.5(a)(9) of the Agreement is hereby deleted in its entirety and replaced with the following:

      "(9) all Delay Damages payable by Contractor have been paid to Owner or the amount of the Contract Price remaining to be paid at Substantial Completion is sufficient to off-set the Delay Damages due and Contractor agrees in writing that such Delay Liquidated Damages may be off-set against the Contract Price remaining to be paid;"

   iii.    Section 4.6(a)(2) of the Agreement is hereby deleted in its entirety and replaced with the following:

"(2)    Contractor has: (i) completed the Capacity Test on the Facility, and either (A) delivered to Owner results demonstrating that the Metered Facility Capacity Ratio is equal to or greater than the Guaranteed Facility Capacity Ratio or (B) delivered to Owner results demonstrating that the Metered Facility Capacity Ratio is equal to or greater than the Minimum Facility Capacity Ratio, and either (x) Contractor has paid in full to Owner all Performance Liquidated Damages or (y) Owner has elected by written notice to Contractor (whether or not Contractor has elected to cure under Section 4.8) to retain an amount of the Contract Price remaining to be paid sufficient to off-set all Performance Liquidated Damages (in which case, subject to Contractor's rights under Section 4.8 to cure, Contractor shall be deemed to have agreed that such damages may be off-set against the Contract Price remaining to be paid) and (ii) completed the Post-Energization Harmonics Measurement Test and delivered to Owner results demonstrating that the Facility has passed the Post-Energization Harmonics Measurement Test;"

iv.    Exhibit K to the Agreement is hereby amended and restated in its entirety by substituting the replacement exhibit attached as <u>Annex A</u> hereto.

v.    Exhibit L to the Agreement is hereby amended and restated in its entirety by substituting the replacement exhibit attached as <u>Annex B</u> hereto.

2.    <u>Force and Effect.</u>  Except as herein expressly changed and amended, the Agreement shall remain and continue in full force and effect in accordance with all of the terms and provisions thereof. This Amendment contains the entire agreement between the Parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, representations, commitments, writings and discussions between them relating to the subject matter expressly addressed in this Amendment.

3.    <u>Severability.</u>  The invalidity or unenforceability of any portion or provision of this Amendment shall in no way affect the validity or enforceability of any other portion or provision hereof.  Any invalid or unenforceable portion or provision shall be deemed severed from this Amendment and the balance of this Amendment shall be construed and enforced as if this Amendment did not contain such invalid or unenforceable portion or provision.  If any such provision of this Amendment is so declared invalid, the Parties shall promptly negotiate in good faith new provisions to eliminate such invalidity and to restore this Amendment as near as possible to its original intent and effect.

4.    <u>Counterparts.</u>  This Amendment may be executed in any number of counterparts, and any Party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Amendment shall become effective when each Party

DocuSign Envelope ID: EE463785-3859-4062-9DCD-082D9EC2A699A

*AES Draft 12/15/22*

shall have received a counterpart by facsimile or electronic mail hereof signed by the other Party.  The Parties agree that the delivery of this Amendment may be effected by means of an exchange of facsimile or emailed signatures with original copies to follow by mail or courier service.

[Signature Page Follows]

*AES Draft 12/15/22*

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed by their respective authorized representatives thereunto duly authorized in multiple counterparts, each of which shall constitute an original.


"OWNER"

PULLMAN SOLAR, LLC


By: *Ron Rodrique*
Name:   Ron Rodrique
Title:       Authorized Representative


"CONTRACTOR"

BORREGO ENERGY, LLC


By: *Brian Barker*
Name: Brian Barker
Its: President, EPC

# EXHIBIT 4

Allegan County Register of Deeds, Doc#2023017143, Liber 4904 Page 20, RELEASE OF LIEN, Recorded 11/21/23 @ 02:24 PM, Page 1 of 2



Allegan County MI Register of Deeds
Bob Genetski, Register of Deeds
Document # 2023017143
OPR LIBER 4904  PAGE  20
Recorded: 11/21/2023 02:24 PM

**CERTIFICATE OF GOOD AND SUFFICIENT BOND
TO VACATE AND DISCHARGE LIEN**

November 21, 2023

Borrego Energy, LLC
1814 Franklin St. #700
Oakland, CA 94612



TAKE NOTICE that a good and sufficient surety bond in the amount of Three Million, Seven Hundred Fifty Six Thousand, Three Hundred Fifty Five Dollars and 46/100 ($3,756,355.46) was filed and accepted in this office by:

Pullman Solar, LLC

As Principal, and by:

United States Fire Insurance Company

as Surety, relating to a claim of lien filed on August 28th, 2023 recorded in Liber 4881, Page 704 with Allegan County Register of Deeds.  Lien pertains to the following described premises:

See Attachment for Legal Description Exhibits A - H

Pursuant to MCL 570.1116, upon the recording of this certificate in the Office of the Register of Deeds where the claim of lien was recorded, the claim of lien of the obligee lien claimant, Borrego Energy, LLC named in the claim of lien shall be discharged.

RECEIVED

'23 NOV 21 PM 2:22

Bob Genetski
Allegan County Clerk & Register of Deeds

CC: Pullman Solar, LLC

Prepared by: Bob Genetski
            113 Chestnut Street
            Allegan, MI 49010



Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 707, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 4 of 11

## EXHIBIT A

<u>Parcel Number</u>:  12-016-008-00

<u>Property Address</u>:

<u>Legal Description</u>:  Land in the Township of Lee, Allegan County, MI, described as follows:

The South 1/2 of the Southeast 1/4 of the Northwest 1/4 of Section 16, Town 1 North Range 15 West.

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 708, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 5 of 11

**EXHIBIT B**

<u>Parcel Number</u>:  12-016-009-00

<u>Property Address</u>:  738 55th St., Pullman, MI

<u>Legal Description</u>:  Land in the Township of Lee, Allegan County, MI, described as follows:

The North One Half of the Southeast Quarter of the Northwest Quarter of Section 16, Town 1, North Range 15 West.

Allegan County Register of Deeds, Doc #2023012443, Liber: 4904 / Page: 21, RELEASE OF LIEN, Recorded:12/11/2023 @ 02:24:14 PM, Pg 6 of 11

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 709, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 6 of 11

## EXHIBIT C

Parcel Number:  12-016-025-00 12-016-003-10

Property Address:  107th Avenue, Pullman, MI

Legal Description:  Land in the Township of Lee, Allegan County, MI, described as follows:

Parcel A:
Part of the Northeast Quarter of Section 16, Town 1 North, Range 15 West, Lee Township, Allegan County, Michigan, being described as: Beginning at the Central Quarter corner of said Section, thence North O 1 degrees 02 minutes 20 seconds West 714.22 feet along the West line of the Northeast Quarter of said Section; thence North 90 degrees 00 minutes 00 seconds East 427.00 feet; thence South 01 degrees 02 minutes 20 seconds East 714.22 feet; thence South 90 degrees 00 minutes 00 seconds West 427.00 feet along the South line of the Northeast Quarter of said Section to the Point of Beginning.
Parcel No: 12-016-003-10

Parcel B
Part of the Southeast Quarter of Section 16, Town 1 North, Range 15 West, Lee Township, Allegan County, Michigan, being described as: Beginning at the Central Quarter corner of said Section, thence North 90 degrees 00 minutes 00 seconds East 983.67 feet along the North line of the Southeast Quarter of said Section; thence South O 1 degrees 25 minutes 23 seconds East 1312.20 feet parallel with the East line of the Northwest Quarter of the Southeast Quarter of said Section; thence North 89 degrees 57 minutes 46 seconds West 986.82 feet along the North line of the South 40 Acres of the West Half of the Southeast Quarter of said Section; thence North 01 degrees 17 minutes 10 seconds West 1311.48 feet along the West line of the Southeast Quarter of said Section to the Point of Beginning.
Parcel No: 12-016-025-00

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 710, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 7 of 11

## EXHIBIT D

Parcel Number:  12-017-005-00

Property Address:  3320 Springhill Drive, Allegan, MI

Legal Description:  Land in the Township of Lee, Allegan County, MI, described as follows:

The South ½ of the North ½ of the Northeast ¼ of Section 17, Town 1 North, Range 15 West except the Pere Marquette Railroad, also except that part lying East of the railroad.

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 711, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 8 of 11

## EXHIBIT E

**Parcel Number**: 12-017-006-00

**Property Address**: 714 56th Street, Pullman

**Legal Description**:   Land in Allegan County described as follows:

THE EAST HALF OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWN 1 NORTH, RANGE 15 WEST; ALSO: THE EAST HALF OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 17, TOWN 1 NORTH, RANGE 15 WEST;

ALSO:
THE WEST HALF OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWN 1 NORTH, RANGE 15 WEST;

ALSO:
THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWN 1 NORTH, RANGE 15 WEST; EXCEPT THE PERE MARQUETTE RAILWAY RIGHT OF WAY, ALL ACCORDING TO .S SURVEY.

ALSO EXCEPTING THEREFROM: THAT PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 17, TOWN 1 NORTH, RANGE 15 WEST, LEE TOWNSHIP, ALLEGAN COUNTY, MICHIGAN DESCRIBED AS BEGINNING AT THE EAST QUARTER POST OF SAID SECTION; THENCE NORTH 00 DEGREES 16 MINUTES 13 SECONDS EAST ON THE EAST SECTION LINE 609.00 FEET; THENCE NORTH 88 DEGREES 53 MINUTES 07 SECONDS WEST PARALLEL TO THE EAST AND WEST QUARTER LINE 251.34 FEET TO THE EAST LINE OF THE C & 0 RAILROAD; THENCE SOUTH 00 DEGREES 50 MINUTES 22 SECONDS EAST ON SAID EAST LINE 609.29 FEET TO THE EAST AND WEST QUARTER LINE; THENCE SOUTH 88 DEGREES 53 MINUTES 07 SECONDS EAST ON SAID QUARTER LINE 239.54 FEET TO THE PLACE OF BEGINNING;

ALSO EXCEPTING THEREFROM: THAT PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 17, TOWN 1, RANGE 15 WEST, LEE TOWNSHIP, ALLEGAN COUNTY, MICHIGAN, DESCRIBED AS COMMENCING AT THE EAST QUARTER CORNER OF SAID SECTION 17; THENCE NORTH 00 DEGREES 16 MINUTES 13 SECONDS EAST ON THE EAST LINE OF SAID SECTION 609.00 FEET TO THE POINT OF BEGINNING OF THE LAND HEREIN DESCRIBED; THENCE NORTH 88 DEGREES 53 MINUTES 07 SECONDS WEST PARALLEL WITH THE EAST & WEST LINE OF SAID SECTION 251.24 FEET TO THE EAST LINE OF THE FORMER PERE MARQUETTE RAILROAD; THENCE NORTH 00 DEGREES 49 MINUTES 46 SECONDS WEST ON SAID EAST LINE 710.85 FEET TO THE NORTH LINE OF THE SOUTH HALF OF THE NORTHEAST QUARTER OF SAID SECTION; THENCE SOUTH 88 DEGREES 49 MINUTES 27 SECONDS EAST ON SAID NORTH LINE 264.88 FEET TO SAID EAST SECTION LINE; THENCE SOUTH 00 DEGREES 16 MINUTES 13 SECONDS WEST ON SAID EAST SECTION LINE 710.24 FEET TO THE POINT OF BEGINNING;

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 712, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 9 of 11

## EXHIBIT F

Parcel Number:  12-017-006-20

Property Address:  714 56th Street, Pullman, MI

Legal Description:  Land in the Township of Lee, Allegan County, Michigan described as follows:

THAT PART OF THE SOUTH 1/2 OF THE NORTHEAST 1/4 OF SECTION 17, TOWN 1 NORTH, RANGE 15 WEST, LEE TOWNSHIP, ALLEGAN COUNTY, MICHIGAN DESCRIBED AS: COMMENCING AT THE EAST 1/4 CORNER OF SAID SECTION 17; THENCE NORTH 00 DEGREES 16 MINUTES 13 SECONDS EAST ON THE EAST LINE OF SAID SECTION 609.00 TO THE POINT OF BEGINNING OF THE LAND HEREIN DESCRIBED, THENCE NORTH 88 DEGREES 53 MINUTES 07 SECONDS WEST PARALLEL WITH THE EAST AND WEST 1/4 LINE OF SAID SECTION 251.24 FEET TO THE EAST LINE OF THE FORMER PERE MARQUETTE RAILROAD; THENCE NORTH 00 DEGREES 49 MINUTES 46 SECONDS WEST ON SAID EAST LINE 710.85 FEET TO THE NORTH LINE OF THE SOUTH 1/2 OF THE NORTHEAST 1/4 OF SAID SECTION; THENCE SOUTH 88 DEGREES 49 MINUTES 27 SECONDS EAST ON SAID NORTH LINE 264.88 FEET TO SAID EAST SECTION LINE; THENCE SOUTH 00 DEGREES, 16 MINUTES 13 SECONDS WEST ON SAID EAST SECTION LINE 710.24 FEET TO THE POINT OF BEGINNING.

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 713, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 10 of 11

**EXHIBIT G**

<u>Parcel Numbers</u>: 12-017-027-10 and 12-017-027-00

<u>Property Address</u>: 5638 107th Ave., Pullman, MI

<u>Legal Description</u>:  Land situated in the County of Allegan, Township of Lee, State of Michigan described as follows:

Parcel 1:
A parcel of land located in the Northeast 1/4 of the Southeast 1/4 of Section 17, Town I North, Range 15 West, Lee Township, Allegan County, Michigan, being more particularly described as follows:
Commencing at the East 1/4 post of Section 17, Town 1 North, Range 15 West, Lee Township, Allegan County, Michigan; thence West along the East and West 1/4 line of said Section 17,339.15 feet to the Westerly right of way line of the C&O_ Railroad and the point of beginning; thence South 1 degrees 57 minutes 01 seconds East along said railroad right of way, 877.09 feet; thence North 89 degrees 59 minutes 21 seconds West parallel with the South 1/4, 1/4 line of said Section 17, 293.36 feet; thence South 00 degrees 46 minutes 35 seconds East parallel with the East I /4, I /4 line of said Section 17, 65.00 feet; thence North 89 degrees 59 minutes 21 seconds West parallel with said South 1/4, 1/4 line, 81.00 feet; thence South 00 degrees 46 minutes 35 seconds East parallel with said East 1/4, 1/4 line, 210.00 feet to a point 165.00 feet North of said South 1/4, 1/4 line; thence North 89 degrees 59 minutes 21 seconds West parallel with said East 1/4, 1/4 line, 610.47 feet to said East 1/4, 1/4 line; thence North 00 degrees 46 minutes 35 seconds West along said East 1/4, 1/4 line, 1151.48 feet to the East and West 1/4 line of said Section 17; thence East along said East and West 1/4 line 966.86 feet to the point of beginning.
Parcel No: 12-017-027-10

Parcel 2:
The Northeast quarter of the Southeast quarter of Section 17, Township I North, Range 15 West, lying West of the Railroad, Except for the South 165 feet thereof;
Also Except, A parcel of land located in the Northeast 1/4 of the Southeast 1/4 of Section 17, Town I North, Range 15 West, Lee Township, Allegan County, Michigan, being more particularly described as follows: Commencing at the East 1/4 post of Section 17, Town 1 North, Range 15 West, Lee Township, Allegan County, Michigan; thence West along the East and West 1/4 line of said Section 17, 339.15 feet to the Westerly right of way line of the C & 0 Railroad and the point of beginning; thence South I degree 57 minutes 0 I second East along said railroad right of way, 877.09 feet; thence North 89 degrees 59 minutes 21 seconds West parallel with the South 1/4, 1/4 line of said Section 17, 293.36 feet; thence South 00 degrees 46 minutes 35 seconds East parallel with the East 1/4, 1/4 line of said Section 17, 65.00 feet; thence North 89 degrees 59 minutes 21 seconds West parallel with said South 1/4, 1/4 line, 81.00 feet; thence South 00 degrees 46 minutes 35 seconds East parallel with said East 1/4, 1/4 line, 210.00 feet to a point 165.00 feet North of said South 1/4, 1/4 line; thence North 89 degrees 59 minutes 21 seconds West parallel with said South 1/4, 1/4 610.47 feet to said East 1/4, 1/4 line; thence North 00 degrees 46 minutes 35 seconds West along the East 1/4, 1/4 line, 1151.48 feet to the East and West ¼ line of said Section 17; thence East along said East and West 1/4 line 966.86 feet to the point of beginning.
Parcel No: 12-017-027-00

Allegan County Register of Deeds, Doc #2023007743, Liber 4504 / Page: 28, RELEASE OF LIEN, Recorded:07/11/2023 @ 02:44:44 PM, Pg 2 of 2

Allegan County Register of Deeds, Doc #2023012378, Liber: 4881 / Page: 714, LIEN, Recorded:08/28/2023 @ 03:03:54 PM, Pg 11 of 11

# EXHIBIT H

<u>Parcel Number</u>:  12-016-007-00

<u>Property Address</u>:  755 56th Street, Pullman, MI

<u>Legal Description</u>:  Land in the Township of Lee, Allegan, County Michigan, described as follows:

The West Half of the Northwest Quarter of Section 16, Town 1, Range 15 West, Lee Township, Allegan County, Michigan;

Except the North 466.75 feet of the East 933.50 feet thereof;

Also Except the South 1127.90 feet of the West Half of the Northeast Quarter of said section.